**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMES OWENS; VICTORIA J. SPIERS;
GARY ROBERT OWENS; BARBARA
GOFF; FRANK B. PRESSLEY, JR.;
YASEMIN B. PRESSLEY; DAVID A.
PRESSLEY; THOMAS C. PRESSLEY;
MICHAEL F. PRESSLEY; BERK F.
PRESSLEY; JON B. PRESSLEY; MARC. Y.
PRESSLEY; SUNDUS BUYUK; MONTINE
BOWEN; FRANK PRESSLEY, SR.; BAHAR
BUYUK; SERPIL BUYUK; TULAY
BUYUK; AHMET BUYUK; DOROTHY
WILLARD; ELLEN MARIE BOMER;
DONALD BOMER; MICHAEL JAMES
CORMIER; ANDREW JOHN WILLIAM
CORMIER; ALEXANDRA RAIN
CORMIER; PATRICIA FEORE; CLYDE M.
HIRN; ALICE M. HIRN; PATRICIA K.
FAST; INEZ P. HIRN; JOYCE REED;
WORKLEY LEE REED; CHERYL L.
BLOOD; BRET W. REED; RUTH ANN
WHITESIDE; LORIE GULICK; PAM
WILLIAMS; FLOSSIE VARNEY; LYDIA
SPARKS; HOWARD SPARKS; TABITHA
CARTER; HOWARD SPARKS, JR.;
MICHAEL RAY SPARKS; GARY O.
SPIERS; VICTORIA Q. SPIERS; JULITA A.
QUALICIO; JUDITH ABASI MWILA;
DONTE AKILI MWAIPAPE; DONTI AKILI
MWAIPAPE; VICTORIA DONTI
MWAIPAPE; ELISHA DONTI MWAIPAPE;
JOSEPH DONTI MWAIPAPE; DEBORA
DONTI MWAIPAPE; NKO DONTI
MWAIPAPE; MONICA AKILI; AKILI
MUSUPAPE; VALENTINE MATHEW
KATUNDA; ABELLA VALENTINE
KATUNDA; VENANT VALENTINE
MATHEW KATUNDA; DESIDERY
VALENTINE MATHEW KATUNDA;
VEIDIANA VALENTINE KATUNDA;
DIANA VALENTINE KATUNDA; EDWINE
VALENTINE MATHEW KATUNDA;
ANGELINA MATHEW FELIX; EDWARD
MATHEW RUTAHESHELWA; ELIZABETH
MATHEW RUTAHESHELWA; ANGELINA

20 CV 02648

Civil Action No.

**FILED UNDER SEAL**

**COMPLAINT**

**JURY TRIAL DEMAND**

RECEIVED 2020 MAR 27 PH 2:10 US DISTRICT COURT SDNY

CONFIDENTIAL

MATHEW RUTAHESHELWA; HAPPINESS
MATHEW RUTAHESHELWA; ERIC
MATHEW RUTAHESHELWA; ENOC
MATHEW RUTAHESHELWA; ANGELINA
MATHEW-FERIX; MATHEW-FERIX;
SAMUEL THOMAS MARCUS; CECILIA
SAMUEL MARCUS; CORONELLA
SAMUEL MARCUS; HANUNI
RAMADHANI NDANGE; SHABANI SAIDI
MTULYA; ADABETH SAID NANG'OKO;
KULWA RAMADHANI; RIZWAN
KHALIQ; JENNY CHRISTIANA
LOVBLOM; IMRAN KHALIQ; TEHSIN
KHALIQ; KAMRAN KHALIQ; IMTIAZ
BEDUM; IRFAN KHALIQ; YASIR AZIZ;
NAURIN KHALIQ; KENNETH SPENCER,
JR.; SAMUEL P. RICE; STEVEN JOSEPH
DIAZ; ESTATE OF DAVID BROWN;
ESTATE OF JESSE JAMES ELLISON;
ROBERT SWORD; STEVEN SIBILLE;
FRANCES SPENCER; ESTATE OF
KENNETH SPENCER, SR.; AMY
MORROW; KAREN BROWN; KRIS
BOERGER; SAMUEL O. RICE; BELINDA
RICE; AMY COGSWELL; DAVID RICE;
TODD RICE; VALERIE TRAIL; DANIEL
RICE; LISA SCHULTZ; STEVEN JAMES
DIAZ; JANE ASTRID DIAZ; ROBERT
DIAZ; TERESA DIAZ; MAGDALENA
MARY DIAZ; RAUL DIAZ; EDWARD
DIAZ; ESTATE OF DANIEL P. DIAZ;
CARMELLA WOOD; PATSY MCENTIRE;
LEWIS BROWN; LISA MAYBIN; RONNY
BROWN; CYNTHIA BURT; ESTATE OF
THERISA EDWARDS; ESTATE OF
ANDRES ALVARADO MIRBAL; ESTATE
OF NERIDA TULL BAEZ; ESTATE OF
MARGARET O'BRIEN; MITCHELL
ANDERSON; ESTATE OF VIRGINIA
ELLISON; ESTATE OF KENNETH
ELLISON; KIMBERLY CARLSON; GARY
CARLSON; DANIEL CARLSON; WILLIAM
CARLSON; PENNY NELSON; BEULAH
SWORD; WILLIAM SWORD; JOHN
SWORD; JERRY SWORD; CAROLINE
BROADWINE; ESTATE OF VERIAN

SIBILLE; ESTATE OF VICTOR SIBILLE,
JR.; VICTOR SIBILLE IV; KEVIN SIBILLE;
VALERIE UNKEL; PAMELA SCHULTZ;
STEPHANIE HARDY; MARY JANE
HOWELL; RONALD HOWELL; DONNA
BLACK; MARIO H. VASQUEZ; DENNY
WEST; THE ESTATE OF JOHN CHIPURA;
EILEEN CHIPURA; NANCY CHIPURA;
GERARD CHIPURA; SUSAN COHEN;
ESTATE OF ROSCOE HAMILTON; FREDA
SUE GAYHEART; RAMONA GREEN;
ROBERT HAMILTON; JAMES EDWARDS;
RAY EDWARDS; BETTY SUE ROWE;
GARY EDWARDS; RALPH EDWARDS;
ESTATE OF LARRY EDWARDS; ESTATE
OF DAVID WORLEY; NANCY WORLEY;
DAVID WORLEY; BRYAN WORLEY;
ESTATE OF JOHN BUCKMASTER;
ESTHER BUCKMASTER; GREGG
BUCKMASTER; VICKIE BUCKMASTER;
ARLEY BUCKMASTER; ESTATE OF
MALKA ROTH; FRIMET ROTH; PESIA
ROTH; RIVKA ROTH RAPPAPORT; ZVI
ROTH; SHAYA ROTH; PINCHAS ROTH;
ESTATE OF JACOB FRITZ; NOALA
FRITZ; ESTATE OF LYLE FRITZ; ETHAN
FRITZ; DANIEL FRITZ; ESTATE OF
BRYAN CHISM; ELIZABETH CHISM;
DANNY CHISM; VANESSA CHISM; JULIE
CHISM; ESTATE OF SHAWN FALTER;
LINDA FALTER; MARJORIE FALTER;
ESTATE OF RUSSELL J. FALTER;
RUSSELL C. FALTER; ANDREW LUCAS;
DAVID LUCAS; TIMOTHY LUCAS;
MARSHA NOVAK; JASON SACKETT;
JOHN SACKETT; ESTATE OF AHMED AL-
TAIE; HATHAL K. TAIE; KOUSAY AL-
TAIE; AND NAWAL AL-TAIE,

                    Plaintiffs,

        v.

TURKIYE HALK BANKASI A.S., a/k/a
"HALKBANK,"

                Defendants.

## INTRODUCTION

1.      The Islamic Republic of Iran—working arm-in-arm with Halkbank and others—has engaged in a highly calculated campaign to evade detection of its capital and asset flows into and out of the U.S. financial markets.  Iran's evasion of U.S. sanctions was orchestrated through the transfer of billions of dollars' worth of funds to Halkbank in bad faith, with the expectation that Halkbank would then disguise Iranian oil proceeds by transferring them on to other participants in Iran's fraudulent scheme in the hope of evading U.S. sanctions.  The transfers at issue were made while Plaintiffs—the victims of acts of terrorism sponsored by Iran—were litigating their claims against Iran.  Plaintiffs' judgments, totaling nearly $2 billion, have never been satisfied by Iran.

2.      Iran made the transfers with knowledge of Plaintiffs' lawsuits and with the intent of circumventing judgments in those cases and U.S. laws designed to capture Iranian funds, after which those funds are subject to attachment and seizure by Plaintiffs and other victims of Iranian-sponsored terrorism.

3.      Iran is the world's leading sponsor of terrorism and an unrepentant judgment debtor.  It owes almost $2 billion to the Plaintiffs, all of whom are victims of terrorism and their families, whose lives were forever altered by the 1998 al Qaeda bombings on the U.S. embassies in Tanzania and Kenya (the "Embassy Bombings"), the 1983 Hezbollah bombing of U.S. Marine barracks in Beirut, Lebanon (the "Beirut Bombing"), the 2001 Hamas bombing of a restaurant in Jerusalem, Israel (the "Jerusalem Bombing"), and the 2006 and 2007 kidnapping and murders of four U.S. service-members on deployment in Iraq (the "Iraq Abductions and Murders").  The men, women and children killed and injured during these terrorist attacks included American heroes—men and women stationed abroad in the U.S. military and Foreign Service, or local employees

1

working at U.S. embassies—and a fifteen-year old U.S. citizen. When the bombs were detonated and murders carried out in Tanzania, Kenya, Beirut, Jerusalem, and Iraq, their bodies and futures were shattered, resulting in indelible physical, emotional and psychological devastation.

4.      The U.S. District Court for the District of Columbia (the "D.C. District Court") has determined on multiple occasions that Iran is liable to these victims for their suffering.

5.      After prolonged litigation, the D.C. District Court determined in 2011 that al Qaeda could not have carried out the Embassy Bombings without Iran's support and sponsorship, and that the "[s]upport from Iran and Hezbollah" in particular "was critical to al Qaeda's execution of the 1998 embassy bombings." As a result of Iran's sponsorship of al Qaeda's terrorism, the court held Iran liable to Plaintiffs for $957,201,851.13 in 2014. But in the 6 years since the court issued judgments against Iran, despite dogged pursuit by its judgment creditors, Iran has not paid one dime towards the judgments.

6.      In 2014, the D.C. District Court similarly determined that Hezbollah received massive support from Iran in carrying out the Beirut Bombing and that the "formation and emergence of Hezbollah as a major terrorist organization," in the first place was "due to the government of Iran." The Court determined that Iran should "be punished to the fullest extent legally possible for the bombing in Beirut," and awarded Plaintiffs judgments totaling $713,693,592.44. Iran has yet to pay a penny of these judgments.

7.      One year later, in 2015, the D.C. District Court determined that Iran was liable to the family and estate for the death of a fifteen-year-old U.S. citizen who was one of the many victims of the Jerusalem Bombing. The Court specifically found that the attack was a "clear" consequence of Iran's provision of "material support of Hamas' terrorist activities." The D.C.

2

District Court entered judgment against Iran in the total amount of $131,191,019, but has yet to pay any amount towards satisfying it.

8.    That same year, the families and estates of the U.S. service members that were abducted and murdered by the Asaib Ahl al-Haq terrorist organization while serving in Iraq initiated a lawsuit against Iran to hold it accountable for those deaths. The D.C. District Court once again found that Iran provided the terrorist organization with material support—support that constituted a "necessary ingredient" "in the chain of events that culminated in the injuries and deaths of" the four U.S. soldiers. Accordingly, the Court found Iran liable to the Plaintiffs for damages and awarded a judgment of $248,948,689. But, Iran has not even attempted to satisfy its debt to these Plaintiffs.

9.    Iran remains one of the world's biggest economies, with its gross domestic product amounting to over $1 trillion, billions of which pass through the international financial markets, including the U.S. financial markets, each year. If detected in the U.S. financial system, however, Iran's assets would have been frozen in the United States and could be used to satisfy Plaintiffs almost $2 billion judgments. Having litigated against U.S. judgment creditors—who have sought for decades to enforce their judgments for Iran's support of terrorism resulting in their injuries— Iran was well-aware of the danger that its funds would be seized by judgment creditors such as Plaintiffs unless elaborate subterfuge was successfully employed.

10.    To evade detection—and its debts to terror victims like the Plaintiffs—Halkbank and Iran developed a fraudulent conveyance scheme involving highly complex, fraudulent transactions that mask the flow of Iranian capital (and oil proceeds in particular) into and out of the U.S. financial markets, and the New York banking system. Through these fraudulent transactions, Iran transferred, or caused to be transferred, its funds to Halkbank with the

understanding that Halkbank would then willingly and knowingly execute subsequent transfers for the benefit of both Halkbank and Iran, including transfers reclassifying the assets as belonging to private individuals or shell companies within Halkbank. Once the assets had been disguised by Halkbank, the bank directed the assets in response to "instructions" from Iran that Halkbank itself designed in order to implement Iran's money laundering goals, allowing it to transfer Iranian assets into and out of the U.S. financial system without detection. None of these transfers were made in good faith.

11.     This ornate and carefully calculated deception allowed billions of dollars of Iranian assets to be fraudulently conveyed to Halkbank and then transferred onwards into the United States without risk of execution by Plaintiffs. Between 2012 and 2016, $1 billion in Iranian assets is estimated to have been fraudulently funneled by Halkbank through the United States pursuant to this scheme. Not only did this allow Iran to evade its debts to Plaintiffs, but it also allowed Iran to circumvent entirely the U.S. Iranian sanctions regime, which was designed and implemented specifically to exclude Iran from the U.S. financial system and capital markets. Indeed, in order to successfully execute this fraud, Halkbank intentionally deceived the United States government, federal agency officials, and countless victim banks on behalf of Iran.

12.     Each transfer to Halkbank was a fraudulent conveyance designed to allow Iran to evade its judgment creditors. These transactions resulted in asset and capital transfers that were not exchanged for equivalent value. In addition, each transaction was effectuated without a good faith basis for the transaction, since each was specifically intended to evade or circumvent Iran's obligations under U.S. law.

13.     Iran's fraudulent conveyances cannot stand under New York law. Iran was a defendant in multiple lawsuits that ultimately resulted in judgments totaling nearly $2 billion in

4

favor of Plaintiffs when Iran schemed to funnel assets in partnership with Halkbank into the United States without detection by Plaintiffs. The fraudulent transfers and conveyances must be undone, and the assets turned over to Plaintiffs, to compensate these long-suffering victims of terrorism in compliance with New York law.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs seek relief under federal law, namely the Terrorism Risk Insurance Act ("TRIA"). Plaintiffs' lawsuit necessarily raises issues of federal law, including Plaintiffs' entitlement to relief under TRIA. In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(11) because this action is a mass action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), involving monetary relief claims of over 100 plaintiffs that are proposed to be tried jointly on the ground that the claims involve common questions of law and fact.

15.     This Court has personal jurisdiction over Halkbank pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which permits this Court to exercise personal jurisdiction to the extent allowed by New York statutes. New York's C.P.L.R. § 302 provides jurisdiction over Halkbank because it transacted business in New York by maintaining correspondent accounts at U.S. financial institutions located in New York. Further, Halkbank knowingly initiated transactions to be completed in U.S. dollars routed through New York-based correspondent accounts of its agents and fellow participants, to complete its fraudulent scheme, as directed by Iran. This Court also has personal jurisdiction over Halkbank under C.P.L.R. § 302(a)(1) because Halkbank executed its scheme through its agents, Suleyman Aslan, Mehmet Hakan Atilla, and Reza Zarrab, each of

5

whom purposefully directed their actions to the U.S. financial system, including financial institutions in New York.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York.

## THE PARTIES

17.     Plaintiffs are 252 individuals who are direct victims and surviving family members of the Embassy Bombings, Beirut Bombing, Jerusalem Bombing, and two related attacks on U.S.-service members serving in Iraq—all attacks carried out with the critical material support of the Iranian government.

18.     Plaintiffs include U.S. foreign service officers and Tanzanian nationals who were employed by the U.S. embassies and on duty during the Embassy Bombings; U.S. service members deployed in Iraq and Beirut; and the family members of a fifteen-year-old U.S. citizen killed by a terrorist attack while out to eat in Jerusalem. These individuals, and their family members, have suffered severe physical and psychological injuries, including loss of life, loss of limbs, permanent disabilities, physiological trauma, and devastating and debilitating emotional distress.

19.     Defendant Halkbank is a foreign financial institution organized under the laws of, and headquartered in, Turkey. The Turkey Wealth Fund, which serves as Turkey's sovereign fund, owns 51% of Halkbank.[1]  Halkbank utilizes correspondent bank accounts all over the world, including the United States through accounts in New York, so that its customers "can make payments to any country in the world."[2]

---

[1] *See Portfolio*, Turkey Wealth Fund, https://www.nytimes.com/2019/10/15/us/politics/halkbank-turkey-iran-indictment.html.

[2] *See FAQ*, Halkbank Belgrade, http://www.halkbank.rs/faq-en.nspx.

20.    At the end of 2018, Halkbank reported assets of more than $64 billion, including legal reserves in excess of $316 million and extraordinary reserves exceeding $3.1 billion. Halkbank's net operating income for 2018 was more than $461 million, averaging over $1.26 million per day.

21.    Halkbank is currently under indictment in this judicial district for activities relating to Plaintiffs' allegations, namely for its role in a multi-year scheme with Iran to directly and indirectly use front companies in Iran, Turkey, the United Arab Emirates, and elsewhere, to violate and evade U.S. prohibitions against Iran's access to the U.S. financial system, restrictions on the use of proceeds of Iranian oil and gas sales, and restrictions on the supply of gold to the government of Iran and Iranian entities.[3]

## FACTUAL ALLEGATIONS

### I.    Iran Owes Nearly $2 Billion To Plaintiffs

#### A.    *The Embassy Bombings*

22.    In 1998, al Qaeda carried out the Embassy Bombings, which were simultaneous suicide bombings on the U.S. embassies in Dar es Salaam, Tanzania and Nairobi, Kenya.

23.    Iran and the Republic of Sudan, which is not a party to this action, deliberately provided material support to al Qaeda's planning, recruitment, and training activities to help it carry out the Embassy Bombings.

24.    During the Embassy Bombings, 224 people were killed and more than 5,000 were wounded, including the 133 Plaintiffs in this action.[4]

---

[3] *See generally United States v. Halkbank*, No. 15-867 (S.D.N.Y.).

[4] *See   1998   Embassy   Bombings   Fast   Facts*,   CNN   (Aug.   13,   2019),
https://www.cnn.com/2013/10/06/world/africa/africa-embassy-bombings-fast-facts/index.html.

### B.     The Embassy Bombings D.C. District Court Action

25.     On October 26, 2001, James Owens brought suit against Iran pursuant to 28 U.S.C. § 1605 of the Foreign Sovereign Immunities Act ("FSIA") for its role in the Embassy Bombings.[5] The *Owens* Suit added additional plaintiffs over time, ultimately including sixty-three (63) plaintiffs seeking justice from Iran and the Republic of Sudan.  On March 5, 2003, the *Owens* plaintiffs successfully completed service of process on Iran.[6]  Iran was thus on notice in 2003 of the *Owens* plaintiffs' action against it.  Iran failed to respond, and defaulted later that year.[7]

26.     Two suits followed.  On August 7, 2008, the Estate of Judith Abasi Mwila, who was murdered in the Embassy Bombings, filed suit along with over fifty (50) plaintiffs,[8] and on March 5, 2010, Rizwan Khaliq filed suit along with eight (8) other individuals.[9]  Iran knew that the *Mwila* and *Khaliq* plaintiffs had initiated lawsuits against it because the *Mwila* and *Khaliq* plaintiffs served process on Iran on September 8, 2009, and October 11, 2010, respectively.[10]  Iran also failed to respond to these actions, and a default judgment was entered against it on February 18, 2010 in the *Mwila* action, and on December 22, 2010 in the *Khaliq* action.[11]  All of the Plaintiffs named in the *Owens*, *Mwila*, and *Khaliq* cases are Plaintiffs in this Action.

27.     In accordance with the FSIA, the D.C. District Court held a consolidated "three-day hearing on liability and damages," during which Plaintiffs from all three actions independently

---

[5]   *See generally Owens v. Republic of Sudan*, No. 01-2244 (D.D.C.) ("*Owens* Suit").

[6]   *Owens* Suit Dkt. 10.

[7]   *Owens* Suit Dkt. 11.

[8]   *See Mwila v. The Islamic Republic of Iran*, No. 08-1377 (D.D.C.) ("*Mwila* Suit"), Dkt. 88.

[9]   *See generally Khaliq v. Republic of Sudan*, No. 10-356 (D.D.C.) ("*Khaliq* Suit"), Dkt. 40.

[10]   *Mwila* Suit Dkt. 16; *Khaliq* Suit Dkt. 20.

[11]   *Mwila* Suit Dkt. 20; *Khaliq* Suit Dkt. 21.

"established their claims 'by evidence satisfactory to the court.'"[12]  Based on the record before it, the D.C. District Court found Iran "liable for damages suffered by the plaintiffs" because the country "provided material aid and support to al Qaeda [operatives]."[13]  *See Owens*, 826 F. Supp. 2d at 135.  Specifically, "[t]he Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al Qaeda and rendered direct assistance to al Qaeda operatives."  *Id.*  That "[s]upport from Iran and Hezbollah," the D.C. District Court concluded, "was critical to al Qaeda's execution of the 1998 embassy bombings."  *Id.* at 139.

28.     The court then referred the cases to special masters to calculate damages.  Based on their calculations, the court awarded $487,687,665.78 to the *Owens* plaintiffs; $49,761,544.86 to the *Khaliq* plaintiffs; and $419,752,640.49 to the *Mwila* plaintiffs.[14]  Iran knew about the *Khaliq* and *Mwila* judgments because notice of the judgments was served on Iran, in accordance with the FSIA, on August 19, 2014.  Iran also knew about the *Owens* judgment because notice was served on Iran, in accordance with the FSIA, on June 9, 2015.

29.     Iran is jointly and severally liable for the entire amount of the judgments, but has not paid one cent to satisfy them.  The judgments presently remain wholly unsatisfied.

30.     On June 12, 2019, the *Owens* plaintiffs, *Mwila* plaintiffs, and *Khaliq* plaintiffs registered their judgments in the United States District Court for the Southern District of New York.  *See Owens v. Sudan*, No. 19-288 (S.D.N.Y. June 12, 2019); *Mwila v. Iran*, No. 19-290 (S.D.N.Y. June 12, 2019); *Khaliq v. Sudan*, No. 19-289 (S.D.N.Y. June 12, 2019).

---

[12]  *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 134-35 (D.D.C. 2011) (quoting 28 U.S.C. § 1608(e)).

[13]  *Id.* at 139.

[14]  *See Owens* Suit Dkt. 303; *Khaliq* Suit Dkt. 42; *Mwila* Suit Dkt. 91

### C.    *The Beirut Bombing*

31.    In 1983, Hezbollah bombed the U.S. Marine barracks in Beirut, Lebanon.

32.    Iran was determined to have had involvement in the attack.

33.    The Beirut Bombing killed 241 U.S. servicemen and wounded many others, including Plaintiffs and their family members in this action.[15]

### D.    *The Beirut Bombing D.C. District Court Actions*

34.    On January 10, 2012, lead-plaintiff Kenneth S. Spencer, Jr., individually and as the representative of the Estate of Kenneth S. Spencer, Sr., and over sixty (60) other plaintiffs brought a suit against Iran pursuant to 28 U.S.C. § 1605A of the FSIA, seeking justice from Iran for its role in the Beirut Bombing.[16]   Within that same year, on November 7, 2012, the *Spencer* plaintiffs served process on Iran.[17]   Iran failed to respond, and therefore defaulted in January 2013, and default judgment was entered against it on June 27, 2013.[18]

35.    The case was referred to a special master for determination of plaintiffs' damages under 28 U.S.C. § 1605A(c).[19]   The D.C. District Court adopted the special master's report and recommendation regarding damages and found that Iran was "responsible for plaintiffs' injuries and thus liable under the FSIA's state-sponsored terrorism exception" and "must be punished to the fullest extent legally possible for the bombing in Beirut on October 23, 1983." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014).   The Court also "applaud[ed] plaintiffs' persistent efforts to hold Iran accountable for its cowardly support of terrorism." *Id.*

---

[15] *See Beirut Marine Barracks Bombing Fast Facts*, CNN (Nov. 13, 2019), https://www.cnn.com/2013/06/13/world/meast/beirut-marine-barracks-bombing-fast-facts/index.html.

[16] *See generally Spencer v. Islamic Republic of Iran*, No. 12-42 (D.D.C.) ("*Spencer* Suit").

[17] *Spencer* Suit Dkt. 23.

[18] *Spencer* Suit Dkts. 24, 31, 34.

[19] *Spencer* Suit Dkt. 34.

36.     The Court awarded a judgment against Iran and for all of the *Spencer* plaintiffs, aside from Willard Howell, totaling $453,596,509.44. *Id.* Iran knew about the *Spencer* judgment because notice of the judgment was served on Iran, in accordance with FSIA, on December 22, 2015.[20]

37.     On February 5, 2020, the *Spencer* plaintiffs registered their judgment in the United States District Court for the Southern District of New York. *See Spencer v. Iran*, No. 20-69 (S.D.N.Y. Feb. 5, 2020).

38.     On December 28, 2012 a similar suit was filed by lead-plaintiff Nancy Worley, on behalf of herself and as the representative of the Estate of David Edward Worley, and thirty-one (31) other plaintiffs—all victims of the 1983 bombing in Beirut and their families.[21] Iran knew that the *Worley* plaintiffs had initiated an action against it because the *Worley* plaintiffs served process on Iran on July 31, 2013.[22] Iran also failed to respond to this action, and default judgment was entered against it on December 8, 2014 on behalf of a majority of the plaintiffs in the *Worley* action.[23]

39.     In the *Worley* Suit, the D.C. District Court found that "'Hezbollah and its agents received massive material and technical support from the Iranian government' in carrying out the Beirut attack and that the 'formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran.'" *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 321 (D.D.C. 2014). After the D.C. District Court entered judgment in favor of plaintiffs and against

---

[20] *Spencer* Suit Dkt. 59.

[21] *See generally Worley v. Islamic Republic of Iran*, Case No. 12-02069 (D.D.C) ("*Worley* Suit").

[22] *Worley* Suit Dkt. 17.

[23] *Worley* Suit Dkt. 32.

Iran with respect to liability, it referred the action to a special master for consideration of plaintiffs' claims for damages under 28 U.S.C. § 1605A(c).[24]

40.     The D.C. District Court adopted the special master's report and recommendation regarding damages and awarded a judgment of $260,097,083 to the *Worley* plaintiffs on April 18, 2016.[25]  After copies of the judgment were mailed to the U.S. Department of State, Director of Overseas Citizens Services, pursuant to FSIA, on December 6, 2019, the D.C. District Court granted the *Worley* plaintiffs' request to proceed with service of the judgment on Iran through diplomatic channels.[26]

41.     Plaintiffs in this action include all of the plaintiffs named in the *Spencer* and *Worley* cases, except for Willard Howell (*Spencer* Suit), Jeff Dadich, Ollie James Edwards, Patricia Ulakovich, Karen Contrillo, the Estate of Richard Morrow, and the Estate of Jane Chipura (*Worley* Suit).

42.     Iran is jointly and severally liable for the entire amount of the *Spencer* and *Worley* judgments, but has not paid one cent to satisfy them.  The judgments presently remain wholly unsatisfied.

### E.     *The Jerusalem Bombing*

43.     In August 2001, a bomb was detonated at a Sbarro restaurant in Jerusalem, Israel on behalf of the militant Islamic group, Hamas.[27]

---

[24] *Worley* Suit Dkts. 32, 33.

[25] *Worley* Suit Dkt. 74.

[26] *Worley* Suit Dkts. 84, 86, 87.

[27] *Suicide bombing at the Sbarro pizzeria in Jerusalem*, Israel Ministry of Foreign Affairs, https://mfa.gov.il/MFA/MFA-Archive/2000/Pages/Suicide%20bombing%20at%20the%20Sbarro%20pizzeria%20in%20Jerusale.aspx; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015).

44.    Iran and Syria, not a party to this action, provided Hamas with support and encouragement to carry out the Jerusalem attack.

45.    The attack killed fifteen people, including 15-year-old U.S. citizen Malka Roth, and injured approximately 130 more.[28]

### F.    The Jerusalem Bombing D.C. District Court Action

46.    On July 28, 2011 nine (9) members of the Roth family, including representatives of their estate, filed a suit against Iran pursuant to 28 U.S.C. § 1605 of the FSIA, seeking damages for the injuries and death of Malka Roth.[29]  Several months later, on September 16, 2012, the *Roth* plaintiffs served process on Iran.[30]  Iran was therefore on notice in 2012 of the *Roth* plaintiffs' claims against it.  Iran failed to respond, and as a result, the clerk of the D.C. District Court entered default judgment was against it on April 21, 2014.[31]

47.    On January 27, 2015, the D.C. District Court granted the *Roth* plaintiffs' (except for Elisheva Roth) motion for default judgment on their claim for damages.[32]  The Court found that Malka Roth's death and the pain and suffering her family experienced as a result were "consequences [that] were 'reasonably certain' to occur as a result of [Iran's] material support of Hamas' terrorist activities."  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 404 (D.D.C. 2015).

---

[28]  *Id.*

[29]  *See generally Roth v. Islamic Republic of Iran*, Case No. 11-1377 (D.D.C.) ("*Roth* Suit").

[30]  *Roth* Suit Dkt. 19.

[31]  *Roth* Suit Dkt. 24.

[32]  *Roth* Suit Dkt. 43.

48.     On January 27, 2015, the D.C. District Court entered judgment against Iran in the total amount of $131,191,019.[33]  On information and belief, Iran knew about the *Roth* judgment because delivery of the notice of judgment was attempted on October 20, 2015, but the Iranian Ministry of Foreign Affairs refused its acceptance.[34]

49.     Iran is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it.  The judgment presently remains wholly unsatisfied.

50.     Plaintiffs in this action include all of the plaintiffs named in the *Roth* case except for except for Arnold Roth and Elisheva Roth.

### G.     *The Iraq Abductions and Murders*

51.     In October 2006 and January 2007, four U.S. soldiers were abducted and murdered while serving in Iraq.[35]  Those soldiers were U.S. service-members Ahmed Al-Taie, who was abducted in Baghdad, Iraq, and Jacob Fritz, Johnathan Chism, and Shawn Falter, who were all abducted from Karbala, Iraq.

52.     The two incidents of murder and kidnapping were carried out by the Asaib Ahl al-Haq ("AAH") terrorist organization, which is a network of Iraqi Shia militias that relied on training, funding, and support from Iran.[36]

### H.     *The Iraq Abductions and Murders D.C. District Court Action*

53.     On March 30, 2015, a group of twenty-six (26) plaintiffs comprised of the estates and family members of the four kidnapping and murder victims brought a suit against Iran under

---

[33] *Roth* Suit Dkt. 43.

[34] *Roth* Suit Dkt. 48.

[35] *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 55 (D.D.C. 2018).

[36] *Id.*

28 U.S.C. § 1605 of the FSIA for its role in those crimes.[37]  The *Fritz* plaintiffs served process on Iran on January 31, 2017.[38]  Iran failed to respond.

54.    The D.C. District Court ordered default judgment against Iran on August 2, 2018 and appointed a special master to hear the damages claims of the plaintiffs.  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 92 (D.D.C. 2018).[39]  The court found that "Iran provided AAH with material support" for the kidnappings and murders, including training, intelligence, and "essential" financial support, and "[t]he support that Iran provided to AAH was not only a 'substantial factor' in the chain of events that culminated in the injuries and deaths of Fritz, Chism, Falter, and Al-Taie, it was a necessary ingredient."  *Id.* at 84–86; *see also Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 58 (D.D.C. 2018).

55.    The D.C. District Court adopted the special master's damages recommendations and entered partial final judgment against Iran in the total amount of $248,948,689.[40]  Iran knew about the *Fritz* judgment because notice of the judgment was served on Iran, in accordance with the FSIA, on December 6, 2018.[41]

56.    Iran is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it.  The judgment presently remains wholly unsatisfied.

57.    Plaintiffs in this action include all of the plaintiffs named in the *Fritz* case except Bashar Al-Taie.

---

[37]  *See generally Fritz v. Islamic Republic of Iran*, Case No. 15-456 (D.D.C.) ("*Fritz* Suit").

[38]  *Fritz* Suit Dkt. 19.

[39]  *See also Fritz* Suit Dkt. 90.

[40]  *Fritz* Suit Dkt. 94.

[41]  *Fritz* Suit Dkt. 106.

58.    Plaintiffs have sought for years to compel Iran to satisfy their respective judgments, but Iran has successfully evaded pursuit from Plaintiffs and the many other victims of terrorism to whom it is liable under U.S. law.  Its success in evading its judgment creditors would not have been possible without its complex schemes with Halkbank.

**II.    To Avoid Paying Its Debts, Iran Has Disguised Its Involvement In The U.S. Financial Markets**

59.    Plaintiffs are entitled to execute on Iranian assets in the United States under both federal and New York law in order to satisfy their judgments.  Their ability to do so, however, turns on their ability to locate Iranian assets within the United States, which have been intentionally obfuscated by Iran and Halkbank in order to avoid detection.

*A.    Plaintiffs Are Entitled To Execute On Iranian Assets Located In The United States*

60.    Federal Rule 69(a) of the Federal Rules of Civil Procedure allows Plaintiffs to employ New York's judgment enforcement procedures except to the extent federal law applies.

61.    New York law permits a judgment creditor to seek a turnover order requiring (1) a "person in possession or custody of money . . . in which the judgment debtor has an interest," or (2) a "person who is a transferee of money . . . from the judgment debtor" to pay that money to the judgment creditor, "or so much of it as is sufficient to satisfy the judgment." C.P.L.R § 5225.

62.    The FSIA also enables Plaintiffs to execute on Iranian assets in the United States where the assets are "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). In fact, because Plaintiffs are the victims of terrorist acts, the FSIA allows Plaintiffs to execute on not only Iran's property, but also property owned by any of its agencies or instrumentalities. *See* 28 U.S.C. § 1610(g).

63.    In addition, TRIA enables Plaintiffs—who have "obtained a judgment against a terrorist party on a claim based on an act of terrorism"—to execute or attach in the aid of execution

16

"the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) . . . in order to satisfy such judgment." TRIA § 201(a), Pub. L. 107-297, 116 Stat. 2322, 2340 (Nov. 26, 2002).

64.     Plaintiffs are entitled to execute against Iran's assets under each of these provisions, including those assets held by or controlled by Halkbank.  The assets that Iran and Halkbank funneled into and out of the U.S. financial system all belong to Iran or its agencies, instrumentalities and alter egos, including the National Iranian Oil Company ("NIOC"), the National Iranian Gas Company ("NIGC"), or the Central Bank of Iran—each of which is liable for Iran's terrorism judgments as a matter of federal law.  Once the Iranian assets were secreted into New York, they were used for commercial purposes, including effectuating U.S. dollar-denominated transactions.  And had they been detected as assets of Iran or its agents and instrumentalities—as they would have absent Halkbank's efforts to obscure Iran's role in initiating the transfers and the larger fraudulent scheme—they could have been executed upon by Plaintiffs because they would have been blocked in U.S. bank accounts in accordance with the sanctions regime under federal law.

### B.     To Evade Plaintiffs, Iran And Halkbank Also Had To Circumvent The U.S. Sanctions Regime

65.     Long after Plaintiffs initiated their legal actions against Iran, the U.S. government began issuing sanctions that grew increasingly restrictive to isolate and penalize Iran for its refusal to comply with international obligations regarding its nuclear program. These measures had their intended effect—by the end of 2012, Iran's economy was in a free-fall with its currency falling to 40% of its value,[42] and Iran's oil wealth was tied up in accounts that it could barely use.  It is

---

[42] *Sanctions push Iran into recession: IFF*, Reuters (Dec. 10, 2012) https://www.reuters.com/article/us-iran-sanctions-economy/sanctions-push-iran-into-recession-iif-idUSBRE8B90OF20121210;  T. Erdbrink, *Iran's*

estimated that over $120 billion in Iran's wealth was effectively frozen around the world, including at least $20 billion at Halkbank.[43]

66.    Among the U.S. sanctions imposed during this time were sanctions that focused on financial transactions involving Iranian oil proceeds (the "Oil Sanctions") and targeted precious metals (the "Gold Sanctions"). Such sanctions are effective because oil transactions in particular are typically priced and conducted in U.S. dollars—because of the dollar's role as the global reserve currency.

67.    In particular, in December 2011, the U.S. government imposed restrictions on government-owned foreign financial institutions that facilitated or conducted transactions for the sale or purchase of petroleum or petroleum products to or from Iran, unless the foreign country significantly reduced its volume of petroleum and petroleum products purchased from Iran. *See* National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(d)(1)-(4), 125 Stat. 1298, 1647-48 (Dec. 31, 2011). These early sanctions were extended in July 2012 to impose sanctions on foreign financial institutions that knowingly conducted or facilitated any significant financial transaction with NIOC or the Central Bank of Iran—entities that transferred funds manipulated by Halkbank. *See* Exec. Order No. 13622, 77 Fed. Reg. 45,897, 45,899 (Aug. 2, 2012). The Oil Sanctions were further tightened in February 2013 to require that Iranian oil proceeds held in Turkey be used only for bilateral trade—that is, to buy Turkish commodities for export to Iran. 22 U.S.C. § 8513a(d)(4)(D)(ii).

---

*President Ties Recent Drop in Currency to U.S.-Led Sanctions*, N.Y. Times (Oct. 2, 2012) https://www.nytimes.com/2012/10/03/world/middleeast/iran-president-mahmoud-ahmadinejad-ties-currency-drop-to-sanctions.html.

[43]  Kenneth Katzman, Cong. Research Serv., RS20871, *Iran Sanctions* (2020), https://fas.org/sgp/crs/mideast/RS20871.pdf.

68.     The Gold Sanctions prohibited materially assisting the purchase or acquisition of precious metals by the government of Iran, including banks and businesses owned by the government. *See* 77 Fed. Reg. at 45,899.  Effective July 1, 2013, any person determined to have participated in the sale, supply, or transfer of gold or other precious metals to or from Iran—whether or not determined to be the government of Iran—would also have property and interests in property in the United States blocked.  *See* 22 U.S.C. § 8804(a)(1)(A).

69.     If a foreign financial institution violated these restrictions, the United States could prohibit that entity's ability to open or maintain correspondent accounts in the United States, effectively shutting the bank out of the U.S. financial system.  *See* 22 U.S.C. § 8804(c); 77 Fed. Reg. at 45,897.

70.     In addition, if funds were transferred to or from Iran or its agencies or instrumentalities, those funds would be blocked by U.S. banks in compliance with the U.S. sanctions regime, which could again subject them to seizure by Plaintiffs to satisfy their judgments.

### *C.     Halkbank Designed Iran's Fraud On Plaintiffs And The U.S. Financial System*

71.     As a result of these sanctions, Iran knew that its oil proceeds would be restricted the moment they were received.  As a result, Iran sought a foreign financial institution that would disguise its asset flows into and out of the United States to help the country engage in prohibited financial transactions, and partnered with Halkbank.  Halkbank willfully and knowingly joined forces with Iran to carefully design, participate in, and benefit from two fraudulent schemes that from start to finish would evade Plaintiffs' lawsuits, and subsequent judgments, through extensive and calculated fraud on U.S. financial institutions.  Iran and Halkbank implemented both schemes by transferring billions of dollars of oil sale proceeds to Halkbank for the purpose of enabling Iran to extract those oil revenues held at Halkbank in violation of U.S. sanctions.  The transfers were made to Halkbank as part of the scheme to enable the government of Iran and Iranian entities to

19

make international payments throughout the world, including through the U.S. financial system, without execution, or even detection, by Plaintiffs.  Halkbank's participation was especially important as few major international banks would willingly volunteer to break U.S. sanctions law. Halkbank earned substantial commissions in fees and revenues for its knowing participation in the scheme to receive transfers from Iran and then transfers those assets on in disguised form.

### 1.    The Gold Export Scheme

72.    By or around early 2012, NIOC, the Central Bank of Iran, and other Iranian entities had transferred billions of dollars' worth of Iranian oil proceeds into accounts at Halkbank.

73.    During the summer of 2012, Halkbank, acting through senior management, designed the "Gold Export Scheme" in order to use the Iranian oil proceeds transferred to Halkbank in foreign transactions.  In particular, the bank's senior management devised a scheme whereby its agents would use funds transferred to Halkbank from Iran to purchase gold in Turkey, carry that gold to Dubai, sell it for cash, and use that cash in all kinds of foreign payments for Iran.

74.    In the fall of 2012, an intermediary acting for Halkbank named Reza Zarrab arranged meetings between Iranian government officials, Iranian bank executives, and Halkbank senior management at Halkbank's offices in Istanbul, Turkey to discuss the scheme.  In particular, in October 2012, Halkbank senior management, Zarrab, and a representative of an Iranian private bank met with Mahmoud Nikousokhan, the then-finance director of NIOC and other Iranian oil officials.[44]  The participants discussed, among other things, ways to boost the amount of Iranian

---

[44] Under Executive Order 13382 and the Weapons of Mass Destruction Non-Proliferation Sanctions Regulations, 31 C.F.R. § 544, Mahmoud Nikousokhan, the then-NIOC finance director and a director of Petro Suisse Intertrade Company SA, had been designated a Specially Designated National, or "SDN."  *See* U.S. Department of the Treasury Press Center, *Treasury Announces New Sanctions Against Iran*, (May 23, 2013) https://www.treasury.gov/press-center/press-releases/Pages/jl1955.aspx.

oil proceeds held at Halkbank and to bring other Iranian oil money currently held at other banks in other countries into Halkbank.

75.    While welcoming increased transfers of new oil proceeds, Halkbank advised against the latter request to move in old oil proceeds, explaining that evading sanctions required Halkbank to execute the scheme the way Halkbank designed it—by internally transferring the Iranian oil proceeds to other accounts at Halkbank in the name of private Iranian banks, and then internally transferring the funds once again to yet more accounts at Halkbank in the name of shell companies controlled by intermediaries like Zarrab.[45]  To outsiders, Halkbank would effectively remove Iran from the equation by virtue of this scheme, which allowed Halkbank to take control over the funds by placing them in the hands of Halkbank intermediaries like Zarrab to be used and transferred pursuant to instructions designed by Halkbank.  As a result, Iranian oil proceeds originated as "Government of Iran oil" money, for example, transformed into "private Iranian bank" money, and ended up as "Reza Zarrab" money (or as money of other Halkbank intermediaries).

76.    Once in the hands of Halkbank's intermediaries, the front companies would buy gold to export from Turkey.  Zarrab and his carriers would physically transport the gold to Dubai, but all of the customs documents, which were created with Halkbank's assistance, would show the final destination as Iran, transiting through Dubai.  Halkbank specifically instructed its intermediaries to place Iran as the intended location on custom forms, maintaining control over the funds once they were in the intermediary's hands.

---

[45]  Halkbank ultimately agreed to accept foreign payments for Iranian oil, but only on the condition that the arrangement not be leaked to the public because of concerns about questions from U.S. regulators.

77.     But after being exported from Turkey, the gold never made it to Iran.  Rather, pursuant to the scheme agreed to between Halkbank and Iran, the gold would be converted into cash or currency and used to conduct international financial transactions around the world, including in the U.S. financial system.  The transactions were executed according to money orders from the government of Iran and Iranian entities, such as NIOC and the Central Bank of Iran.  The money orders would indicate the intended beneficiary of the transaction, the amount necessary to complete the transaction, and the currency needed for the transaction.

78.     In sum, the Gold Export Scheme operated as follows:

a.      NIOC sold oil to Turkish companies, and at Iran's direction the Turkish companies made payments of the money owed to NIOC into accounts at Halkbank maintained for the benefit of Iran.

b.      Consistent with Halkbank's design of the fraudulent scheme, NIOC would then send a money order for an intra-Halkbank transfer to accounts at Halkbank held by private Iranian banks, such as Sarmayeh Bank.  This transfer served to begin the process of freeing the oil proceeds from sanctions.

c.      The money order from NIOC, drafted pursuant to instructions from personnel at Halkbank, would contain payment instructions to the private Iranian banks, detailing the ultimate recipient of the money, the final destination bank, the currency, and the account information.

d.      The private Iranian bank, having received NIOC's "instructions" in the form dictated by Halkbank, would send a wire instruction that an equivalent amount be transferred from the private Iranian bank's account at Halkbank to a purportedly

non-Iranian intermediary account held by shell companies, also at Halkbank. This transaction was documented in the instructions as a transaction for gold.

e.    An intermediary, often Zarrab, would then use the monies transferred to the shell companies' Halkbank accounts to transfer the funds to another Turkish bank, where the monies were then used to purchase gold in Turkey.

f.    The intermediary would then export the gold to Dubai, where it was sold for cash.

g.    The cash received was then deposited at another intermediary account in a bank in Dubai. Those funds would then be transferred to Dubai-based exchange houses for purposes of conducting international transactions, including in U.S. dollar-denominated transactions funneled through U.S. correspondent accounts.

h.    Iran directed the intermediary in Dubai, through a prior money order sent to the private Iranian bank, to make payments from the Dubai-based exchanges according to whatever payments it desired to make, and in what currency denomination.

79.    Between approximately December 2012 and October 2013 alone, the government of Iran and the Iranian entities that held accounts at Halkbank directed more than $900 million in such transactions to be conducted by U.S. financial institutions through correspondent accounts maintained in the United States.

### 2.    The Fake Food Scheme

80.    In February 2013, the United States imposed sanctions that imposed a "bilateral trade" restriction on Iranian oil proceeds. This required that the proceeds of Iranian oil sales made to Turkey be deposited into accounts in Turkey and be used only for trade between Turkey and Iran.

81.    Worried that U.S. regulators would learn of Halkbank's exchange of Iranian oil proceeds for gold to be exported out of Turkey, Iran and Halkbank created a new scheme to

23

fraudulently convey Iranian oil proceeds and deploy those proceeds to make international payments for Iran. Between April 9 and 10, 2013, Halkbank senior management and Iranian government banking and oil officials, including Nikousokhan, NIOC's then-finance director, discussed the design of a new scheme through which Iran would continue to transfer, or cause to be transferred, funds to Halkbank and Halkbank would continue to execute multiple transfers of Iranian oil proceeds, yet falsely represent that the purpose of those transfers was to sell food to Iran. This scheme closely followed the Gold Export Scheme—the Fake Food Scheme entailed numerous transfers within Halkbank of the Iranian oil proceeds transferred to it before Halkbank transferred the funds to intermediary shell companies controlled by intermediaries, including Zarrab. The primary difference came in the documentation. Halkbank manipulated these transactions to falsely represent that they involved a sale of food to Iran when in fact no food was actually sold at all. While nominally submitted by Halkbank intermediaries, it was Halkbank officials who controlled the content of the transfer documents.

82.    Once these payments were in the hands of Zarrab-controlled accounts, or accounts controlled by other Halkbank intermediaries, the funds would then be used to make international payments for the benefit of Iran, including through the U.S. financial system. These international transactions were carried out in the same way as the Gold Export Scheme detailed above.

83.    Altogether, U.S. financial institutions unwittingly exported funds and financial services in the amount of at least approximately $1 billion for Iran in violation of U.S. sanctions laws as a result of Iran and Halkbank's execution of these fraudulent schemes.

### 3.    Iran's Accounts At Halkbank Were Held In The Names Of The Iranian Government's Agencies, Instrumentalities, or Alter Egos

84.    The proceeds of Iran's sale of oil and gas transferred to Halkbank were initially transferred into accounts in the names of NIOC, the Central Bank of Iran, and NIGC. Because, as

a matter of fact and law, NIOC, the Central Bank of Iran, and the NIGC are arms of the Iranian government, any assets held by or traced to these entities are also subject to execution in the United States to satisfy Plaintiffs' judgments.

85.     NIOC is an Iranian oil company entirely owned by the government of Iran, through the Ministry of Petroleum, and is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.[46] Despite its corporate existence, NIOC expressly identifies itself as a "government agency," rather than a separate and independent entity.[47]

86.     The U.S. government agrees, classifying NIOC as part of the government of Iran. On February 5, 2012, the President signed Executive Order 13,599 to implement the 2012 NDAA to block all property and interests in the property of the government of Iran.  77 Fed. Reg. 6,659. Pursuant to that Executive Order, OFAC officially identified NIOC as the government of Iran.[48]

87.     In addition, on September 24, 2012, OFAC submitted a letter to Congress explaining that OFAC had concluded NIOC to be an agent or affiliate of Iran's Islamic Revolutionary Guard Corps ("IRGC"), itself a part of the Iranian military and thus the Iranian government.[49] OFAC noted that "IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.  Recently, the IRGC has been coordinating a new campaign to sell Iranian oil, in order to evade international

---

[46]  Letter from the A. Szubin, Director of U.S. Department of Treasury Office of Foreign Assets Control, to Congress, at   1   (Sept.   24,   2012),   https://www.treasury.gov/resource-center/sanctions/Programs/Documents/report_to_congress_09242012.pdf.

[47]  *National Iranian Oil Company*, LinkedIn, https://www.linkedin.com/company/national-iranian-oil-company/about/ (last visited Mar. 8, 2020).

[48]  *OFAC FAQs: Iran Sanctions*, Resource Center, United States Department of the Treasury https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_iran.aspx#eo13599 (last visited Mar. 7, 2020).

[49]  Letter from the A. Szubin to Congress, at 1.

sanctions."[50] OFAC explained that the "IRGC's influence has grown within NIOC," pointing to how Iran's parliament had appointed Rostam Qasemia, a Brigadier General in the IRGC, as Minister of Petroleum, who had publicly stated his allegiance to the IRGC in his new role as the Minister of Petroleum.[51]

88.    Thus, NIOC is an arm of the government of Iran and should be considered the state itself. At a minimum, it serves as an agency or instrumentality of Iran. NIOC is not a citizen of a state of the United States, and it was created under the laws of Iran.

89.    Alternatively, NIOC is an alter ego of Iran's government. It is a corporate entity that is wholly owned by Iran. Iran formed NIOC "after [the] nationalization of the Iranian oil industry" in the 1950s.[52] It operates as the flagship of the four main "national companies" that constitute Iran's Ministry of Petroleum, which "implement[s] the major polices of the Islamic Republic in the oil and gas sectors including producing, developing, planning, and supervising all operations in both [the] upstream and downstream oil industry."[53] The Ministry of Petroleum, officially "intended to monitor NIOC, has actually developed a symbiotic relationship in which the two are intertwined and nearly indistinguishable."[54] For example, the Minister of Petroleum appoints the CEO of NIOC, who then serves the government of Iran as a Deputy Minister of

---

[50]  *Id.*

[51]  *Id.*

[52]  *National      Iranian      Oil      Company*,      The      Islamic      Republic      of      Iran, https://en.mop.ir/portal/home/?generaltext/4012/4187/165282/National-Iranian-Oil-Company-(NIOC)      (last visited Mar. 8, 2020).

[53]  *Ministry of Petroleum of Iran*, LinkedIn, https://www.linkedin.com/company/ministry-of-petroleum-of-iran/about/ (last visited Mar. 8, 2020).

[54]  Daniel Brumberg and Ariel Ahram, *The Natl. Iranian Oil Co. In Iranian Politics*, Baker Inst. for Pub. Policy, at 26 (Mar. 2017), https://www.bakerinstitute.org/media/files/page/99dcb050/noc_nioc_brumberg_ahram.pdf.

Petroleum.[55]  These cross-appointments create a feedback loop, breaking down any meaningful distinction between the Ministry and NIOC.  The government of Iran strictly controls the Ministry of Petroleum and NIOC:  Iran's Supreme Leader sets the Ministry's agenda, and the Ministry of Petroleum is a member of the Supreme Energy Council, which is chaired by the President of Iran.[56] As a result of this control, the Ministry of Petroleum acts as a mouthpiece for NIOC, tweeting press releases when important developments occur, and NIOC acts as a mouthpiece for the Ministry of Petroleum, discussing general news related to the Ministry negotiations, OPEC meetings, and development projects in Iran.  What is more, Iran underwrites NIOC's debts and it is the government that allocates NIOC's budget through legislation.[57]

90.    Furthermore, Iran uses NIOC to achieve Iran's energy, social and political objectives.  Sharing the same priorities as the Ministry of Petroleum, NIOC's agenda includes "national and regional policies."[58]  For example, the Ministry's "Vision" was announced in its "6th Development Plan and Ministry of Petroleum Policies to Realize Objectives of Vision Plan, Resilient Economy, etc." and that development plan contained detailed directives covering the minutiae of the oil industry, including many changes that would impact NIOC and noting explicitly

---

[55] *Organizational Chart of the Ministry of Petroleum*, The Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165294/Organizational-Chart-of-the-Ministry-of-Petroleum (last visited Mar. 8, 2020).

[56] *See Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background; *see also General Policies Instructed by Supreme Leader Ayatollah Ali Khamenei for Oil & Gas Sector*, the Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165568/General-Policies-Instructed-by-Supreme-Leader-Ayatollah-Ali-Khamenei-for-Oil--Gas-Sector (last visited Mar. 8, 2020).

[57] Daniel Brumberg and Ariel Ahram, *The Natl. Iranian Oil Co. In Iranian Politics*, at 2.

[58] *National Iranian Oil Company*, The Islamic Republic of Iran Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165282/National-Iranian-Oil-Company-(NIOC)    (last visited Mar. 8, 2020).

that a key goal is to "[i]ncrease NIOC's share of revenue from joint oil and gas fields' output."[59] This is because Iran relies on NIOC's profits—"NIOC must sell in the international market to generate revenue for the Iranian national treasury. The state can then use these funds as it sees fit."[60] NIOC, moreover, has also directly administered a significant program subsidizing domestic consumption of fuel for the entire country.[61]

91.     Outside of the energy sector, NIOC has remitted funds to the national treasury for government spending on social programs, such as education and food subsidies,[62] and to the defense and state police, awarding contracts to a construction and development wing of the IRGC.[63] For another example, during the Iran-Iraq war, "NIOC offices were used as fronts to circumvent the Western arms embargo, essentially bartering oil for weapons."[64]

92.     Iran, moreover, uses NIOC to protect "the country's oil wealth from foreign interference"[65] by controlling the type of contracts that NIOC may enter into with foreign companies.[66]

93.     The Central Bank of Iran was also a nominal owner of the Iranian oil proceeds held at Halkbank. The Central Bank of Iran is also wholly owned by the government of Iran. It

---

[59] *Vision*,      The      Islamic      Republic      of      Iran      Ministry      of      Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165639/Vision (last visited Mar. 24, 2020).

[60] Daniel Brumberg and Ariel Ahram, at 4.

[61] *Id.* at 22-23.

[62] *Id.* at 24.; *see also* D. Victor, D. Hults, & M. Thurber, *Oil, monarch, revolution, and theocracy: a study on the National Iranian Oil Company* in *Oil and Governance State-Owned Enterprises and the World Energy Supply*, at 248, Cambridge University Press (Dec. 31, 2011).

[63] D. Victor, D. Hults, & M. Thurber, *Oil, monarch, revolution, and theocracy*, at 256.

[64] Daniel Brumberg and Ariel Ahram, at 18-19.

[65] *Id.* at 257.

[66] *See Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background.

describes itself as "banker to the government."[67]  Moreover, the Central Bank of Iran is "mandated to keep government accounts, grant loans and credits to state enterprises and agencies."[68]

94.     The U.S. government has also identified the Central Bank of Iran as part of the government of Iran.  On February 5, 2012, the President signed Executive Order 13,599 to implement the 2012 NDAA to "block[]" "all property and interests in property of the Government of Iran, *including the Central Bank of Iran*."  Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 8, 2012) (emphasis added).  Thus, unlike most central banks around the world, the Central Bank of Iran is deemed to be part and parcel with the Iranian government under U.S. law.

95.     The Central Bank is thus an arm of the government of Iran and should be considered the state itself.  At a minimum, the Central Bank of Iran is an agency or instrumentality of Iran. The Central Bank of Iran is not a citizen of a state of the United States, and it was created under the laws of Iran.  Indeed, the U.S. government has identified the Central Bank of Iran as "an agency, instrumentality and controlled entity of the government of Iran for all purposes."  31 C.F.R. § 535.433.

96.     Alternatively, the Central Bank of Iran is an alter ego of the government.  It is a corporate entity that is wholly owned by Iran.  The government of Iran established the Central Bank of Iran in 1960 with Iran's first Monetary and Banking Act "to issue currency and serve as the government's banker."[69]  Indeed, the government of Iran exercises day-to-day control over the Central Bank.  The Iranian General Assembly, which oversees the operations of Central Bank, is

---

[67] *General Information*, Central Bank of the Islamic Republic of Iran, https://www.cbi.ir/page/GeneralInformation.aspx (last visited Mar. 12, 2020).

[68] *Id.*

[69] R. Zahedi and P. Azadi, *Central Banking in Iran*, Stanford Iran 2040 Project, at 6, (June 2018) https://iranian-studies.stanford.edu/sites/g/files/sbiybj6191/f/publications/central_banking_in_iran.pdf.

composed of the President of Iran, the Minister of Economic Affairs, Head of the State Management and Planning Organization, Minister of Industry, Mine and Trade, and one more minister to be selected by the Council of Ministers.[70]  The Governor and Deputy Governor of the Central Bank of Iran is nominated by the President, confirmed by the General Assembly, and appointed by the President.[71]  In short, "the appointment and removal of [the Central Bank of Iran's] governors have been based solely on the discretion of the government."[72]

97.    Iran uses the Central Bank of Iran to achieve Iran's own economic and political goals.  Unlike a typical central bank, the Central Bank of Iran "can neither independently set monetary policy goals nor conduct monetary policy."[73]  Instead, the Central Bank of Iran "chronically serve[s] as a quasi-fiscal arm to finance the unsustainable policies of different [Iranian] governments while simply overlooking its primary task of ensuring price stability."[74]

98.    Further, the General Assembly considers and approves the balance sheet of the Central Bank of Iran and the recommended appropriation of the net profit.[75]

99.    In exercising that control, the government of Iran has used the Central Bank of Iran to further its military, rather than just Iran's economy, by moving "millions of dollars through banks to support the Quds Force and Hizballah."[76]  The Quds Force, "IRGC's extra-territorial branch responsible for supporting proxies in the region," "engage[s] in large-scale illicit financing

---

[70] *Organization*, Central Bank of the Islamic Republic of Iran, https://www.cbi.ir/organization/16147.aspx (last visited Mar. 12, 2020).

[71] *Id.*

[72] R. Zahedi and P. Azadi, *Central Banking in Iran*, at 14.

[73] *Id.*

[74] *Id.*

[75] *Organization*, Central Bank of the Islamic Republic of Iran.

[76] Iran Action Group, U.S. Department of State, *Outlaw Regime: A Chronicle of Iran's Destructive Activities*, at 5, https://www.state.gov/wp-content/uploads/2018/12/Iran-Report.pdf.

schemes to fund its malign activities."[77] These schemes are "facilitated at the highest levels of Iran's government, including through the Central Bank of Iran."[78] For example, in May 2018, the U.S. Treasury revealed that the Central Bank of Iran's Governor and the Assistant Director of the Central Bank's international department conspired with the Quds Force "to conceal the movement of illicit funds to its terrorist proxy, Hizballah."[79]

100.   NIGC, an Iranian gas company, is also wholly owned by the government of Iran, through the Ministry of Petroleum.  As one of the "key state-owned enterprises," NIGC supplies "more than 70 percent of total energy in the country" and "controls natural gas downstream activities" to "process, deliver, and distribute natural gas for domestic use."[80]

101.   Thus, NIGC is an arm of the government of Iran and should be considered the state itself.  At a minimum, it serves as an agency or instrumentality of Iran.  And, NIGC is not a citizen of a state of the United States, and it was created under the laws of Iran.

102.   Alternatively, NIGC is an alter ego of Iran's government.  It is a corporate entity that is wholly owned by Iran.  Iran created NIGC in 1965 as one of the four principle companies under the purview of the Ministry of Petroleum.[81]  Since then, NIGC has "moved in line with the

---

[77] *Id.* at 23.

[78] *Id.*

[79] *Id.*

[80] *Organization Chart*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=394 (last visited Mar. 13, 2020); *Natural Gas*, National Iranian Gas Company, Oct. 14, 2018, http://www.iraniangas.ir/index.aspx?fkeyid=&siteid=3&pageid=393&newsview=1236 (last visited Mar. 13, 2020). *See Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background.

[81] *National Iranian Gas Company (NIGC)*, The Islamic Republic of Iran Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165290/National-Iranian-Gas-Company-(NIGC) (last visited Mar. 13, 2020).

31

country's economic and social development goals."[82]  Indeed, one of NIGC's core strategies is "to enhance Iran's current share in the total global gas trade."[83]  As it does for NIOC, Iran's Ministry of Petroleum, which is controlled by Iran's Supreme Leader and the president of Iran, controls NIGC.[84]  The Minister of Petroleum appoints the CEO of NIGC,[85] who then serves the government of Iran as a Deputy Minister of Petroleum.[86]  As a result of this control, the Ministry speaks on behalf of NIGC, announcing nationwide "projects" that are "on the agenda" of NIGC, and NIGC speaks on behalf of Iran, explaining its efforts to further Iran's international goal of "achieving 30% share of natural gas in the world."[87]  Furthermore, and also like NIOC, Iran has not only been held responsible for NIGC's debts, but has paid full compensation to NIGC's creditors.[88]

103.    The Ministry, moreover, imposes its will on the operations of NIGC.  For example,

---

[82]  *Id.*

[83]  H. Omidvar, *Iran, the Key Player of Transition*, Int'l J. of Petrochemistry & Research, at 259 (Feb. 26, 2019), *available at* https://madridge.org/international-journal-of-petrochemistry/ijpr-1000144.pdf.

[84]  *Ministry of Petroleum of Iran*, LinkedIn, https://www.linkedin.com/company/ministry-of-petroleum-of-iran/about/ (last visited Mar. 8, 2020); *see also Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background; *see also General Polices Instructed by Supreme Leader Ayatollah Ali Khamenei for Oil & Gas Sector*, the Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165568/General-Policies-Instructed-by-Supreme-Leader-Ayatollah-Ali-Khamenei-for-Oil--Gas-Sector (last visited Mar. 8, 2020).

[85]  *New NIGC CEO Appointed*, National Iranian Gas Company, (Apr. 12, 2018), http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=276&newsview=1999.

[86]  *Organizational Chart of the Ministry of Petroleum*, The Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165294/Organizational-Chart-of-the-Ministry-of-Petroleum (last visited Mar. 8, 2020).

[87]  *Iran starts building MEs largest gas storage tank*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=276&newsview=7317 (last visited Mar. 25, 2020); *Iran proposes achieving 30% share of natural gas by 2040*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=276&newsview=6272 (last visited Mar. 25, 2020).

[88]  *See, e.g., Turkmenistan suspends gas supplies to Iran*, Economist, http://country.eiu.com/article.aspx?articleid=1954995179&Country=Turkmenistan&topic=Economy&subto_1 (last visited Mar. 25, 2020); A. Agency, *Iran pays $1.9B arbitration debt to Turkey, settles debt for gas exports*, Daily Sabah, (Feb 6, 2018), https://www.dailysabah.com/energy/2018/02/06/iran-pays-19b-arbitration-debt-to-turkey-settles-debt-for-gas-exports.

the Ministry directed NIGC to reorganize its structure to create "two integrated departments—one focusing on gas imports, exports, transit, gas swaps and upstream ventures, and the other on [liquefied natural gas] projects" so as to "strengthen NIGC as a potential future national gas champion."[89]

104.   Iran additionally uses NIGC to achieve Iran's social, economic, and political objectives.  For example, NIGC deploys "31 provincial gas companies throughout the country which are responsible for gas delivery to the cities, villages, power plants, industries and commercial consumers."[90]  Moreover, NIGC, on behalf of Iran, exports natural gas throughout the world, and Iran uses NIGC to attract foreign investment and hard currency.[91]  Outside of the energy sector, Iran directs NIGC to assist with social programs.  For example, Iran requires NIGC to pay 20 percent of its earned income each year to the Ministry of Education for renewal of heating systems and equipment of Iranian secondary schools."[92]

105.   In light of the foregoing, the property of NIOC, the Central Bank of Iran, and NIGC are all subject to attachment in aid of execution, and subject to execution upon the judgment against Iran because each entity operates as an alter ego of the government based on the level of economic control Iran has over their property and their day-to-day operations.

106.   Furthermore, given the nature of Plaintiffs' judgments, the property of NIOC, the

---

[89] *Iran reorganises gas companies to spur development*, Oil&Gas (May 19, 2010), https://www.oilandgasmiddleeast.com/article-7368-iran-reorganises-gas-companies-to-spur-development.

[90] *A Glance At The NIGC Administration And Organization Staff*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?fkeyid=&siteid=3&pageid=393&newsview=1235 (last visited Mar. 13, 2020).

[91] *See* Annual Review 2017/2018, Central Bank of The Islamic Republic of Iran at 55, *available at* https://www.cbi.ir/simplelist/AnnualReview_en.aspx.; *see also Iran attracts $2b in foreign capital through BOT contracts: NIGC*, Iran Daily (June 18, 2018), http://www.iran-daily.com/News/216885.html.

[92] *See, e.g.*, *NIGC fulfills 95% of commitments to Iran's Ministry of Education*, Trend News Agency (Dec. 25, 2018), https://en.trend.az/iran/2998350.html.

Central Bank of Iran, and NIGC are all subject to attachment in aid of execution, and subject to execution upon the judgment against Iran even if they were not alter egos of Iran. Rather, because they are themselves the Iranian government state, agencies or instrumentalities of Iran, their assets (including those held or manipulated by Halkbank) are subject to execution regardless of the level of economic control Iran has over their property by the government of the foreign state; whether the profits of the property go to Iran; the degree to which Iranian government officials manage the property or otherwise control its daily affairs; whether Iran is the sole beneficiary in interest of the property; or whether establishing the property as a separate entity would entitle Iran to benefits in the United States courts while avoiding its obligations.

### III.   Halkbank Exercised Control And Dominion Over The Iranian Accounts To Execute Iran's Fraudulent Conveyances

#### A.   *Halkbank's Senior Management And Agents Worked Closely Together To Execute And Conceal The Fraudulent Conveyance Schemes*

107.    Halkbank carefully designed, participated in, and meaningfully benefitted from the Gold Export Scheme and the Fake Food Scheme that allowed Iran access to transfer $20 billion worth of oil revenues to Halkbank, which ultimately disguised them and forwarded them on to its agents for the express purpose of violating U.S. sanctions. To do this, Halkbank's senior management and agents worked closely together to control Iran's funds, ushering them through numerous internal transfers and intermediary shell companies before they traveled to their intended beneficiary.

108.    Among other senior Halkbank executives, Aslan, Halkbank's General Manager, agreed to the scheme, and met with Iranian banking and oil officials to ensure the schemes' smooth operation without detection. For instance, on or about March 26, 2013, it was Aslan who advised Zarrab that Halkbank would stop processing fraudulent gold transactions over the next several months and would begin to channel the Iranian oil revenues out of Turkey by pretending that these

34

transfers were in connection with selling food to Iran, which would qualify as an exception to U.S. sanctions. Aslan also advised Zarrab at that time that Halkbank would provide the requisite documentation for these transactions, even if that involved submitting fraudulent documents.

109. Furthermore, during the execution of the schemes, Aslan extensively communicated with Zarrab and Halkbank's other intermediaries, thereby maintaining control of the Iranian funds and ensuring that they would reach their intended beneficiary without detection. In one instance, on or about May 6, 2013, Aslan told Zarrab that Atilla had reported that NIOC had directly transferred 70 million Turkish lira to an account controlled by Zarrab at Halkbank. This transfer contradicted the agreement among Halkbank, NIOC, and Zarrab—*i.e.*, that NIOC's oil proceeds would be transferred to a private Iranian bank before being transferred to Zarrab. At Zarrab's request, Aslan agreed to void the transaction and told Zarrab that Halkbank would not report the sanctions violation. But for Aslan's control, that transaction would have alerted U.S. regulators to the schemes.

110. Atilla, Halkbank's Deputy General Manager, also met frequently with Iranian banking and oil officials to explain Halkbank's careful design of the fraudulent schemes, and Halkbank's specific participation in each scheme. Atilla also extensively communicated with Zarrab and Halkbank's other intermediaries to ensure that the intended transactions were completed in a way that concealed Iran's nexus to the funds. For example, he instructed Zarrab to alter the customs paperwork submitted to Halkbank documenting the gold transactions by changing the purported destination of the gold from Dubai to Iran.

111. Moreover, during Halkbank's execution of the Fake Food Scheme, Atilla constantly communicated with Zarrab, advising him to be careful about the documents that he submitted on behalf of Halkbank because errors could expose the scheme. For instance, on or

about July 2, 2013, Atilla cautioned Zarrab when the quantities of the purported food reflected in the documents were unrealistic in light of the vessels that Zarrab purported to use to transport the food. Similarly, on or about July 9, 2013, Zarrab and Atilla discussed more errors in the falsified documents noting that the documents either (a) claim to load quantities of goods on the vessels larger than the purported capacities of the ships, or (b) purport to use vessels that were large enough to be able to provide the bills of lading that Zarrab could not, in fact, provide. Atilla instructed Zarrab to ensure that the "load . . . match" the size of the vessels. But for Halkbank's constant monitoring and intervention through bank personnel such as Atilla, the Fake Food Scheme would have been susceptible to detection.

112.   Zarrab and other Halkbank intermediaries worked closely with Aslan and Atilla and other Halkbank executives to execute Iran and Halkbank's fraudulent schemes. Zarrab in particular arranged multiple meetings with Halkbank's senior management and Iranian banking and oil officials; he controlled many of the intermediary shell companies that purchased gold to export to Dubai and arranged couriers to physically carry that gold to Dubai; he controlled many of the intermediary shell companies that facilitated transfers through exchange houses that, in turn, transferred Iranian oil proceeds through U.S. correspondent accounts; and he regularly falsified documents both for the Gold Export Scheme and Fake Food Scheme according to Halkbank's instructions and under the bank's constant watch. The fraudulent schemes, however, involved many other intermediaries in addition to Zarrab, and Halkbank continued to receive transfers of funds from Iran and continued to pass them on for routing through New York correspondent accounts for at least two years after Zarrab was arrested in Turkey for his fraud.

113.   Halkbank senior management also met with OFAC regularly, at least twice a year, during the operation of these fraudulent schemes. At these meetings, some of which were held in

Washington, D.C., Halkbank's senior management lied to OFAC, assuring U.S. regulators that the bank was not executing transactions on behalf of Iran. Halkbank did this in order to conceal its role in receiving the fraudulent transfers from Iran and forwarding them on for routing through the United States. For example, in March 2012, the then-U.S. Undersecretary of the Treasury for Terrorism and Financial Intelligence, David Cohen, discussed with Halkbank the U.S. requirement to reduce Iranian oil imports and the accompanying penalty of cutting off banks from the U.S. financial market if imports were not significantly reduced. During this meeting, Halkbank senior management informed OFAC that Halkbank was not allowing Iran to acquire gold using its Iranian oil proceeds that had been transferred to Halkbank and that that they knew and understood that Iran would seek to use deceptive practices to evade U.S. sanctions. Later that year, Halkbank again affirmatively lied to U.S. regulators when it emailed the then-Director of OFAC and claimed that Halkbank stopped allowing Iranian gold transactions as of June 10, 2013.

### B.    *Halkbank Benefitted From Its Execution Of The Schemes*

114.    The Gold Export and Fake Food Schemes hinged on transfers of Iranian funds to Halkbank for subsequent transfer to accounts subject, directly and indirectly, to Halkbank's dominion and control. The transfers were undertaken for the express purpose of allowing Halkbank to exercise dominion and control over the accounts, so as to render the funds contained therein available for Halkbank's and, eventually, Iran's use (less numerous commissions, bribes and other amounts received by Halkbank, its banking personnel and its agents). Thus, the relations between Iran and Halkbank differed vastly from an ordinary depository relationship.

115.    Indeed, as U.S. sanctions became more expansive in limiting how Halkbank could treat the funds Iranian entities such as NIOC had transferred to it, those deposits became far less profitable for Halkbank. The Gold Export Scheme and Fake Food Scheme served to free up oil

proceeds for Halkbank's control. But for these schemes, those funds would not have been available for Halkbank's use.

116. The Gold Export Scheme and Fake Food Scheme, moreover, benefitted Halkbank because the bank received a commission for executing these schemes, and its fees and revenues increased as a result of the schemes. The revenues generated by laundering billions of dollars were, unsurprisingly, substantial.

117. Lastly, Halkbank deliberately designed the illicit transactions so that it could maintain its own access to the American financial system. Specifically, stripping Iran's nexus from these transactions enabled Halkbank to continue using correspondent banking accounts in the United States, including in New York, while achieving the goal of converting Iranian oil proceeds to dollars by routing transactions through accounts in New York. Without these accounts, Halkbank would not be able to conduct U.S. dollar transactions for itself and its customers.

## C.   *Halkbank Faces Criminal Liability For Its Execution Of Iran's Fraudulent Conveyances*

118. In 2016, Zarrab was arrested upon arriving in Florida from Istanbul. The United States Attorney's Office for the Southern District of New York charged him with, among other things, conspiracy to defraud the United States and to impede the lawful functions of OFAC; conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"); bank fraud; conspiracy to commit bank fraud; money laundering; and conspiracy to commit money laundering. Facing 130 years of imprisonment, Zarrab pled guilty to the aforementioned charges in October 2017. He is currently serving his prison sentence.

119. Atilla was also arrested in March 2017, and charged with a host of federal crimes, including conspiracy to defraud the United States; conspiracy to violate IEEPA; bank fraud;

conspiracy to commit bank fraud; money laundering; and conspiracy to commit money laundering. Atilla's trial on these charges began in November 2017, and included testimony from Zarrab who testified regarding the design, development, and execution of the fraudulent schemes—including both the Gold Export Scheme and the Fake Food Scheme. Following that trial, Atilla was convicted of conspiracy to defraud the United States, conspiracy to violate the IEEPA, bank fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering, and sentenced to 32 months in prison.

120.    Soon thereafter, the U.S. government indicted Halkbank itself for its role in the fraudulent schemes alleged herein. This criminal proceeding is currently pending in the Southern District before Judge Berman, and Halkbank's arraignment is scheduled for March 31, 2020. As a result of Iran and Halkbank's fraudulent scheme, the full extent of Iran's transfers to Halkbank as well as Halkbank's role in receiving fraudulently conveyed Iranian oil proceeds, and intentionally and knowingly controlling the Iranian funds to disguise them and hide them from regulators and then transferring those funds on was not known to Plaintiffs until the government filed its indictment in 2019.

## IV.    Halkbank's Dominion And Control Of The Schemes Enabled The Execution Of International Payments Using The Funds Otherwise Due To Plaintiffs

121.    Without Halkbank's close coordination with Iranian officials, senior-level management, and agents, consistent monitoring of every step of the schemes, and deliberate lies to OFAC and other financial institutions, these fraudulent transactions would not have evaded detection in the U.S. financial system. Halkbank knowingly and intentionally caused at least $1 billion of the Iranian oil proceeds to pass through U.S. correspondent accounts located in New York.

122.   For instance, as part of the scheme, on October 21, 2014, Centrica General Trading, one of Zarrab's companies that has an account with Halkbank in Turkey funded using transfers from Iran to Halkbank, made a payment of $92,723 to Shanghai Hisheng Plastic Products Company Limited, a company in China that holds an account at the Bank of China, so that Iran could use the funds for its own benefit. Halkbank caused the funds to be transferred through New York correspondent accounts by executing or causing to be executed several transfers of these funds: first the funds were transferred to Centrica's account, then the funds traveled from Centrica's accounts to a currency exchange house, then to a correspondent account at a bank in New York, and finally to Bank of China. In a similar example, on October 21, 2014, Halkbank executed a transfer of the fraudulently conveyed funds, causing Centrica General Trading to make a payment of $45,639 to P.T. South Pacific Viscose, a company in Indonesia that holds an account at the Bank Negara Indonesia for Iran's ultimate benefit. Again, after Halkbank executed several internal transfers of these funds, the funds were sent out of Halkbank to Centrica's account, then on through a currency exchange house, then to a correspondent bank account in New York, and finally to Bank Negara Indonesia.

123.   At least $1 billion of the funds that were fraudulently conveyed by Iran to Halkbank were intentionally routed though U.S. dollar correspondent accounts in New York by Halkbank and Iran.

124.   Upon information and belief, Iranian oil proceeds remain in accounts held by Halkbank and Halkbank continues to actively transact business in the United States.

## CLAIMS FOR RELIEF

### FIRST COUNT

**(Against Halkbank for Rescission and Turnover of Fraudulent
Conveyances in Violation of New York Debtor and Creditor Law § 273-a)**

125.    Plaintiffs incorporate herein by reference paragraphs 1 through 124, *supra*, as if fully set forth herein.

126.    Iran fraudulently conveyed billions of dollars' worth of oil proceeds to Halkbank in bad faith with the express intention of laundering these funds in order to conduct international financial transactions in violation of U.S. sanctions.  Halkbank willingly and knowingly received fraudulent transfers from Iran and designed, participated in, and benefited from the fraudulent schemes to fraudulently divert Iranian assets owed to Plaintiffs to intermediary shell companies that enabled the government of Iran and its agencies, instrumentalities, and alter egos to engage in illicit financial transactions that violated U.S. sanctions and exploited the U.S. financial system.

127.    Halkbank knowingly accepted the fraudulent transfers and benefitted by receiving substantial commission for its role in the schemes, earning fees and revenues that would have been unavailable to it absent the transfers at issue.  Further, Halkbank benefited from its development and execution of the Gold Export Scheme and Fake Food Scheme by freeing otherwise blocked Iranian funds for its own use while nominally on deposit in the name of Iran's alter ego and Halkbank's agents.  Halkbank also benefitted from its development and execution of the Gold Export Scheme and Fake Food Scheme by knowingly and deliberately concealing the schemes from U.S. regulators so that it could maintain its access to the U.S. financial system and its U.S. correspondent banking accounts while profiting from its relationship with Iran.

128.    The conveyances of Iranian oil revenues to Halkbank and from Halkbank into intermediary shell companies at Halkbank were made without fair consideration because they were

designed to be fraudulent and not conducted in good faith. In addition, fraudulent conveyances of Iranian oil revenues that Halkbank further directed to third-party beneficiaries through U.S. correspondent accounts were also made without fair consideration because they were designed to be fraudulent and not conducted in good faith.

129.    Iran engaged in multiple transfers of Iranian oil proceeds to accounts at Halkbank in bad faith with the express intent that the origin of those proceeds be concealed before they were transferred on by Halkbank. Once at Halkbank, the funds were transferred further to accounts nominally held in the name of a private bank and intermediary shell companies for no equivalent value. The funds Iran fraudulently transferred to Halkbank, which then controlled and subsequently transferred the funds into the hands of its agents, would then be used to execute international financial transactions for Iran, including at least $1 billion in transfers that Halkbank deliberately routed through correspondent accounts in New York.

130.    Iran failed to deal honestly, fairly and openly when it participated in two fraudulent schemes that utilized trade-based money laundering, falsified documents, front companies, and payment intermediaries. In efforts to evade detection by Plaintiffs and others, Iran worked with Halkbank and its top-level executives to design and conduct multiple transfers to conceal information that would reveal a nexus to the government of Iran. By removing this information, the funds—once transferred out of Turkey via intermediary shell companies—could travel through the U.S. financial system. Together, Iran and Halkbank's schemes defrauded U.S. financial institutions by inducing them to provide financial services for the government of Iran and NIOC, among other Iranian entities, in violation of sanctions laws. By evading detection, Iran intentionally evaded Plaintiffs' legitimate claims, which could have been at least partially satisfied if Iran's funds had been frozen as required by U.S. law.

42

131.   To execute these schemes while evading sanctions and maintaining its U.S. correspondent accounts, Halkbank explicitly and repeatedly lied to OFAC multiple times, including at meetings in which Halkbank senior management traveled to Washington, D.C., to meet with U.S. regulators.   Specifically, Halkbank falsely informed OFAC that it ceased facilitating gold sales to Iran in June 2013 when it had not; failed to report violations; and gave false assurances that Halkbank was not allowing Iran to direct a scheme that enabled it to acquire gold using oil revenues when it was allowing Iran to do exactly that.

132.   Halkbank's lies and deception hindered and delayed U.S. Treasury's ability to discover that Iran was, in fact, laundering nearly $1 billion through the U.S. financial system at institutions in New York. Halkbank's deception further prevented sanctions against Halkbank that would have cut it off from the U.S. financial system. Further, Halkbank's conduct shielded billions of dollars of Iranian assets from seizure and execution by Plaintiffs in the United States.

133.   At the time of the fraudulent conveyances that occurred from 2012 until March 28, 2014, Iran was a defendant in the actions initiated by the *Owens* plaintiffs, the *Mwila* plaintiffs, the *Khaliq* plaintiffs, the *Spencer* plaintiffs, the *Worley* plaintiffs, and the *Roth* plaintiffs in the D.C. District Court.

134.   At the time of the fraudulent conveyances that occurred from March 28, 2014 until 2016, Iran was indebted to the Plaintiffs, by virtue of the judgments entered against it in the amount of $487,687,665.78 for the *Owens* plaintiffs, in the amount of $419,752,640.49 for the *Mwila* plaintiffs, in the amount of $49,761,544.86 for the *Khaliq* plaintiffs, in the amount of $453,596,509.44 for the *Spencer* plaintiffs, in the amount of $260,097,083 for the *Worley* plaintiffs, and in the amount of $131,191,019 for the *Roth* plaintiffs.   At this time, Iran was also a

defendant in the *Fritz* Suit, in which it was ultimately ordered to pay a $248,948,689 judgment to the *Fritz* Plaintiffs.

135.    The judgments are final judgments rendered against Iran.

136.    Iran has failed to satisfy the judgments.

137.    The transfers made by Iran to Halkbank with knowledge of Plaintiffs' claims and during the pendency of Plaintiffs' lawsuits were not made in good faith and because Iran has failed to satisfy Plaintiffs' judgments, New York Debtor and Creditor Law Section 273-a dictates that Iran's conveyances were fraudulent as to Plaintiffs.

138.    As a result of the fraudulent nature of the Gold Export Scheme and Fake Food Scheme, Plaintiffs are entitled to an order setting aside the conveyances and causing Halkbank to turn over the transferred property to Plaintiffs.

139.    Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in Halkbank's possession, Plaintiffs are entitled to an order requiring Halkbank to pay money damages to Plaintiffs in the amount of the judgments.

140.    Furthermore, as a result of Halkbank's gross and wanton conduct, namely fabricating evidence and directly lying to U.S. regulators, Plaintiffs are entitled to an order requiring Halkbank to pay punitive damages in the amount of the judgments.

### SECOND COUNT

**(Against Halkbank for Rescission and Turnover of Fraudulent
Conveyances in Violation of New York Debtor and Creditor Law Section 276)**

141.    Plaintiffs incorporate herein by reference paragraphs 1 through 140, *supra*, as if fully set forth herein.

142.    Iran fraudulently conveyed its oil proceeds to Halkbank, so that it could use these funds to conduct international financial transactions. Halkbank designed, participated in, and

benefited from these fraudulent schemes to fraudulently divert Iranian assets owed to Plaintiffs to intermediary shell companies that enabled the government of Iran and Iranian entities to deliberately and knowingly engage in illicit financial transactions that violated U.S. sanctions and exploited the U.S. financial system. Both separately and collectively, these transactions bear a number of badges of fraud, including, but not limited to, a close relationship between Iran and Halkbank, multiple secret transactions not in the ordinary course of business, inadequacy of consideration, the use of multiple shell companies, Iran's use of the funds after the chain of fraudulent transfers was complete, and Iran's knowledge of Plaintiffs' claims and the judgments at the time the transfers occurred.

143.    To accomplish the Gold Export Scheme and Fake Food Scheme, Iranian officials, Halkbank, and others involved in the scheme worked closely together. Iranian banking and oil officials met frequently with Halkbank and its intermediaries, including Zarrab, to ensure that the schemes would be designed and carried out carefully to avoid detection. In addition, senior Halkbank executives including Aslan and Atilla constantly communicated with intermediaries like Zarrab who used shell companies to purchase gold to export out of Turkey to then be used to make financial payments in accordance with instructions received from Iran and NIOC. At times, for example, Aslan and Atilla directed Zarrab to correct errors on documents submitted to Halkbank that falsified the Gold Export Scheme and Fake Food Scheme, and cautioned Zarrab when he engaged in transactions outside the scope of the schemes' design.

144.    Iran and Halkbank conducted these transfers outside the ordinary course of business. For example, at Iran's request Halkbank transferred money at Halkbank to Iranian private bank accounts at Halkbank to conceal that the funds were associated with the government of Iran or NIOC. Those funds were then further transferred at Halkbank's direction to accounts in

the name of shell companies, also at Halkbank. To carry out these schemes for the government of Iran and NIOC, Halkbank intentionally accepted falsified documents to substantiate both the Gold Export and Fake Food Scheme; and directly lied to U.S. regulators and other financial institutions about its participation in and execution of these schemes to purposefully evade detection and circumvent U.S. sanctions.

145.    Iran and Halkbank effectuated the fraudulent schemes with the intention of evading its debt to Plaintiffs, as well as hindering and delaying U.S. Treasury's ability to administer sanctions as compliance with such sanctions would have led to the funds transferred through New York being frozen and available to satisfy, at least in part, Plaintiffs' judgments. Iran defrauded U.S. regulators through transfers to Halkbank with the intent that Halkbank would develop and execute layered transactions that concealed information relating to the government of Iran and NIOC to give Iran access to the U.S. financial system.

146.    At the time of the fraudulent conveyances that occurred from 2012 until March 28, 2014, Iran was a defendant in the actions initiated by the *Owens* Plaintiffs, the *Mwila* Plaintiffs, the *Khaliq* Plaintiffs, the *Spencer* plaintiffs, the *Worley* plaintiffs, and the *Roth* plaintiffs in the D.C. District Court.

147.    At the time of the fraudulent conveyances that occurred from March 28, 2014 until 2016, Iran was indebted to the Plaintiffs, by virtue of the judgments entered against it in the amount of $487,687,665.78 for the *Owens* Plaintiffs, in the amount of $419,752,640.49 for the *Mwila* Plaintiffs, in the amount of $49,761,544.86 for the *Khaliq* Plaintiffs, in the amount of $453,596,509.44 for the *Spencer* plaintiffs, in the amount of $260,097,083 for the *Worley* plaintiffs, and in the amount of $131,191,019 for the *Roth* plaintiffs. At this time, Iran was also a

defendant in the *Fritz* Suit, in which it was ultimately ordered to pay a $248,948,689 judgment to the *Fritz* Plaintiffs.

148.    The judgments are final judgments rendered against Iran.

149.    Iran has failed to satisfy the judgments.

150.    As a result of the fraudulent nature of the Gold Export and Fake Food schemes, Plaintiffs are entitled to an order from the Court setting aside the conveyances and causing Halkbank to turn over the transferred property to Plaintiffs.

151.    Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in Halkbank's possession, Plaintiffs are entitled to an order requiring Halkbank to pay money damages to Plaintiffs in the amount of the judgments.

152.    Furthermore, as a result of Halkbank's gross and wanton conduct, namely fabricating evidence and directly lying to U.S. regulators, Plaintiffs are entitled to an order requiring Halkbank to pay punitive damages in the amount of the judgments.

## THIRD COUNT

### (Against Halkbank for Turnover Pursuant to C.P.L.R. § 5225)

153.    Plaintiffs incorporate herein by reference paragraphs 1 through 152, *supra*, as if fully set forth herein.

154.    Section 5225(b) of the C.P.L.R. states, in relevant part, that a court "shall require a . . . person in possession or custody of money . . . in which the judgment debtor has an interest or . . . a person who is a transferee of money . . . from the judgment debtor . . . to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor."

155.    Pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and C.P.L.R. § 5225, Plaintiffs respectfully request that the Court enforce Plaintiffs' judgments against Iran by issuing

an order conveying, assigning, and directing the payment to Plaintiffs of all rights, title, and interest of Iran in any Iranian assets that remain in the possession of Halkbank.

### FOURTH COUNT

**(Against Halkbank for Turnover Pursuant to the Terrorism Risk Insurance Act)**

156.   Plaintiffs incorporate herein by reference paragraphs 1 through 155, *supra*, as if fully set forth herein.

157.   TRIA provides that "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).

158.   Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA, § 201(a).

159.   In Executive Order 13,599, the President invoked his IEEPA authority and "blocked" "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch." 77 Fed. Reg. 6,659.

160.   Plaintiffs hold judgments for compensatory damages against Iran based on an act of terrorism under 28 U.S.C. § 1605A.

161.   The Central Bank of Iran, NIOC, and the NIGC satisfy the definition of Iran because they are owned or controlled by, or acting on behalf of, the government of Iran.

48

162.    Alternatively, the Central Bank of Iran, NIOC, and the NIGC satisfy the definition of Iran because they are agencies or instrumentalities or alter egos of the government of Iran.

163.    Had Halkbank not concealed the Iranian assets that traveled through the U.S. financial system, those assets would have been blocked pursuant to Executive Order 13,599, and thus subject to execution by the Plaintiffs.

164.    Under TRIA, Plaintiffs are thus entitled to an order directing Halkbank to turn over any remaining Iranian funds in partial satisfaction of the compensatory damages awarded in the judgments.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.    Enter an order rescinding, or setting aside, the fraudulent conveyances made by Iran to Halkbank through intermediaries on behalf of the government of Iran, NIOC, the Central Bank of Iran, and NIGC, and requiring Halkbank to turn over the fraudulently transferred assets to Plaintiffs in the amount of Plaintiffs' judgments, including pre- and post-judgment interest;

2.    Enter an order requiring Halkbank to pay Plaintiffs monetary damages in the amount of Plaintiffs' judgments, including pre- and post-judgment interest, to the extent that the fraudulently transferred assets no longer exist or are no longer in Halkbank's possession;

3.    Enter an order directing Halkbank to turn over any asset of Iran currently within its possession;

4.    Enter an order requiring Halkbank to pay Plaintiffs punitive damages;

5.    Enter an order enjoining Halkbank from taking any action to transfer, dispose of, encumber, or otherwise reduce or jeopardize Plaintiffs' interest in Iranian assets;

6.    Order payment of Plaintiffs' attorneys' fees and expenses; and

7.    Award Plaintiffs other and further relief the Court deems just and proper.

Dated: March 26, 2020                    Respectfully submitted,

Chantale Fiebig
Matthew D. McGill
Noah P. Sullivan (*pro hac vice* application
forthcoming)
Suria M. Bahadue (*pro hac vice* application
forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9522
mmcgill@gibsondunn.com
cfiebig@gibsondunn.com
nsullivan@gibsondunn.com
sbahadue@gibsondunn.com

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

*Attorneys for Plaintiffs*

50