**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

JAMES OWENS, et al.,

                Plaintiffs,

       -against-

TURKIYE HALK BANKASI A.S., a/k/a
"HALKBANK,"

             Defendant.

Civil Action No: 20-cv-2648 (DLC)

Oral argument requested

**OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR ORDER OF ATTACHMENT</u>**

`

John S. Williams (JW-6927)
Eden Schiffmann (*pro hac vice* forthcoming)
Kristin L. Saetveit (*pro hac vice* forthcoming)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, D.C. 20005

650 Fifth Ave., Suite 1500
New York, New York 10019

Phone: (202) 434-5000
Fax:     (202) 434-5029
Email:  jwilliams@wc.com
*Attorneys for Defendant*

Dated: July 30, 2020

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................................1

STATEMENT OF FACTS ...................................................................................................................3

    A.    The Government's Allegations ..............................................................................3

    B.    Plaintiffs' Fraudulent Conveyance Claims and Motion for Prejudgment
             Attachment ..............................................................................................................5

LEGAL STANDARD ...........................................................................................................................8

ARGUMENT .........................................................................................................................................9

    I.    PLAINTIFFS ARE NOT ENTITLED TO ATTACHMENT. .......................................9

        A.    Plaintiffs Cannot Meet Their Burden to Show that Attachment Is
             Necessary. ................................................................................................................9

        B.    This Court Should Deny Attachment Because It Would Harm Third-
             Party Customers and Be Oppressive to Halkbank. .........................................12

    II.    PLAINTIFFS CANNOT ESTABLISH PROBABLE SUCCESS ON THE
         MERITS. ...........................................................................................................................14

        A.    Plaintiffs Have Not Shown Probable Success in Proving that Halkbank
             Was a Transferee or Beneficiary ........................................................................15

         B.    Plaintiffs Have Not Shown Probable Success in Proving Intent to
             Defraud Creditors ..................................................................................................20

        C.    Plaintiffs Have Not Shown Probable Success in Proving that the
             Conveyances Lacked Fair Consideration ...........................................................21

    III.    PLAINTIFFS WOULD HAVE TO POST A MUCH MORE SUBSTANTIAL
         UNDERTAKING IF THE COURT WERE TO IMPOSE ATTACHMENT ............23

CONCLUSION ...................................................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*61 West 62nd Owners Corp. v. Harkness Apartment Owners Corp.*,
   570 N.Y.S.2d 8 (App. Div., 1st Dept. 1991).............................................................................24

*Ames v. Clifford*, 863 F. Supp. 175 (S.D.N.Y. 1994) ........................................................9, 10, 11

*Amusement Industry, Inc. v. Midland Avenue Assocs.*,
   820 F. Supp. 2d 510 (S.D.N.Y. 2011).............................................................................6, 18, 21

*Bank of China v. NBM LLC*, 192 F. Supp. 2d 183 (S.D.N.Y. 2002) ........................................9, 11

*Bollenbach v. Haynes*, No. 18-cv-997,
   2018 WL 4278347 (S.D.N.Y. May 29, 2018) ............................................................1, 2, 8, 12

*Boyd v. 254 PAS Property LLC*,
   124 N.Y.S.3d 781 (App. Div., 1st Dept. 2020) (mem.) ..........................................................20

*Brastex Corp. v. Allen International, Inc.*, 702 F.2d 326 (2d Cir. 1983).......................................1

*Buy This, Inc. v. MCI Worldcom Communications, Inc.*,
   178 F. Supp. 2d 380 (S.D.N.Y. 2001)............................................................................... passim

*Capital Ventures International v. Republic of Argentina*,
   443 F.3d 214 (2d Cir. 2006)..................................................................................................9, 13

*Cargill Finiancial Services International, Inc. v. Bank Finance & Credit Ltd.*,
   896 N.Y.S.2d 317 (App. Div., 1st Dept. 2010)..........................................................1, 2, 13, 24

*Dafeng Hengwei Textile Co. v. Aceco Industrial & Commercial Corp.*,
   54 F. Supp. 3d 279 (E.D.N.Y. 2014) ......................................................................1, 12, 13, 14

*FDIC v. Porco*, 75 N.Y.2d 840 (1990) ....................................................................6, 15, 16, 18

*Fratelli Italiani, LLC v. Mironova*,
   No. 18-cv-7013, 2019 WL 3759160 (S.D.N.Y. Apr. 11, 2019) .........................................1, 15

*Fundación Presidente Allende v. Banco de Chile*,
   No. 05-cv-9771, 2006 WL 2796793 (S.D.N.Y. May 29, 2006) ..................................... passim

*General Textile Printing & Processing Corp. v. Expromtorg International Corp.*,
   862 F. Supp. 1070 (S.D.N.Y. 1994)...............................................................................1, 9, 10

*Geren v. Quantum Chemical Corp.*, 832 F. Supp. 728 (S.D.N.Y. 1993) ....................................15

*Glazer & Gottlieb v. Nachman*, 650 N.Y.S.2d 717 (App. Div., 1st Dept. 1996) ..........................1

*Gowan v. Westford Asset Management LLC (In re Dreier LLP)*,
   462 B.R. 474 (Bankr. S.D.N.Y. 2011)...................................................................................23

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ..................................................6, 22, 23

*In re Brosnahan*, 324 B.R. 199 (Bankr. W.D.N.Y. 2005) .........................................................17

Page

Cases—continued:

*In re Cornerstone Homes, Inc.*, 567 B.R. 37 (Bankr. W.D.N.Y. 2017) .........................................17

*JSC VTB Bank v. Mavlyanov*, 63 N.Y.S.3d 40 (App. Div., 1st Dept. 2017) ................................24

*Kogan v. National Bank of North America*, 402 F. Supp. 359 (E.D.N.Y. 1975)..........................16

*Leser v. U.S. Bank N.A.*, No. 09-cv-2362, 2013 WL 3788877 (E.D.N.Y. July 18, 2013).............22

*Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47 (2d Cir. 1982).................10

*Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003).....................................................21

*Margolies v. Encounter, Inc.*, 42 N.Y.2d 475 (1977) ...................................................................24

*Medical Buildings Assocs. v. Abner Properties Co.*,
    959 N.Y.S.2d 476 (App. Div., 1st Dept. 2013).........................................................................24

*Meridien International Bank v. Republic of Liberia*,
    No. 92-cv-7039, 1996 WL 22338 (S.D.N.Y. Jan. 22, 1996) ........................................1, 10, 14

*Mitchell v. Fidelity Borrowing LLC*, 827 N.Y.S.2d 107 (App. Div., 1st Dept. 2006)..................24

*Mitchell v. Lyons Professional Services, Inc.*, 109 F. Supp. 3d 555 (E.D.N.Y. 2015) ................18

*Penoyar v. Kelsey*, 150 N.Y. 77 (1896) ...............................................................................1, 2, 8

*Reading & Bates Corp. v. National Iranian Oil Co.*, 478 F. Supp. 724 (S.D.N.Y. 1979) ...........10

*Sidwell & Co. v. Kamchatimpex*, 632 N.Y.S.2d 455 (Sup. Ct. N.Y. Cty. 1995) ....................13, 24

*Sigmoil Resources, N.V. v. Pan Ocean Oil Corp. (Nigeria)*,
    650 N.Y.S.2d 726 (App. Div., 1st Dept. 1996)....................................................................13, 24

*Society Milion Athena, Inc. v. National Bank of Greece*, 281 N.Y. 282 (1939)......................17, 19

*Sylmark Holdings Ltd. v. Silicone Zone International Ltd.*,
    783 N.Y.S.2d 758 (Sup. Ct. N.Y. Cty. 2004) .........................................................................9, 10

*Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.*,
    424 F. Supp. 1125 (S.D.N.Y. 1976)................................................................................... passim

*Wilds v. Lebanon National Bank*, 220 N.Y.S. 480 (App. Div., 1st Dept.) ...................2, 15, 16, 19

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 1705(a) ............................................................................................12

2019 N.Y. Sess. Laws ch. 580 (A. 5622) (McKinney) ....................................3

N.Y. Civil Practice Law and Rules (CPLR)
    6201.................................................................................................................8
    6201(1).............................................................................................................8
    6201(3).............................................................................................................8
    6212(a).........................................................................................................8, 14
    6212(b).........................................................................................................3, 24
    6214(b).............................................................................................................7

New York Debtor and Creditor Law (DCL)
    § 273-a (repealed 2020) .................................................................3, 6, 20, 21
    § 276 (repealed and replaced 2020) ...............................................3, 7, 20, 21

31 C.F.R. § 560.204 ..........................................................................................12

31 C.F.R. § 560.427(a)(2) .................................................................................12

Fed. R. Civ. P. 64(a) ...........................................................................................8

## OTHER AUTHORITIES

Vincent C. Alexander*, McKinney's Practice Commentaries* (2013)...............9

1 Garrard Glenn, *Fraudulent Conveyances and Preferences* (1940) .......22, 23

Dominic Massaro et al., *Enforcing Judgments and Collecting Debts in New York*
    (2019–2020 ed.)............................................................................................24

David D. Siegel, *New York Practice* (6th ed. 2019) ...................................7, 15

William Pratt Wade, *A Treatise on the Law of Attachment & Garnishment* (1886) ......................8

## <u>INTRODUCTION</u>

When Plaintiffs moved this Court *ex parte* for an order of attachment and temporary restraining order, the memorandum submitted on their behalf failed to inform the Court of central tenets of New York attachment jurisprudence. Under those tenets, it is plain that Plaintiffs are not entitled to an order of attachment. Those tenets are:

1. "Because attachment is *a 'harsh' remedy that must be 'construed narrowly* in favor of the party against whom the remedy is invoked,' *a plaintiff bears a high burden* to show that attachment is warranted." *E.g.*, *Bollenbach v. Haynes*, No. 18-cv-997, 2018 WL 4278347, at *2 (S.D.N.Y. May 29, 2018) (emphasis added) (citation omitted); *accord, e.g.*, *Glazer & Gottlieb v. Nachman*, 650 N.Y.S.2d 717 (App. Div., 1st Dept. 1996); *see generally Penoyar v. Kelsey*, 150 N.Y. 77, 79–80 (1896).

2. Where, as here, parties seek an order of attachment to prevent the dissipation of assets, Mot. 23,[1] "attachment should issue only upon *a showing that drastic action is required*." *E.g.*, *Buy This, Inc. v. MCI Worldcom Commc'ns., Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001) (emphasis modified) (internal quotation marks omitted); *accord Fratelli Italiani, LLC v. Mironova*, No. 18-cv-7013, 2019 WL 3759160, at *7 (S.D.N.Y. Apr. 11, 2019); *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1073 (S.D.N.Y. 1994).

3. A party seeking attachment in that situation has an affirmative obligation to supply "*probative evidentiary facts that defendant has disposed or is about to dispose of any property in order to frustrate a potential judgment*, or to flee the jurisdiction of the Court." *Gen. Textile*, 862 F. Supp. at 1074 (emphasis added); *see Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 331 (2d Cir. 1983) ("Fraud is not lightly inferred, and the moving papers must contain evidentiary facts—as opposed to conclusions—proving the fraud."); *Dafeng Hengwei Textile Co. v. Aceco Indus. & Commercial Corp.*, 54 F. Supp. 3d 279, 286 (E.D.N.Y. 2014); *Meridien Int'l Bank v. Republic of Liberia*, No. 92-cv-7039, 1996 WL 22338, at *4 (S.D.N.Y. Jan. 22, 1996).

4. Even if a party meets the above heightened showings, courts retain the discretion to deny motions for attachment when the attachment order's burden will "*fall[ ] directly on . . . third parties*" or is "*likely to be oppressive*" to the defendant. *Dafeng*, 54 F. Supp. 3d at 286–87 (emphasis added) (internal quotation marks omitted); *see Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.*, 424 F. Supp. 1125, 1133 (S.D.N.Y. 1976); *Cargill*

---

[1] Plaintiffs seek to support their dissipation argument by noting that Halkbank objected to personal jurisdiction in a pending criminal case against the bank. *See* Mot. 23. To be clear, Halkbank has appeared in this matter and the criminal matter. Plaintiffs' characterization of Halkbank's position in the criminal matter is disingenuous, as Halkbank only exercised its constitutional rights without any attempt to evade the court's jurisdiction.

*Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*, 896 N.Y.S.2d 317, 318 (App. Div., 1st Dept. 2010).

Nowhere in the two paragraphs that Plaintiffs devote to explaining why they are entitled to an attachment do they acknowledge, let alone address, these principles. *See* Mot. 23. These principles compel denial of Plaintiffs' motion.

As Turkiye Halk Bankasi A.S. ("Halkbank") demonstrates below, there is no evidence that it is removing assets from the jurisdiction to avoid a future judgment. Indeed, the evidence is to the contrary. There is no need for any "drastic action." *E.g.*, *Buy This*, 178 F. Supp. 2d at 383.

An attachment order would be particularly inappropriate here given that Plaintiffs' desired attachment will harm third parties and Halkbank. Halkbank's only assets in the United States are three correspondent bank accounts, which are accounts used to provide Halkbank's customers with access to U.S. dollar transactions in this country and around the globe. New York courts acknowledge that "wholesale attachment" of funds in correspondent bank accounts, like Plaintiffs seek here, would "interfere[] with ***innocent third parties' access to their money***." *Cargill*, 896 N.Y.S.2d at 318 (emphasis added). As to Halkbank itself, the attachment would destroy its access to the U.S. markets "prior to any adjudication to determine the rights of the parties." *Bollenbach*, 2018 WL 4278347, at *2 (internal quotation marks omitted); *Penoyar*, 150 N.Y. at 80.

Plaintiffs' attachment motion neither proves their need for an attachment nor confronts the dangers the attachment poses. Instead, Plaintiffs devote almost their entire argument to the claim that they are likely to succeed on the merits of their two fraudulent conveyance claims. Mot. 11–22. But there again, Plaintiffs ask the Court to contradict longstanding New York law that a depository bank is not liable for fraudulent conveyance when it merely facilitates the transfer of assets, rather than taking ownership of the assets. *Fundación Presidente Allende v. Banco de Chile*, No. 05-cv-9771, 2006 WL 2796793, at *3 (S.D.N.Y. May 29, 2006); *Wilds v. Leb. Nat'l*

*Bank*, 220 N.Y.S. 480, 484 (App. Div., 1st Dept.), *aff'd*, 245 N.Y. 629 (1927).  Nor do Plaintiffs provide any evidence that the alleged scheme was intended to defraud creditors, dooming Plaintiffs' intentional fraudulent conveyance claim under New York Debtor and Creditor Law (DCL) § 276 (repealed and replaced 2020).[2]  For the same reasons, Plaintiffs fail to show that the conveyances at issue in this case lacked fair consideration, undermining their constructive fraudulent conveyance claim under DCL § 273-a (repealed 2020).

Finally, if this Court does grant prejudgment attachment, it should require Plaintiffs to post a substantially greater undertaking under CPLR 6212(b).  The purpose of such undertakings is to ensure that a defendant who prevails on the merits or the issue of attachment can recover damages, including both reasonable attorneys' fees and any other form of damages, caused by the attachment.  Given the significant damage to Halkbank's business that would result from granting Plaintiffs' motion, New York law suggests a bond of $100 million should be required.

## STATEMENT OF FACTS

### A.    The Government's Allegations

Halkbank is currently a defendant in a criminal trial scheduled for February 2021.  *United States v. Turkiye Halk Bankasi, A.S.*, No. S6 15 Cr. 867 (RMB).  Halkbank is presumed innocent, and intends to vigorously defend itself at trial.  Indeed, that trial will mark the first time that someone has defended the bank's conduct.  Certain former executives of the bank were also indicted, and one—Mehmet Hakan Atilla—went to trial and was convicted.  But Atilla's trial strategy was a familiar one; he did not seek to defend Halkbank's conduct and instead claimed that he did not "kn[o]w what was going on at Halkbank."  Declaration of John S. Williams ("Williams

---

[2] Effective April 4, 2020, New York repealed the Uniform Fraudulent Conveyance Act and replaced it with the Uniform Voidable Transactions Act.  2019 N.Y. Sess. Laws ch. 580 (A. 5622) (McKinney).

Decl."), Ex. A (Excerpt of Defense Summation, *United States v. Atilla*).  The government's allegations against Halkbank therefore remain untested by the adversarial process and Halkbank has every intention of defending itself against them.

Because Plaintiffs' case derives from the government's allegations, however, it is important to start with them.  The government's case centers on Iranian-Turkish businessman Reza Zarrab, whom the government alleges conspired with Iran to evade U.S. sanctions.  For years the United States has imposed, and frequently modified, a variety of sanctions on Iran that have limited both that country's ability to sell its oil and gas as well as its lawful use of the proceeds from such sales.  Superseding Indictment (Weigel Decl. Ex. 39) ¶¶ 9–24.  For example, as of 2012 Iran could sell its petroleum products only directly to a foreign country, and U.S. law required "any funds owed to Iran" for such sales to be "deposited in an account within that foreign country."  *Id.* ¶ 18.  Once the proceeds from the sales had been deposited in such an account, Iran could withdraw that money only for specific, limited purposes.  *See id.* ¶¶ 19–21.  For oil and gas sales to Turkey, Iran's receipts were deposited at accounts in Halkbank.  *Id.* ¶ 3.

In the government's telling, Zarrab approached a Halkbank executive in March 2012 and proposed a plan to transfer Iranian oil proceeds, legally held at Halkbank, out of the bank and then on to Dubai where Zarrab could put the funds to use for Iran, allegedly in violation of U.S. sanctions.  *Id.* ¶ 29.  The purpose of Zarrab's scheme was "to violate and evade U.S. national security controls against" Iran, including "to evade and avoid prohibitions against Iran's access to the U.S. financial system."  *Id.* ¶ 1.

During Atilla's trial, Zarrab created two diagrams of the transactions he testified to.  *See* Williams Decl., Exs. C–D.  The transactions had many stages.  According to the indictment, the first stage was to transfer the funds from accounts held by Iranian entities to accounts that Zarrab

and others controlled.  *See* Superseding Indictment ¶¶ 25–27, 50–58.  These transactions occurred within Halkbank and were supported by documentation indicating that the transfers were in support of gold, food, or medicine transactions permitted by U.S. sanctions at the time, but the government alleges that the transactions as actually carried out violated sanctions.  *Id.*  Indeed, Zarrab admitted during his testimony in Atilla's trial that he and others at his direction prepared false documents to show to Halkbank employees.  Williams Decl., Ex. B.

Once the funds arrived in Zarrab-controlled accounts, Zarrab claimed that he would transfer the money to Dubai, sometimes through other intermediary banks.  *See* Williams Decl., Exs. C–D.  Zarrab testified that he would then direct several more transactions within Dubai before transferring some portion of the funds on to foreign businesses to "make international payments on behalf of the Government of Iran and Iranian banks."  Superseding Indictment ¶ 6; *see* Williams Decl., Exs. C–D.  The government asserts that $20 billion in total funds were utilized through Zarrab's scheme.  Superseding Indictment ¶ 4.  Of that total, the government claims approximately $1 billion passed through the United States.  *Id.* ¶ 64.  In his testimony, Zarrab claimed to be diagramming transactions in which funds entered the United States through accounts at Standard Chartered.  Williams Decl., Exs. C–D.  As a whole, the government alleges, the Zarrab transactions were "a vehicle for further evasion of U.S. sanctions" by Iran.  Superseding Indictment ¶ 53.

### B.    Plaintiffs' Fraudulent Conveyance Claims and Motion for Prejudgment Attachment

Plaintiffs claim to base their allegations on the indictment, *see, e.g.*, Am. Compl. ¶¶ 23, 136, but they depart from the government's allegations in important ways.  For example, Plaintiffs have recast Zarrab from being an independent businessman to being Halkbank's "agent."  *See id.* ¶ 17; Mot. 1.  More importantly, while the indictment repeatedly alleges that the purpose

of Zarrab's scheme was to assist Iran in evading sanctions, Plaintiffs baldly assert that the purpose was actually to evade Plaintiffs' judgments. *E.g.*, Am. Compl. ¶¶ 13, 14, 84, 85, 146.[3]

Plaintiffs allege several claims stemming from that invention, including the two New York fraudulent conveyance claims referenced in the instant motion for prejudgment attachment. As the Second Circuit has explained, New York's Uniform Fraudulent Conveyance Act "is a set of legal rather than equitable doctrines, whose purpose is . . . to aid specific creditors who have been defrauded by the transfer of a debtor's property." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995). Fraudulent conveyance law does not prevent a debtor from purchasing goods or services, or from paying antecedent debts, but only from frustrating a creditor's collection of a debt by the simple expedient of diminishing his assets by fraudulently alienating them to another.

New York courts permit fraudulent conveyance claims against only those who are "transferees of the assets" or "beneficiaries of the conveyance." *FDIC v. Porco*, 75 N.Y.2d 840, 842 (1990). The fraudulent conveyance statute does not permit claims against those accused only of "aiding and abetting" a fraudulent conveyance. *See, e.g.*, *Amusement Indus., Inc. v. Midland Ave. Assocs.*, 820 F. Supp. 2d 510, 533–34 (S.D.N.Y. 2011).

Plaintiffs' first claim alleges a constructive fraudulent conveyance under DCL § 273-a. Am. Compl. ¶¶ 141–56. That statute permits creditors to set aside a "conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him," if "after final judgment for the plaintiff, the defendant fails to satisfy the judgment." DCL § 273-a. Plaintiffs' second claim

---

[3] Plaintiffs are 553 individuals who have obtained approximately $5 billion in default judgments against Iran in U.S. courts arising out of terrorist attacks carried out with the support of the Iranian government, dating back as far as 1983. Am. Compl. ¶¶ 3, 19. Plaintiffs' have moved for leave to file a second amended complaint, which would add plaintiffs and to which Defendants intend to object. *See* Dkt. 25. That motion is pending with the Court.

alleges intentional fraudulent conveyance under DCL § 276, which pertains to conveyances made "with actual intent . . . to hinder, delay, or defraud either present or future creditors."

On June 30, 2020, Plaintiffs filed a Motion for Order of Attachment and Temporary Restraining Order (Mot.).  Plaintiffs sought "attachment of Halkbank's assets to secure them for satisfaction of" the judgment Plaintiffs seek to obtain in this case.  Mot. 3.

As noted above, attachment is a "drastic" remedy.  *Buy This*, 178 F. Supp. 2d at 383.  It freezes the property to which it applies, prohibiting the owner of the property from accessing, moving, or disposing of that property.  CPLR 6214(b).  When the attached property is money in a bank account, the depository bank must bar the owner of the funds from accessing, withdrawing, transferring, or in any way using the funds in the account.  *See id.*; David D. Siegel, *New York Practice* § 320 (6th ed. 2019) (attachment "precludes the garnishee [depository bank] from disposing of the defendant's property to anyone but the levying sheriff"); *Trigo*, 424 F. Supp. at 1133 (attachment of bank account resulted in funds being "frozen").

Halkbank's only assets in the United States are correspondent bank accounts it holds with three United States financial institutions.  Declaration of Serdar Sürer ("Sürer Decl.") ¶¶ 4–6.  The accounts are part of an international financial system known as "correspondent banking," and are the gateway through which customers financially interact in U.S. dollars with the U.S. market and many other markets around the globe.  *Id.* ¶¶ 5, 7.  Halkbank offers its customers use of these dollar-denominated funds and deducts an equivalent value of funds held in its customers' overseas accounts.  *Id.* ¶ 5.  The majority of the transactions serviced through the correspondent accounts are undertaken for small-to-medium businesses and individuals.  *Id.* ¶ 9.  Freezing those accounts would lock these third-party customers, and Halkbank, out of U.S. dollar transactions in this country and around the globe.  *Id.* ¶¶ 9–10.

## **LEGAL STANDARD**

New York law governs Plaintiffs' motion for attachment.  *See* Fed. R. Civ. P. 64(a).  New York courts have long recognized that attachment, although provided by statute, "violates every principle of proprietary right held sacred by the common law."  *Penoyar*, 150 N.Y. at 80 (quoting William Pratt Wade, *A Treatise on the Law of Attachment & Garnishment* § 2 (1886)).  Courts therefore construe the doctrine narrowly and demand the plaintiff meet a high burden before imposing an order of attachment.  *E.g.*, *Bollenbach*, 2018 WL 4278347, at *2.  There are two sets of requirements Plaintiffs must meet.

First, Plaintiffs must meet a set of threshold requirements found in CPLR 6212(a) "[1] that there is a cause of action, [2] that it is probable that the plaintiff will succeed on the merits, [3] that one or more grounds for attachment provided in [CPLR] 6201 exist, and [4] that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  CPLR 6212(a). Plaintiffs must meet these showings "by affidavit and such other written evidence as may be submitted."  *Id.*  CPLR 6201 identifies different grounds for attachment that satisfy the threshold showing required by the statute.  Plaintiffs claim two grounds apply here: that Halkbank is "a foreign corporation not qualified to do business in the state" and that Halkbank "with intent to defraud [its] creditors or frustrate the enforcement of a judgment . . . has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." CPLR 6201(1), (3); *see* Mot. 23.

It is black-letter law, however, that "a showing that the statutory requirements for attachment are satisfied does not automatically entitle [the movant] to an order of attachment." *E.g.*, *Bollenbach*, 2018 WL 4278347, at *2.  Rather, a movant must show that it has a "need for the attachment."  *Id.*  That requires the movant to show that "the remedy is needed to secure

payment or obtain jurisdiction." *Capital Ventures, Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006); *see, e.g.*, *Bank of China v. NBM LLC*, 192 F. Supp. 2d 183, 187 (S.D.N.Y. 2002); *Gen. Textile*, 862 F. Supp. at 1073.

This gives rise to the second set of requirements. Where, as here, a plaintiff seeks an order of attachment to avoid a defendant's "dissipat[ing] any assets," Mot. 23, an attachment order "should issue only upon a showing that drastic action is required." *E.g.*, *Gen. Textile*, 862 F. Supp. at 1073. In particular, movants must show that "the defendant is attempting to dispose of his assets in order to frustrate the ability of the plaintiff to collect any judgment that might ultimately be obtained." *Ames v. Clifford*, 863 F. Supp. 175, 177 (S.D.N.Y. 1994).

## ARGUMENT

### I.    PLAINTIFFS ARE NOT ENTITLED TO ATTACHMENT.

#### A.    Plaintiffs Cannot Meet Their Burden to Show that Attachment Is Necessary.

Recognizing that attachment is not just a "harsh" remedy but a discretionary one, New York courts limit its application to those narrow circumstances in which attachment actually serves the goals of obtaining jurisdiction or preventing the "transferring or secreting [of] assets out of New York." *Bank of China*, 192 F. Supp. 2d at 187; *see Capital Ventures*, 443 F.3d at 222; *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 783 N.Y.S.2d 758, 773 (Sup. Ct. N.Y. Cty. 2004); Vincent C. Alexander, *McKinney's Practice Commentaries*, CPLR 6201:0 (2013). The first purpose—obtaining jurisdiction—is not an issue. Halkbank has three correspondent accounts in New York, is committed to maintaining those accounts in New York, and, while reserving its rights, has appeared in this case to address Plaintiffs' claims regarding those New York accounts.

That leaves only the second goal: preventing a party from frustrating a judgment by moving its assets out of the jurisdiction. Mot. 23. This ground is rightly construed narrowly. "[A]ttachment should issue only upon a showing that ***drastic action is required*** for security

purposes." *Buy This*, 178 F. Supp. 2d at 383 (emphasis modified) (internal quotation marks omitted). The movant's heightened burden requires evidence showing that "these defendants would conceal or convert any of their assets were it not for an attachment order." *Id.*; *Ames*, 863 F. Supp. at 177. To make those showings, the movant must come forth with "***probative evidentiary facts*** that defendant has disposed or is about to dispose of any property in order to frustrate a potential judgment." *Gen. Textile*, 862 F. Supp. at 1074 (emphasis added); *see Reading & Bates Corp. v. Nat'l Iranian Oil Co.*, 478 F. Supp. 724, 727 (S.D.N.Y. 1979), *disagreed with on other grounds by Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47 (2d Cir. 1982).

Plaintiffs have ignored their high burden, and presented no evidence to meet it. Instead, Plaintiffs spend the vast majority of their argument section defending the merits of their claims, Mot. 11–22, and half a page addressing the other express requirements for attachment, *id.* 23. They simply assert that "[g]iven the opportunity, Halkbank likely will dissipate any assets that may be available to satisfy Plaintiffs' ultimate judgment." *Id.* This is insufficient. To justify the "harsh remedy" and "drastic action" of attachment, Plaintiffs must offer more than "conjecture." *Meridien Int'l Bank*, 1996 WL 22338, at *4; *Gen. Textile*, 862 F. Supp. at 1074; *Sylmark*, 783 N.Y.S.2d at 773–74.

Plaintiffs imply that their allegations that Halkbank "has assisted Iran in avoiding judgments" suggest that Halkbank will dissipate assets from New York. Mot. 23. Halkbank will vigorously defend itself against the Zarrab-scheme allegations in the criminal trial and, if need be, in this case. In any event, allegations that a party ***assisted a country avoid sanctions*** hardly amounts to "probative evidentiary facts" that the party itself "***has disposed or is about to dispose of any property*** in order to frustrate a potential judgment." *Gen. Textile*, 862 F. Supp. at 1074 (emphasis added); *see Ames*, 863 F. Supp. at 177.

10

Fundamentally, however, those allegations are irrelevant. The former executives at Halkbank against whom criminal allegations have been made are no longer at Halkbank. Their alleged conduct is no evidence of what Halkbank will do today. *See Ames*, 863 F. Supp. at 178–79 (noting evidence must evince actual fraudulent intent; not even removal of assets is itself sufficient); *cf. Bank of China*, 192 F. Supp. 2d at 188–91 (detailing "concrete evidence" regarding transactions taken by defendant to dissipate assets).

The evidence of what Halkbank will do today is this: Halkbank is not removing, and will not remove, assets from the jurisdiction. Halkbank's only assets in New York are the funds in its correspondent bank accounts. Sürer Decl. ¶ 6. Halkbank has a clear economic interest in maintaining these accounts in New York. The correspondent bank accounts exist so that Halkbank can provide its customers access to U.S. dollar transactions around the globe. *Id.* ¶ 7. As Plaintiffs allege, losing correspondent accounts would "effectively shut[] the bank out of the U.S. financial system." Am. Compl. ¶ 81. Halkbank cannot restructure its business in a way that both dissipates its New York assets and allows its customers to make U.S. dollar transactions.

It is therefore unsurprising that Halkbank has not removed its assets from its correspondent accounts despite risks to its assets similar to those raised by Plaintiffs' case. *See* Sürer Decl. ¶ 8. Halkbank has been under indictment in this District since October 2019, including for charges that potentially threaten its access to the U.S. financial system. Superseding Indictment at 42–44. But despite the indictment, and despite the counts seeking forfeiture of Halkbank's assets, Halkbank has maintained its commitment to offering U.S. dollar transactions to its customers through its New York-based correspondent accounts and has kept those accounts open and operating. Sürer Decl. ¶ 8. There is no reason to think that Plaintiffs' claims will change anything about Halkbank's behavior—certainly, Plaintiffs have offered none. This evidence of Halkbank's conduct far

outweighs Plaintiffs' naked speculation. Halkbank is committed to maintaining these accounts. *Id.* Its ability to service customers depends on them. *Id.* ¶¶ 4–10. Plaintiffs have not met their burden of showing that "drastic action is required." *Buy This*, 178 F. Supp. 2d at 383.

Moreover, Plaintiffs' theory is incompatible with the underlying U.S. sanctions regime. Plaintiffs claim that had the funds been properly identified as Iranian, they would have had the opportunity to seize them to satisfy their judgments when the funds were transferred through the U.S. financial system. Not true. Had they been identified as Iranian funds, these assets never would have entered the U.S. because they would have been rejected under the U.S. sanctions regime. *See* 15 U.S.C. § 1705(a) (making violations of sanctions unlawful); 31 C.F.R. § 560.204 (barring "services to Iran or the government of Iran"); 31 C.F.R. § 560.427(a)(2) (barring provision of "banking services" to Iran). Put another way, the fraud alleged by Plaintiffs could not have been to evade U.S. creditors because the alleged fraud itself is the only thing that permitted the alleged transfer of funds through the U.S. system in the first place. Plaintiffs' legal theory is therefore contradictory and self-defeating. If Plaintiffs wished to collect their judgments, the proper method is to file their judgments before the local courts of countries where Iran deposited funds. To Halkbank's knowledge, no such attempt has been made before the Turkish courts.

**B.    This Court Should Deny Attachment Because It Would Harm Third-Party Customers and Be Oppressive to Halkbank.**

Plaintiffs' requested attachment would injure innocent third parties and "be oppressive" to Halkbank. *Dafeng*, 54 F. Supp. 3d at 286 (internal quotation marks omitted); *Trigo*, 424 F. Supp. at 1133. The Court should deny their motion on these additional, independent grounds. *E.g.*, *Bollenbach*, 2018 WL 4278347, at *2.

***First***, attaching Halkbank's correspondent accounts would undoubtedly injure innocent third parties. Halkbank's only U.S. assets are its correspondent accounts that are used to serve

Halkbank's customers.  Sürer Decl. ¶¶ 4–6.  The accounts are the only way those customers can access U.S. dollars to use in dollar-denominated transactions either in this country or overseas.  *Id.* ¶¶ 7, 9.  Attached correspondent bank accounts would be "frozen," *Trigo*, 424 F. Supp. at 1133, putting an end to Halkbank customers' abilities to interact with the U.S. financial system and engage in dollar-denominated transactions around the world.  Sürer Decl. ¶ 7.

It is precisely because of those concerns that New York courts are loathe to order attachment of correspondent bank accounts and disrupt the correspondent banking system that is a foundation stone of modern global finance.  "Great care must be taken to avoid impeding the role of correspondent accounts in the facilitation of international transactions." *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 650 N.Y.S.2d 726, 727 (App. Div., 1st Dept. 1996).  "If New York permits correspondent bank accounts to be regularly subject to attachment after a credit has been made by a foreign bank to its local customers, the entire system of correspondent banking, in which New York banks play an important role, will be disrupted."  *Sidwell & Co. v. Kamchatimpex*, 632 N.Y.S.2d 455, 459 (Sup. Ct. N.Y. Cty. 1995).  Indeed, New York courts have expressly denied attachment of correspondent bank accounts on the basis that the funds in those accounts were "held for the benefit of third-party clients . . . who used the accounts to transact foreign business in U.S. currency," meaning that attachment "***would have interfered with innocent third parties' access to their money***." *Cargill Fin. Servs.*, 896 N.Y.S.2d at 318 (emphasis added).[4] The same is true here.  Most of the transactions processed through Halkbank's correspondent accounts are for small-to-medium businesses and individuals.  Sürer Decl. ¶ 9.  Attachment would

---

[4] To the extent the Second Circuit's decision in *Capital Ventures* left any question as to whether a court has discretion to deny a motion for attachment so long as the aims of the attachment remedy are still served, *see* 443 F.3d at 222, the First Department's subsequent decision in *Cargill*—as well as the Eastern District decision in *Dafeng*—confirm that courts retain such discretion.  *Cargill*, 896 N.Y.S.2d at 318; *see Dafeng*, 54 F. Supp. 3d at 286.

cause substantial disruptions to those customers' businesses and banking activities. *Id.* Indeed, attachment would harm a second group of innocent third parties—Halkbank shareholders. Investors in the bank, many of whom reside outside Turkey, including in the United States, would be harmed as the stock market reacts to news that the bank is no longer able to facilitate customer transactions in one of the world's principal currencies. *Id.* ¶ 11.

**Second**, attaching Halkbank's correspondent accounts would "be oppressive" to Halkbank itself. *Dafeng*, 54 F. Supp. 3d at 286; *Trigo*, 424 F. Supp. at 1133. Providing its customers access to the U.S. and global financial systems is one of Halkbank's core functions. Attaching Halkbank's correspondent accounts would destroy that access. In *Trigo*, the court denied a request for attachment because a previous attachment had led to the defendant bouncing checks and a number of suppliers denying the defendant credit. *Id.* Here, the injury from attachment would be far more profound: Because Halkbank would be unable to access U.S. dollar transactions anywhere around the world, customers would leave the bank. Sürer Decl. ¶¶ 9–10. The bank's reputation would be deeply compromised by losing access to one of the world's principal currencies. *Id.* ¶ 11.

These likely harms to Halkbank's business and reputation are the kind of "irremediable hardship" that independently warrants denying a request for attachment. *Dafeng*, 54 F. Supp. 3d at 286 (quoting *Meridien*, 1996 WL 22338, at *4). The Court should accordingly deny Plaintiffs' motion for an order of attachment even if it determines that Plaintiffs have met the statutory thresholds for such an order. As we now explain, however, Plaintiffs have not done so.

## II.    PLAINTIFFS CANNOT ESTABLISH PROBABLE SUCCESS ON THE MERITS.

To meet the statutory minimum for an order of attachment, Plaintiffs need to show "by affidavit and . . . other written evidence" "that it is probable that [they] will succeed on the merits." CPLR 6212(a). The probability standard "requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that

required to make a prima facie case." *Fratelli Italiani*, 2019 WL 3759160, at *9; *accord* Siegel, *supra*, § 316 (probability showing "means that there must be something in the proof," including "evidentiary detail," "stronger than the mere prima facie case that could satisfy as a pleading"). Plaintiffs cannot meet this standard because their complaint attempts to write aiding-and-abetting liability into the fraudulent conveyance statutes, in contradiction of a century of New York case law. In fact, Plaintiffs have not stated claims for fraudulent conveyance at all.

### A.    Plaintiffs Have Not Shown Probable Success in Proving that Halkbank Was a Transferee or Beneficiary.

Plaintiffs' fraudulent conveyance claims will fail because they do not allege—nor will they be able to prove—that Halkbank was either a transferee or beneficiary, as defined by New York law, of the bank transfers at issue. This deficiency is fatal to both of Plaintiffs' fraudulent conveyance claims, which are the only claims Plaintiffs proffer as a basis for attachment.

Plaintiffs acknowledge that black-letter law holds that fraudulent conveyance claims lie only against parties that "are transferees of the assets" or "beneficiaries of the conveyance." *Porco*, 75 N.Y.2d at 842; *see* Mot. 13–14. That is because the "creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance, and requiring that it be restored to the debtor's possession." *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 736 (S.D.N.Y. 1993) (internal quotation marks omitted), *aff'd.*, 99 F.3d 401 (2d Cir. 1995). The proper defendant in a fraudulent conveyance claim is therefore a party to whom the debtor (whether directly or indirectly) transferred an ownership interest (*i.e.* Reza Zarrab). *See id.*

New York courts have held for nearly a century that a plaintiff cannot bring a fraudulent conveyance claim against a bank acting "[as] a depository." *Fundación*, 2006 WL 2796793, at *3 (quoting *Wilds*, 220 N.Y.S. at 484). A bank acting as a depository is "***not a transferee***" of funds;

instead, the *account holders* in whose name the funds are held own the funds, and such account holders "[are] the transferees." *Wilds*, 220 N.Y.S. at 484 (emphasis added). Accordingly, "[a] bank's actions, in connection with the withdrawal and/or transfer of the debtor's assets, cannot give rise to a claim of fraudulent conveyance against it." *Fundación*, 2006 WL 2796793, at *3. Such a bank is a depository "or, at most, an agent of the payor," but never receives transfer of ownership in the funds themselves. *Kogan v. Nat'l Bank of N. Am.*, 402 F. Supp. 359, 362 (E.D.N.Y. 1975).

Nor is a depository bank a "beneficiary" of transfers it effects between others' accounts. Again, the beneficiary of the conveyance is the person or entity to whose account the funds have been moved. A bank merely moving funds between two of its customers' accounts does not become a beneficiary of the transfer unless it "divert[s] the funds for the bank's own use." *Fundación*, 2006 WL 2796793, at *3. Where a bank acts "in accordance with the instructions it receive[s] from its customers," it has no "dominion or control over the assets," and does not "derive[] any benefit from the conveyance." *Id.* This is true regardless of whether, as in *Fundación*, the bank and its leadership had full knowledge of and an intention to assist with the account holder's fraudulent conveyance. *Id.* at *1. That is because the New York courts have expressly rejected either "conspiracy" or "aiding and abetting" theories of fraudulent conveyance. *Id.* at *3; *see Porco*, 75 N.Y.2d at 842. The fraudulent conveyance statutes are intended to achieve a very particular goal: recover the debtor's property that the debtor has fraudulently alienated. That is why only those who actually received, owned, or became beneficiaries of an interest in the property are proper defendants.

In this case, neither Plaintiffs' Amended Complaint nor the indictment on which it is based ever alleges that Iran, any agent of Iran, or Zarrab used Halkbank as anything other than a

depository or agent. Plaintiffs instead offer cases in which parties allege fraudulent conveyance claims against banks as evidence "that a bank's ***status as a depository institution*** is no defense to transferee liability under the DCL." Mot. 13–14 (emphasis added). The question presented by Plaintiffs' claims, however, is whether a bank can be liable when it is acting ***as a depository***, not whether somehow "status as a depository institution" grants immunity to fraudulent conveyance claims. In each case Plaintiffs cite, the bank was not acting as a depository of someone else's funds. Rather, each case implicates a bank's own funds, either because the bank took payment on a loan it had issued from its own funds (thus taking ownership of repaid money, rather than depositing it in a customer's account), or because the bank defaulted on its deposit obligations and diverted its depositors' funds for its own purposes. *In re Brosnahan*, 324 B.R. 199, 204 (Bankr. W.D.N.Y. 2005) (schemer fraudulently transferred mortgage to bank); *Soc'y Milion Athena, Inc. v. Nat'l Bank of Greece*, 281 N.Y. 282, 295 (1939) (banks transfer funds to related institutions and refuse to honor certificates of deposit); *In re Cornerstone Homes, Inc.*, 567 B.R. 37, 49 (Bankr. W.D.N.Y. 2017) (Ponzi schemer fraudulently conveyed money by repaying loans to banks). None of these cases refutes the rule that a bank that merely holds or transfers another's funds is not a "transferee" or "beneficiary" of those conveyances under New York law. *Fundación*, 2006 WL 2796793, at *3.

Plaintiffs offer two theories for why Halkbank should be liable as a "transferee" or "beneficiary" notwithstanding that it functioned as a depository. First, Plaintiffs assert that Halkbank should be considered a transferee because it allegedly acted as "the mastermind behind and knowing conduit for fraudulent conveyances." Mot. 14 n.5. Second, Plaintiffs suggest that Halkbank was a "beneficiary" of the fraudulent conveyances because it was paid commissions for its banking services. Mot. 14. Both arguments are meritless.

17

*First*, Plaintiffs' argument that a depository bank becomes liable for fraudulent conveyance if it serves as a "mastermind" and "knowing conduit" to a debtor's fraudulent conveyance has no basis in law. It also has no basis in fact: Plaintiffs will never be able to show that Halkbank was the "mastermind" of Zarrab's schemes. Even the indictment alleges that Zarrab approached Halkbank.

In any event, the New York Court of Appeals in *Porco* expressly rejected the argument that a creditor has a fraudulent conveyance action or a conspiracy action "against nontransferees or nonbeneficiaries solely for assisting in the conveyance of a debtor's assets." 75 N.Y.2d at 842. And New York courts have consistently rejected "an aiding and abetting theory of fraudulent conveyance." *Amusement Indus.*, 820 F. Supp. 2d at 533 (collecting cases). *Fundación* illustrates the point.[5] That case involved Augusto Pinochet's alleged efforts to hide his assets from creditors through transactions designed and executed by Banco de Chile. In that case, as in this one, the creditor plaintiff alleged that the bank "took actions . . . in violation of internal bank procedures and U.S. and [foreign] banking laws and regulations," including "obstruct[ing] examinations by federal regulators," and claimed that the bank did so "with full knowledge that it was participating in a scheme to conceal assets." Compl. ¶¶ 3, 5, *Fundación*, (No. 05-cv-9771), 2005 WL 3655859 (S.D.N.Y. Nov. 18, 2005). Despite these allegations, the fraudulent conveyance claim against the bank was dismissed because a "bank's actions, in connection with the withdrawal and/or transfer of the debtor's assets, cannot give rise to a claim of fraudulent conveyance against it because the bank was not acting as a transferee, but rather was merely a depository." *Fundación*, 2006 WL

---

[5] The only case Plaintiffs cite for the proposition that Halkbank is a proper fraudulent conveyance defendant because it allegedly participated or masterminded Iran's fraud is *Mitchell v. Lyons Professional Services, Inc.*, 109 F. Supp. 3d 555, 568–69 (E.D.N.Y. 2015), *aff'd sub nom. Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636 (2d Cir. 2016). That case says nothing to help Plaintiffs, and indeed Plaintiffs appear to cite it only for the general proposition that fraudulent conveyance law "has little regard for form over substance." *Id.* Here, however, the substance is that liability cannot attach to a party that is neither a transferee nor a beneficiary.

2796793, at *3.  Despite the plaintiff's allegations of the bank's intimate involvement with Pinochet's scheming, the bank did not "divert the funds for the bank's own use," but rather transferred the funds "in accordance with the instructions it received from its customers."  *Id.*

**Second**, Plaintiffs argue that Halkbank was a "beneficiary" of Iran's conveyances because Halkbank allegedly received commissions for the banking services it performed on Iran's behalf, Mot. 14, noting that Halkbank charged an industry-standard commission "of about 1%," Am. Compl. ¶ 129.  Plaintiffs' argument stretches the word "beneficiary" well past breaking.  They do not cite any case in which a bank was a "beneficiary" of a debtor's transfer of deposited funds simply because the debtor paid the bank a transaction fee.  Again, this argument cannot be squared with *Fundación* or *Wilds*, in which depository banks (which doubtless received income for their efforts) transferred funds for their customers without becoming liable for those funds.  On the contrary, Plaintiffs' suggestion that a depository bank becomes liable as a "beneficiary" of a transaction simply by making any money off a transaction would totally gut the principle that banks acting as depositories are not liable for fraudulent conveyances.  Instead, the test for whether a bank is a beneficiary of *depository* funds is whether the bank "divert[s] the funds for the bank's own use," *Fundación*, 2006 WL 2796793, at *3, as the bank did in *Society Milion Athena*, 281 N.Y. at 291 (refusing to repay deposited funds).

At most, Plaintiffs could argue (but do not) that Halkbank was the transferee or beneficiary of the funds used to pay Halkbank's alleged commissions which, unlike Iran's alleged deposits, Halkbank would have come to own on its own account.  But shrinking Plaintiffs' claim to that smaller conveyance does them no favors.  Plaintiffs adduce no evidence, nor will they, that anybody paid Halkbank fair-market-value commissions and service fees with the intent to prevent Plaintiffs from obtaining those commissions, dooming any argument that Halkbank's receipt of

commissions constituted intentional fraudulent conveyance. *See* DCL § 276. And Plaintiffs adduce no evidence, nor will they, that Halkbank's receipt of commissions for banking services actually rendered were transactions that lacked "fair consideration," as required for a constructive fraudulent conveyance claim pursuant to DCL § 273-a. Plaintiffs' attempt to impose liability on Halkbank for receiving commissions for its services will not save their claim.

### B.    Plaintiffs Have Not Shown Probable Success in Proving Intent to Defraud Creditors.

Plaintiffs' intentional fraudulent conveyance claim requires them to prove "by clear and convincing evidence" that Iran engaged in each conveyance "with actual intent . . . to hinder, delay, or defraud either present or future creditors." *Boyd v. 254 PAS Prop. LLC*, 124 N.Y.S.3d 781 (App. Div., 1st Dept. 2020) (mem.) (standard of proof); DCL § 276. Plaintiffs have not shown "probable" success on the merits of their intentional fraudulent conveyance claim because they have not adduced any evidence suggesting that Iran engaged in conveyances with the "actual intent" to prevent Plaintiffs from enforcing their judgments.

Every document Plaintiffs cite states that Iran made certain conveyances to evade *U.S. sanctions*—not Plaintiffs' judgments. Indeed, even the government's indictment—which Halkbank strongly contests—states that Iran engaged in transactions designed to evade sanctions, because these sanctions forbid Iran from bringing property to the United States at all. *See, e.g.*, Superseding Indictment ¶¶ 1, 25, 71. The indictment makes repeated allegations about the motivations of the alleged participants in the scheme, but notably contains no suggestion whatsoever that the scheme was intended to defraud Plaintiffs or any creditors. Plaintiffs offer only say-so to establish Iran's supposed specific intent to evade their money judgments. *E.g.*, Am. Compl. ¶ 161. Given that neither the indictment, nor any other document Plaintiffs tender, offers

a scintilla of evidence that Iran possessed that specific intent—much less the clear and convincing factual proof Plaintiffs must muster—Plaintiffs have not shown a likelihood of success.

Plaintiffs attempt to rely on certain "badges of fraud" to carry their burden. Mot. 18–19. But these alleged badges of fraud carry little if any weight. Plaintiffs must prove that Iran intended not only to commit *a fraud*, but specifically that it intended *to defraud Plaintiffs as creditors*. DCL § 276. The sources on which Plaintiffs rely expressly identify the object of the alleged fraud as evading sanctions—and notably contain no suggestion that an object was to frustrate creditors. "The existence of actual intent to defraud is never presumed, and intent to defraud cannot be found based merely on suspicion, conjecture, or doubtful inference." *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) (internal quotation marks omitted), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). Given the high burden to prove intentional fraudulent conveyance and the total absence of evidence of the specific intent required, Plaintiffs have not carried their burden to show probable success on their claim for intentional fraudulent conveyance.

### C.    Plaintiffs Have Not Shown Probable Success in Proving that the Conveyances Lacked Fair Consideration.

Plaintiffs have not demonstrated a probability of success on their constructive fraudulent conveyance claim because they have not shown that they will succeed in proving a lack of "fair consideration." DCL § 273-a. Constructive fraudulent conveyance claims allow courts to avoid conveyances "without regard to the actual intent of the defendant," but only when a conveyance was "made without fair consideration." *Id.* Fair consideration is absent when a transaction lacks (1) a "fair equivalency of the consideration given" or (2) "good faith." *Amusement Indus.*, 820 F. Supp. 2d at 527.

Plaintiffs unsurprisingly downplay the "fair equivalency" component of the test, because they can point to no evidence that the transfers as a whole lacked fair value or that Iran fraudulently

alienated property.  As the Second Circuit has explained, complex, multi-part transactions often should be "'*collapsed' and treated as phases of a single transaction* for analysis under the" fraudulent conveyances statute.  *HBE Leasing*, 48 F.3d at 635 (emphasis added).[6]  A factfinder should view the multi-part transfer as "a single transaction" and determine "whether, as a result of the transaction, the debtor's estate was unfairly diminished."  *Id.* (quoting 1 Garrard Glenn, *Fraudulent Conveyances and Preferences* § 275, at 471 (1940)).

In this case, the allegations in the Amended Complaint and the government's indictment suggest that, viewed as a whole, Zarrab's scheme did not fraudulently alienate Iran's property or diminish Iran's estate; on the contrary, the indictment alleges that Iran used the transactions for purposes such as the "repayment of pre-existing debts."  *Id.* at 634; *see* Superseding Indictment ¶ 6.  The allegations are not that Iran and Zarrab arrived at a way to diminish Iran's funds to frustrate creditors, but rather a way to launder Iran's money and gain access to those funds so that it could use them "to make international payments on behalf of the Government of Iran and Iranian banks."  Superseding Indictment ¶ 6.  Unless those "international payments" were for less than an equivalent value, there is no fair-equivalency problem.  While Plaintiffs allege that these transactions violated U.S. sanctions, there is no reason to infer that, ultimately, the counterparties did not receive equivalent value to what they provided.

---

[6] Plaintiffs cite *Leser v. U.S. Bank N.A.*, No. 09-cv-2362, 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013), for the proposition that "[i]f any component of a transfer is deemed fraudulent, the entire transfer must be voided in its entirety."  Mot. 15.  The district court's statement in that case was imprecise.  The *Leser* court cited the Second Circuit's *HBE Leasing* opinion for the quoted proposition.  In *HBE Leasing*, however, the court of appeals' point was not that an entire transaction is necessarily fraudulent if any component of it, *when viewed alone*, appears to lack reasonably equivalent consideration.  On the contrary, its point was almost exactly the opposite: that "multilateral transactions" should be "collapsed" and viewed "as phases of a single transaction."  48 F.3d at 635.  So, while a single part of a transaction may appear to have adequate consideration on both sides when viewed in isolation (or not), the Second Circuit was explaining that other parts of the transaction might render the overall transaction fraudulent (or not).  *Id.*  As the Second Circuit explained, the ultimate "test is whether, as a result of the transaction, the debtor's estate was unfairly diminished."  *Id.* (internal quotation marks omitted).

22

Without a strong argument as to equivalent value, Plaintiffs focus instead on the argument that Halkbank lacked good faith when engaging in the conveyances at issue. Mot. 15–17. Halkbank will prove that it acted in good faith in the relevant transactions. At this stage, however, the salient point is that Plaintiffs focus on the wrong aspect of Halkbank's good faith: their alleged bad faith desire to evade *sanctions*. Plaintiffs focus on Halkbank's alleged "participation" in the Zarrab scheme. *Id.* at 16.

The constructive fraudulent conveyance statute's "good faith" requirement should, however, be construed narrowly. *See HBE Leasing*, 48 F.3d at 636. The Second Circuit has endorsed the test as being whether the transferee "***knew, or should have known***, that he was not trading normally, but that . . . ***the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors***." Glenn, *supra* § 295, at 512 (emphasis added); *HBE Leasing*, 48 F.3d at 636 (citing and quoting treatise parenthetically, and stating "UFCA requirement of 'good faith' refers ***solely***" to that test (emphasis added)); *see Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 462 B.R. 474, 489 (Bankr. S.D.N.Y. 2011).

Plaintiffs have no allegations that Halkbank knew or should have known that Iran was seeking to avoid Plaintiffs' judgments. Although Halkbank strenuously contests them, the allegations of the indictment point the other way: that the purpose of Zarrab's scheme was to evade U.S. sanctions, not U.S. civil default judgments. *See* pp.3–5, *supra*.

## III.  PLAINTIFFS WOULD HAVE TO POST A MUCH MORE SUBSTANTIAL UNDERTAKING IF THE COURT WERE TO IMPOSE ATTACHMENT.

The Court should deny Plaintiffs' motion. But if it were to grant it, Plaintiffs would be required to provide an undertaking many times more than is currently noted. A plaintiff is required to give an undertaking "in an amount sufficient to pay defendant damages, including attorneys' fees, in the event . . . that plaintiff was found not entitled to an attachment" or that the defendant

prevails against the plaintiff's claims. *Mitchell v. Fid. Borrowing LLC*, 827 N.Y.S.2d 107, 108 (App. Div., 1st Dept. 2006); *see* CPLR 6212(b). Based on the serious potential financial damage to Halkbank from attachment of its correspondent accounts, this Court should order that Plaintiffs provide a bond of $100 million.

The New York Court of Appeals has explained that "the purpose and function of an undertaking" given to support a prejudgment remedy "is to ***reimburse the defendant for damages sustained***" by imposing the remedy. *Margolies v. Encounter, Inc.*, 42 N.Y.2d 475, 477 (1977) (emphasis added). The amount of the attachment undertaking should therefore cover the damages to the bank that are likely to result from imposing the attachment. *See, e.g.*, *JSC VTB Bank v. Mavlyanov*, 63 N.Y.S.3d 40, 44 (App. Div., 1st Dept. 2017); *Med. Bldgs. Assocs. v. Abner Props. Co.*, 959 N.Y.S.2d 476, 488 (App. Div., 1st Dept. 2013); *61 W. 62nd Owners Corp. v. Harkness Apartment Owners Corp.*, 570 N.Y.S.2d 8, 9 (App. Div., 1st Dept. 1991); Dominic Massaro et al., *Enforcing Judgments and Collecting Debts in New York* § 4:37 (2019–2020 ed.).

Here, the damages to be expected from an attachment order are substantial. Halkbank's correspondent bank accounts play a critical role in Halkbank's business. Sürer Decl. ¶ 10. As explained *supra*, these accounts are the means by which Halkbank provides its customers with access to U.S. dollar transactions anywhere in the world. *Id.* ¶¶ 5, 9. Plaintiffs themselves stress that shutting down a foreign bank's correspondent accounts "effectively shut[s] the bank out of the U.S. financial system." Am. Compl. ¶ 81. If anything, Plaintiffs' allegation understates the gravity of the remedy they seek: Plaintiffs' motion would shut the bank out of not only U.S. transactions, but also any transactions in U.S. dollars anywhere in the world. That is presumably one reason why so many New York courts have rejected attachments of correspondent accounts. *See, e.g.*, *Cargill*, 896 N.Y.S.2d at 318; *Sigmoil*, 650 N.Y.S.2d at 727; *Sidwell*, 632 N.Y.S.2d at

459.  The damages to Halkbank from freezing its correspondent accounts would be significant. Customers would inevitably leave the bank.  Sürer Decl. ¶ 11.  The bank's reputation and stock price would be harmed.  *Id.*  Given that Halkbank has approximately $87.5 billion in assets, a conservative estimate of the damages Plaintiffs would cause Halkbank easily surpasses $100 million.  *Id.* ¶ 12.

For that reason, Halkbank respectfully requests that, if this Court grants Plaintiffs' motion for attachment, this Court modify Plaintiffs' required bond to an amount of $100 million.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for prejudgment attachment should be denied.

Dated: July 30, 2020                    Respectfully submitted,
       Washington, D.C.

John S. Williams (JW-6927)
Eden Schiffmann (*pro hac vice* forthcoming)
Kristin L. Saetveit (*pro hac vice* forthcoming)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, D.C. 20005

650 Fifth Ave., Suite 1500
New York, New York 10019

Phone: (202) 434-5000
Fax:    (202) 434-5029
Email: jwilliams@wc.com

25