**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES OWENS; VICTORIA J. SPIERS; GARY ROBERT OWENS; BETTY OWENS; BARBARA GOFF; FRANK B. PRESSLEY, JR.; YASEMIN B. PRESSLEY; DAVID A. PRESSLEY; THOMAS C. PRESSLEY; MICHAEL F. PRESSLEY; BERK F. PRESSLEY; JON B. PRESSLEY; MARC. Y. PRESSLEY; SUNDUS BUYUK; MONTINE BOWEN; FRANK PRESSLEY, SR.; BAHAR BUYUK; SERPIL BUYUK; TULAY BUYUK; AHMET BUYUK; DOROTHY WILLARD; ELLEN MARIE BOMER; DONALD BOMER; MICHAEL JAMES CORMIER; ANDREW JOHN WILLIAM CORMIER; ALEXANDRA RAIN CORMIER; GEORGE KARAS; NICHOLAS KARAS; PAUL HIRN; ELOISE HUBBEL; MARGARET BAKER; LINDA O'DONNELL; ESTATE OF LEROY MOOREFIELD; LORETTA PAXTON; LORA MURPHY; LINDA SHOUGH; LAURA HARRIS; ESTATE OF ROGER MOOREFIELD; ESTATE OF RODNEY MOOREFIELD; RICHARD PATRICK; ESTATE OF EULOGIO QUILACIO; EDILBERTO QUILACIO; ROLANDO QUILACIO; SUSAN NICHOLAS; CANDELARIA FRANCELISO; WILLIAM MWILA; EDWINA MWILA; HAPPINESS MWILA; PATRICIA FEORE; CLYDE M. HIRN; ALICE M. HIRN; PATRICIA K. FAST; INEZ P. HIRN; JOYCE REED; WORKLEY LEE REED; CHERYL L. BLOOD; BRET W. REED; RUTH ANN WHITESIDE; LORIE GULICK; PAM WILLIAMS; FLOSSIE VARNEY; LYDIA SPARKS; HOWARD SPARKS; TABITHA CARTER; HOWARD SPARKS, JR.; MICHAEL RAY SPARKS; GARY O. SPIERS; VICTORIA Q. SPIERS; JULITA A. QUALICIO; JUDITH ABASI MWILA; DONTE AKILI MWAIPAPE; DONTI AKILI MWAIPAPE; VICTORIA DONTI | Civil Action No. 20-cv-2648-DLC<br><br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

MWAIPAPE; ELISHA DONTI MWAIPAPE;
JOSEPH DONTI MWAIPAPE; DEBORA
DONTI MWAIPAPE; NKO DONTI
MWAIPAPE; MONICA AKILI; AKILI
MUSUPAPE; VALENTINE MATHEW
KATUNDA; ABELLA VALENTINE
KATUNDA; VENANT VALENTINE
MATHEW KATUNDA; DESIDERY
VALENTINE MATHEW KATUNDA;
VEIDIANA VALENTINE KATUNDA;
DIANA VALENTINE KATUNDA; EDWINE
VALENTINE MATHEW KATUNDA;
ANGELINA MATHEW FELIX; EDWARD
MATHEW RUTAHESHELWA; ELIZABETH
MATHEW RUTAHESHELWA; ANGELINA
MATHEW RUTAHESHELWA; HAPPINESS
MATHEW RUTAHESHELWA; ERIC
MATHEW RUTAHESHELWA; ENOC
MATHEW RUTAHESHELWA; ANGELINA
MATHEW-FERIX; MATHEW-FERIX;
MATHEW RTAHESHELWA; TIRISA
THOMAS; SAMUEL THOMAS MARCUS;
CECILIA SAMUEL MARCUS;
CORONELLA SAMUEL MARCUS;
KULWA RAMADHANI; RIZWAN
KHALIQ; JENNY CHRISTIANA
LOVBLOM; IMRAN KHALIQ; TEHSIN
KHALIQ; KAMRAN KHALIQ; IMTIAZ
BEDUM; IRFAN KHALIQ; YASIR AZIZ;
NAURIN KHALIQ; KENNETH SPENCER,
JR.; SAMUEL P. RICE; STEVEN JOSEPH
DIAZ; ESTATE OF DAVID BROWN;
ESTATE OF JESSE JAMES ELLISON;
ROBERT SWORD; STEVEN SIBILLE;
DONALD HOWELL; FRANCES SPENCER;
ESTATE OF KENNETH SPENCER, SR.;
AMY MORROW; KAREN BROWN; KRIS
BOERGER; SAMUEL O. RICE; BELINDA
RICE; AMY COGSWELL; DAVID RICE;
TODD RICE; VALERIE TRAIL; DANIEL
RICE; LISA SCHULTZ; STEVEN JAMES
DIAZ; JANE ASTRID DIAZ; ROBERT
DIAZ; TERESA DIAZ; MAGDALENA
MARY DIAZ; RAUL DIAZ; EDWARD
DIAZ; ESTATE OF DANIEL P. DIAZ;
CARMELLA WOOD; PATSY MCENTIRE;

LEWIS BROWN; LISA MAYBIN; RONNY
BROWN; CYNTHIA BURT; ESTATE OF
THERISA EDWARDS; ESTATE OF
ANDRES ALVARADO MIRBAL; ESTATE
OF NERIDA TULL BAEZ; ESTATE OF
MARGARET O'BRIEN; MITCHELL
ANDERSON; ESTATE OF VIRGINIA
ELLISON; ESTATE OF KENNETH
ELLISON; KIMBERLY CARLSON; GARY
CARLSON; DANIEL CARLSON; WILLIAM
CARLSON; PENNY NELSON; BEULAH
SWORD; WILLIAM SWORD; JOHN
SWORD; JERRY SWORD; CAROLINE
BROADWINE; ESTATE OF VERIAN
SIBILLE; ESTATE OF VICTOR SIBILLE,
JR.; VICTOR SIBILLE IV; VICTOR
WATORO; KEVIN SIBILLE; VALERIE
UNKEL; PAMELA SCHULTZ; STEPHANIE
HARDY; MARY JANE HOWELL; RONALD
HOWELL; DONNA BLACK; MARIO H.
VASQUEZ; DENNY WEST; THE ESTATE
OF JOHN CHIPURA; EILEEN CHIPURA;
NANCY CHIPURA; GERARD CHIPURA;
SUSAN COHEN; ESTATE OF ROSCOE
HAMILTON; FREDA SUE GAYHEART;
RAMONA GREEN; ROBERT HAMILTON;
JAMES EDWARDS; RAY EDWARDS;
BETTY SUE ROWE; GARY EDWARDS;
RALPH EDWARDS; ESTATE OF LARRY
EDWARDS; ESTATE OF DAVID WORLEY;
NANCY WORLEY; DAVID WORLEY;
BRYAN WORLEY; ESTATE OF JOHN
BUCKMASTER; ESTHER BUCKMASTER;
GREGG BUCKMASTER; VICKIE
BUCKMASTER; ARLEY BUCKMASTER;
ESTATE OF MALKA ROTH; FRIMET
ROTH; PESIA ROTH; RIVKA ROTH
RAPPAPORT; ZVI ROTH; SHAYA ROTH;
PINCHAS ROTH; ESTATE OF JACOB
FRITZ; NOALA FRITZ; ESTATE OF LYLE
FRITZ; ETHAN FRITZ; DANIEL FRITZ;
ESTATE OF BRYAN CHISM; ELIZABETH
CHISM; DANNY CHISM; VANESSA
CHISM; JULIE CHISM; ESTATE OF
SHAWN FALTER; LINDA FALTER;
MARJORIE FALTER; ESTATE OF

RUSSELL J. FALTER; RUSSELL C.
FALTER; ANDREW LUCAS; DAVID
LUCAS; TIMOTHY LUCAS; MARSHA
NOVAK; JASON SACKETT; JOHN
SACKETT; ESTATE OF AHMED AL-TAIE;
HATHAL K. TAIE; KOUSAY AL-TAIE;
NAWAL AL-TAIE; MONICAH OKOBA
OPATI, in her own right, as executrix of the
estate of CAROLINE SETLA OPTI;
SELIFAH ONGECHA OPATI; RAEL
ANGARA OPATI; SALOME RATEMO, in
his own right, as executor of the ESTATE OF
SALLY CECILIA MAMBOLEO; KEVIN
RATEMO; FREDRICK RATEMO; LUIS
RATEMO; STACY WAITHERA; MICHAEL
DANIEL WERE; JUDITH NANDI BUSERA;
ROSELYNE KARSORANI; GEORGE
MWANGI; BERNARD MACHARI; GAD
GIDEON ACHOLA; MARY NJOKI
MUIRIRI; JONATHAN KARANIA NDUTI;
ANNE NGANGA MWANGI; ESTER
NGANGA MWANGI; GITIONGA
MWANIKI; ROSE NYETTE; ELIZABETH
NZAKU; PATRICK NYETTE; CORNELIUS
KEBUNGO; PHOEBE KEBUNGO; JOAN
ADUNDO; BENARD ADUNDO; NANCY
NJOKI MACHARIA; STANLEY KINYUA
MACHARIA; SALLY OMONDI; JAEL
NYOSIEKO OYOO; EDWIN OYOO;
MIRIAM MUTHONI; PRISCAH OWINO;
GREG OWINO; MICHAEL KAMAU
MWANGI; CHRISTINE MIKALI KAMAU;
JOSEPH GATHUNGA; JOSHUA O.
MAYUNZU; ZACKARIA MUSALIA
ATING'A; JULIUS M. NYAMWENO;
POLYCHEP ODHIAMBO; DAVID JAIRUS
AURA; CHARLES OLOKA OPONDO; ANN
KANYAHA SALAMBA; ANN SALAMBA;
ERASTUS MIJUKA NDEDA; CECILIA
NDEDA; TECHONIA OLOO OWITI;
JOSEPH INGOSI; WILLIAM W. MAINA;
PETER NGIGI MUGO; SIMON MWANHI
NGURE; JOSEPH K. GATHUNGU; DIXON
OLUBINZO INDIYA; PETER NJENGA
KUNGU; CHARLES GT. KABUI; JOHN
KISWILI; FRANCISO KYALO; ROSE

NYETTE; PATRICK NYETTE; CHARITY
KITAO; LEILANI BOWER; WINNIE
NDIODA KIMEU;; MICHAEL NGANGA
KIMEU; AUDREY MAINI NASIEKU
PUSSY; KENNEDY OKELO; HELLEN
OKELO NYAIEGO; RONALD OKELO;
ELIZABETH M. AKINYI OKELO; LESLIE
ONONO; LAURA ONONO; STEPHEN
ONONO; ANDREW ONONO; LESLEY
HELLEN ACHIENG; RISPAH JESSICA
AUMA; STEPHEN JONATHAN OMANDI;
ANDREW THOMAS OBONGO; LAURA
MARGARET ATIENO; WALLACE
NJOREGE STANLEY NYOIKE; PETER
KINYANJUI; LUKAS NDILE KIMEU;
JACKSON KTHUVA MUSKOYA; GLADYS
MUNANIE MUSYOKA; TITUS MUSYOKA;
ARCY MUSYOKA KITHUVA; JANE
MUTUA; MARY NZISIVA SAMUEL;
SYUINDO MUSYOKA; KILEI MUSYOKA;
KEELIY MUSYOKA; MANZI MUSYOKA;
CONCEPTOR ORENDE; GRACE BOSIBERI
ONSONGO; NEPHAT KIMATHI;
LEONARD SHINENGAH; CAROLINE
WANGU KARIGI; STEVE MARUNGI
KARIGI; MARTIN KARIGI; WYCLIFFE
OKELLO KHABUCHI; IRENE KHABUCHI;
MARY SALIKU BULIMU; HESBON
BULIMU; JACKSON BULIMU; GODFREY
BULIMU; MILLICENT BULIMU; LYDIA
BULIMU; RODGERS BULIMU; FRIDA
BULIMU; EMMILY BULIMU; MERCY
BULIMU; HESBON LIHANDA; WINIFRED
MAINA; BETTY KAGAI; KATIMBA
MOHAMED; FRIDA YOHAN MTITU;
GEOFFREY L. TUPPER; OMAR ZUBERI
OMAR; ASHA R. MAHUNDI; EMMA R.
MAHUNDI; MWAJUMA R. MAHUNDI;
SHABAN R. MAHUNDI; JUMA R.
MAHUNDI; AMIRI R. MAHUNDI;
YUSUPH R. MAHUNDI; MWAJABU R.
MAHUNDI; ALLY R. MAHUNDI; SAID R.
MAHUNDI; MWAJUMBA MAHUNDI;
ASHA SHABANI KILUWA; LEVIS
MADAHANA BUSERA; EMMANUEL
MUSAMBAYI BUSERA; CHRISTINE

KAVAI BUSERA; AGNES TUPPER;
AGNES WANJIKU NDUNGU;  SHADRACK
TUPPER; DONNIE GAUDENS; SELINA
GAUDENS; MARY ESTHER KIUSA;
LEONARD RAJAB WAITHIRA; JOSEPH
NDUNGU WAITHIRA; GRACE WANJIRU
WAITHIRA; BADAWY ITATI ALI;
FRIDAH MAKENA ALIJAH; RUTH
GATWIRI MWIRIGI; JOAN KENDI
NKANATHA; FRANCIS JOSEPH
KWINBERE; IRENE FRANCIS
KWIMBERE; FREDRICK FRANCIS
KWIMBERE; SANI BENJAMIN FRANCIS
KWIMBERE; BARBARA WOTHAYA
OLAO; ALLAN COLLINS OLAO; LEVINA
VALERIAN R. MINJA; VIOLET TIBRUSS
MINJA; EMMANUEL TIBRUSS MINJA;
NICKSON TIBRESS MINJA; REHANA
MALIK; ELIZABETH CLIFFORD TARIMO;
MARAGET CLIFFORD TARIMO; MERCY
NYOKABI NDIRITU; CHRISTOPHER
NDIRITU; EDWIN KAARA MAGOTHE;
SEDRICK JEROME KEITH NAIR; TANYA
NAIR; SEDRICK NAIR; VALENTINA
HIZA; CHRISTOPHER HIZA;
CHRISTANTSON HIZA; CHRISTEMARY
HIZA; SALIMA ISUMAIL; JOSEPH
FARAHAT ABDALLAH; MAJDOLINE
SARAH ABDALLAH; RISPAH AYSHA
ABDALLA; CHRISTINE BWAKU;
EPHRAIM BWAKU; FLAVIA HIYANGA;
DIANA FREDERICK KIBODYA;
MARGARET NJERU MURIGI; BELONCE
WAIRIMU MURIGI; FAITH NJERI
MURIGI; MISCHECK NDUATI MURIGI;
ERIC WAMBUA MWAKA; PETER
MULWA MWAKA; FELIX MATHEKA
MWAKA; CIVILIER WAYUA MWAKA;
AGNES AKIWAL KUBAI; COLLINS
KUBAI; CELESTINE KUBAI; SALINE
KUBAI; HELLEN JEPKORIR MARITIM;
ALICE JEROP MARITIM; RUTH
CHERONO MARITIM; ANNE CHEPKEMOI
MARITIM; SHARONE MARITIM; EDGAR
MARITIM; SHEILA CHEBET MARITIM;
GIDEON MARITIM; EDGAR KIPLINO

MARTIN; RAMMY KIPYEGO ROTICH;
WAMBUI E. KUNGU; LORNA N. KUNGU;
EDWARD G. KUNGU; ONEAL EZEKIEL
MDOBILU; ONAEL DAVID MDOBILU;
PETER LOUS MDOBILU; JOHN GEORGE
MDOBILU; KATHERINE ANNE MDOBILI;
KATHERINE MWAKA; IMMANUEL
SETVEN MDOBILU; ANIPHA SOLLY
MPOTO; JOSHUA DANIEL MDOBILU;
INOSENSIA MPOTO; VICTOR MPOTO;
DENIS MATERN MPOTO; ANTHONY
MUNGAI; BARBARA MUTHONI; EDDIE
KIARIE KIBURU; ANTHONY KIARIE;
BARBARA KIARIE; JOANNE NATALIE
AWUOR OPORT; YVONNE NATASHA
AKINYI OPORT; SALLY RISSY AUMA
OPORT; MILICENT MALESI; CHARITY
KIATO; JUDY KIARIE; GODFREY
JADEVERA; LYDIA ANDEMO; RODGERS
AKIDIVA; FRIDA MWANURU; EMMILY
MMBONE; JACKSON MADEGWA;
MERCY MAKUNGU; LYDIA OSEBE
GWARO; DEBORA MOIGE GWARO;
EMMANUEL OGORO GWARO; JAMES
OGWERI GWARO; EUCABETH GWARO;
JOHN NDIBUI MWANGI; GIDEON
WABWOBA OFISI; ANDREW NHULI
MAKAU; FRANCIS WABUTI OFISI;
GEOFFREY MBUURI MBUGUA; ALEX
JOHN MJUGUNA MBUGUA; ANNE
WAMBUI NG'ANG'A; ESTHER NJERI
NG'ANG'A; CATHERINE NJERI
MWANGI; JACKSON NDUNGU; JOHN
NGURE; LUCY KAMBO; JACKLINE
WAMBUI; JEFF RABAR ORIARO; BETTY
ORIARO; FELIX MUNGUTI; PETRONILA
KATHEO MUNGUTI; ALEX KITHEU
MUNGUTI; ZAKAYO MATIKO; JACOB
GATI; VALENTINE JEMO; MAUREEN
KADI; BEVERLYNE KADI; BEVERLYNE
NDEDA; CECILIA DAYO; DICKSON
ULLETA LIHANDA; RUTH KAVERERI;
BERYL SHIUMBE; IRENE KHASANDE;
MICHAEL TSUMA; LESLIE SAMBULI;
PETER KUNIGO; HARRIET CHORE;
JAMES JANDY MURABU; STANLEY

CHAKA MURABU; STACY CHAKA;
JAMES CHAKA; STACEY NZALAMBI
MURABU; IFURAIM ONYANGO OKUKU;
CHRISTINE NABWIRE OKUKU; JOSPEH
KAMBO; VALLEN ANDEYO; PETER
MUYALE KUYA; PENINAH AKWALE
MUCII; DANIEL AMBOKO KUYA; LOISE
KUYA; NORMAN KAGAI; TABITHA
KAGAI; CHARLES KAGAI; WENDY
KAGAI; PAULINE AKOTH ADUNDO;
SAMUEL ODHIAMBO; THERESA
ACHIENG ADUNDO; ISIDORE OPONDO
ADUNDO; ANNE WASONGA ADUNDO;
THOMAS ADUNDO; JANE KHABUCHI;
HENRY ALIVIZA SHITIAVAI; JUDY
ALIVIZA SHITIAVAI; HUMPHREY
ALIVIZA; COLLINS MUDAIDA ALIVIZA;
JACQUELINE ALIVIZA; JARUHA
YASHIEENA MUSALIA; FLORENCE
MUSALIA; ELLY MUGOVE MUSALIA;
VALLEN ANDEYO; JURUHA MUSALIA;
GLADIS LIHANDA; RUTH LIHANDA;
HESBON LIHANDA; JANE ISIAHO
SHAMWAMA; BEATRICE HOKA;
BEATRICE AMDUSO; JOAB ANDAYI
MISANGO; JUSTIN AMDUSO; IREEN
SEMO; JOHNSTONE MUKABI; ANN
WAIRIMU; MARYANN NJOKIE; DANIEL
KIONGO; SAMMY NDUNGU KIARIE;
FAITH MUTINDI; JOYCE MUTHEU;
BEATRICE ATINGA; SAMMY OKERE;
PURITY MUHONJA; VICTOR ADEKA,
BRIAN KUBAI; JOHN ZEPHANIA MBOGE;
JOYCE THADEI LOKOA; MERESIANA
(MARY) PAUL; GRACE PAUL; RASHID
SELEMANI KATIMBA; SAID SELEMANI
KATIMBA; ASHA OMARI ABDULLAH;
AUGUST MAFFRY; CAROLINE S.
MAFFRY; ALISON D. MAFFRY; ALICE-
MARY TALBOT; ENNA JOHN OMOLO;
LYNETTE OYANDA; LINDA OYANDA;
FELOGENE OYANDA; VERA JEAN
OYANDA; CLAIRE OWINO, KENNETH
OWINO; LEAH OWINO; GERALD OWINO;
ORA COHEN; MEIRAV COHEN; SHIRA
COHEN; DANIEL COHEN; ELCHANAN

COHEN; ORLY COHEN; ORLY
MOHABER; SHALOM COHEN; SHOKAT
SADIAN; RONIT MOHABER; NERIA
MOHABER; JOSEPH MOHABER;
NETHANIEL CHAIM BLUTH; SHOSHANA
ROSALYN BLUTH; EPHRAIM BLUTH;
TSIPORA BATYA BLUTH REICHER;
ISAAC MENAHEM BLUTH; YIGAL
AMIHAI BLUTH; ARIEH YAHUDA
BLUTH; CHANINA SAMUEL BLUTH;
ABRAHAM BLUTH; JOSEPH BLUTH;
WINIFRED WAIRIUMU WAMAI, in her
own right, as personal representative of the
ESTATE OF ADAMS TITUS WAMAI;
DIANA WILLIAMS; TITUS WAMAI;
ANGELA WAMAI; LLOYD WAMAI; JOHN
MURIUKI GIRANDI; SARAH ANYISO
TIKOLO, individually and for the ESTATE
OF MOSES GEOFREY NANIAI; NEGEEL
ANDIKA; GRACE NJERI KIMATA,
individually and as personal representative for
the ESTATE OF FRANCIS WATORO
MAINA; GITAU CATHERINE WAITHIRA;
EARNEST GICHIRI GITAU; FELISTER
WANJIRU GITAU; GRACE NJERI GICHO,
individually and as personal representative for
the ESTATE OF PETER KABAU
MACHARIA; DIANA NJOKI MACHARIA;
NGUGI MACHARIA; LUCY KAMAU,
individually and as personal representative for
the ESTATES OF JOSEPH KAMAU
KIONGO and TERESIA WAIRIMU; JANE
KAMAU; ALICE MUHONI KAMAU;
NEWTON KAMAU; PAULINE KAMAU;
PETER KAMAU; MERCY KAMAU
WAIRIMU; ANN WAMBUI KAMAU;
DANIEL KIOMHO KAMAU; NYANGORO
WILFRED MAYAKA, individually and as
personal representative for the ESTATE OF
MAYAKA LYDIA MUKIRI; DOREEN
MAYAKA; DICK OBWORO; DIANA
NYANGARA; DEBORAH KERUBO;
DEBRA MAYAKA; JACOB AWALA,
individually and as personal representative for
the ESTATES OF JOSIAH OWUOR and
EDWINA OWUOR; WARREN AWALA;

VINCENT OWOUR; MORDECHAI
THOMAS ONONO, individually and as
personal representative for the ESTATE OF
LUCY GRACE ONONO; PRISCILLA
OKATCH, individually and as personal
representative for the ESTATE OF MAURICE
OKATCH OGOLA; DENNIS OKATCH;
ROSEMARY ANYANGO OKATCH;
SAMSON OKATCH; JENIPHER OKATCH;
JOSINDA KATUMBA KAMAU, individually
and as personal representative for the ESTATE
OF VINCENT KAMAU NYOIKE;
CAROLINE WANJIRU KAMAU; FAITH
WANZA KAMAU; ELIZABETH VUTAGE
MALOBA, individually and as personal
representative for the ESTATE OF
FREDERICK YAFES MALOBA; KENNETH
MALOBA; MARGARET MALOBA;
ADHIAMBO SHARON; OKILE MARLON;
LEWIS MAFWAVO; MARLONG OKILE;
MARY MUTHEU NDAMBUKI, individually
and as personal representative for the ESTATE
OF KIMEU NZIOKA NGANA; GRACE
NJERI GICHO, individually and as personal
representative for the ESTATE OF PETER
KABAU MARCHARIA; STANLEY NJAR
NGUGI; MARGARET NJOKI NGUGI; ANN
RUGURU; NAGUGI MACHARIA; DAVID
KARIUKI NGUGI; PAUL MWANGI
NGUGI; JOHN MUNGAI NGUGI; PETER
NGUGI; GRACE NJERI KIMATA,
individually and as personal representative for
the ESTATE OF FRANCIS WATORO
MAINA; MAINA VICTOR; WAMBUI
RACHEL; OLE PUSSY SAMUEL KASHOO,
individually and as personal representative for
the ESTATE OF RACHEL MUNGASIA
PUSSY; ANDREW PUSSY; SAMUEL
PUSSY;  DOREEN NASIEKU; ELSY
PUSSY; ROSEMARY ANYANGO OLELE,
individually and as personal representative for
the ESTATE OF FRANCIS OLEWE
OCHILO; WENDY ACHIENG; JULIET
AWUOR; JANE KATHUKA, individually and
as personal representative for the ESTATE OF
GEOFFREY MULU KALIO; BERNICE

MUTHEU NDETI; DAEN NTHAMBI
MULU; TABITHA NTHAMBI KALIO;
AQUILAS MUTUKU KALIO; CATHERINE
MBATHA; LILIAN MBELU KALIO;
CATHERINE GITUMBO, individually and as
personal representative for the ESTATE OF
JOEL GITUMBO KAMAU; EUNICE
MUTHOUI; ELIZABETH WANJIKU;
DAVID KAMAU; PETER KIBUE KAMAU;
PHILIP KARIUKI GITUMBO; KAMALI
MUSYOKA, individually and as personal
representative for the ESTATE OF DOMINIC
MUSYOKA; BEATRICE MARTHA
KITHUVA; BENSON MALUSI MUSYOKA;
WASON MUSYOKA; CAROLINE
KASUNGO MGALI; TITUS KYAW
MUSYOKA; VELMA BONYO, individually
and as personal representative for the ESTATE
OF KLYELIFF C. BONYO; DORINE
BONYO; ELIJAH BONYO; ANJELA
BONYO; WINNIE BONYO; JOYCE ABUR,
individually and as personal representative for
the ESTATE OF ERIC ONYANGO; TILDA
A. ABUR; KELESENDHIA APONDI;
BARNABAS ONYANGO; PAUL JABODA
ONYANGO; FAITH KIHAFIO, individually
and as personal representative for the ESTATE
OF TONY KIHATO IRUNGU; JACQUILINE
WANGECI; STEVE MBUKU; ANNAH
WANGECI IRUNGU; ALI HUSSEIN ALI,
individually and as personal representative for
the ESTATE OF HINDU OMAR IDDI;
FATHMA IDDI; OMAR IDDI; HAMIDA
IDDI; RASHIHID IDDI; MAHMOUD IDDI;
SUSAN HIRSH, individually and as personal
representative for the ESTATE OF
ABDULRAHMAN M. ABDALLA; SELINA
SAIDI, individually and as personal
representative for the ESTATE OF SAIDI
ROGATH; ESTATE OF VERONICA ALOIS
SAIDI; JOHN SAIDI; DANIEL SAIDI;
IDIFONCE SAIDI; ESTATE OF AISHA
MAWAZO; ADABETH NANG'OKO;
HANUNI NDANGE, individually and as
personal representative for the ESTATE OF
YUSUF NDANGE; MAUA MDANGE;

HALIMA NDANGE; JUMA NDANGE;
MWHAJABU NDANGE; ABDUL NDANGE;
RAMAHDANI NDANGE; JUDITH MWILA,
individually and as personal representative for
the ESTATE OF WILLIAM ABBAS
MWILA; MOHAMED Y. MNYOLYA,
individually and as personal representative for
the ESTATE OF ABDALLAH M.
MNYOLYA; NURU H. SULTANI; AISHA
KAMBENGA, individually and as personal
representative for the ESTATE OF BAKARI
NYUMBU; KULWA RAMADHANI,
individually and as personal representative for
the ESTATE OF DOTTO RAMADHANI;
MENGO RAMADHANI; REHENA
RAMADHANI; UPENDI RAMADHANI;
KASSIM RAMADHANI; MAJAHWA
RAMADHANI; SAIDI MTUYLA; ABDUL
MTULYA; MAGDALENA PAUL, ESTATE
OF ELISHA E. PAUL; SHABANI MTULYA,
individually and as personal representative for
the ESTATE OF MTENDEJE RAJABU;
HUSSEIN RAMADHANI, individually and as
personal representative for the ESTATE OF
RAMADHANI MAHUNDI; RUKIA
MUNJIRU ALI; MILKE W. MACHARIA;
BEUNDA KEBOGO J. CHAKA; GEORGE
M. MIMBA; MARY OFISI; MONICA
MUNYORI; NICHOLAS M. MUTISO;
DAVID K. KIBURU; JECINTA W.
WAHOME; JOSEPH WAHOME; BELINDA
AKINYI ADIKA; KIRIUMBU WMBURU
MUKURIA; ELIZABETH MULI KIBUE;
MARY WANJUGU GITONGA; LAYDIAH
WANJIRU MWANGI; CHARLES MWAKA
MULWA; BONIFACE CHEGE; LUCY
CHEGE; CAROLINE W. GICHURU;
LIVINGSTONE MADAHANA;
WELLINGTONE OLUOMA; MARINI
KARIMA; ELSIE W. KAGIMBI; SAMUEL
O. ORIARO; GIDEON K. MAZITIM;
MARGARET W. NDUNGU; MENELIK
KWAMIA MAKONNEN; JOHN MUIRU
NDUNGU; CHARLES NKANATHA; PERIS
GITUMBU; STACY WAITHERE;
CAROLINE NGUI NGUGI; PATRICK

OUMA OKECHI; RAPHEL N. KIVINDYO;
TOBIAS O. OTIENO; AARON MAKAU;
RAMDAN KIMAM JURAU; CAROLINE N.
OCHIENG; OLAMBO CHARLES; EMILY
K. MINAYO; FRANCIS MAINE NDIBUL;
CHARLES M. NDIBUL; MOSES M.
KUIYVA; MARINA KIRIMA; THOMAS
OHUORO; LIMMLES I. KASUI; MICHAEL
N. MWORIA; JOASH O. OKENDO; JULIUS
OGORO; AGGREY N. ABUTI; RENSON M.
ASHIKA; ABDULRAHMAN R. BASHIR;
JENNIFER J. CHEBOL; JOSEPH T.
GATHECHA; IDDI A. KAKA; JAMES
KANJA; BERNARD M. KASWII; DAVID M.
KIMANI; SAMUEL KIVINDYO; PETER N.
KUNG'U; WAMBUI KUNG'U; RACHEL
WAMBUI WATORO; LORNA KUNG'U;
EDWARD KUNG'U; GITONGA
MWANIKE; THOMAS G. KURIA; JAMES
M. MACHARIA; MILKA WANGARI
MACHARIA; TOITORO O. MASANGA;
ROBERT M. MATHEKA; RICHARD N.
MAWEU; MATTHEW M. MBITHI;
FRANCIS N. MBURU; PAUL K. MUSAU;
EDWARD M. MUTHAMA; THOMAS M.
MUTUA; JAMES M. MUTUKU; PAUL G.
MWINGI; LUCAS M. NDILE; ANTHONY
NGINYA; ALEXANDER C. NJERU; ENOS
NZALWA; JULIUS M. NZIVO;
FREDERICK O. OBANGA; JUSTUS M.
WAMBUA; MAKONNEN K. MENERIC;
JAMES BABIRA NDEDA; PAULINE D.
ABDALLAH; JOHN NDUATI; WUNNIE W.
GICHURU; BLASIO SHIKAMI; BLASIO
KUBAI; CYNTHIA KIMBLE; HENRY
KESSY; EVITTA KWIMBERE;
ELIZABETH SLATER; NAFISA MALIK;
VALERIE NAIR; LAUREL MCMULLEN;
CHRISTANT HIZA; FREDERICK
KABODYA; JUSTINA MDOBILU;
BENJAMIN WINFORD; CHRISTOPHER
MCMULLEN; HOSIANNA MMBAGA;
TIBRUSS MINJA; SAJJAD GULAMALI;
ANNASTACIAH LUCY BOULDEN;
CLIFFORD TARIMO; SITA MAGUA;
EDDIESON KAPESA; VALENTRY

KATUNDA; EDSON MAUMU; ZEPHANIA
MBOGE; EDWARD RUTASHEHERWA;
VICTOR MPOPO; ALLY KINDAMBA;
GAUDENS THOMAS; MARY ONSONGO,
individually and as personal representative for
the ESTATE OF EVANS ONSONGO;
ENOCH ONSONGO; PERIS ONSONGO;
VENICE ONSONGO; ONSONGO
MWEBERI; SALOME ONSONGO;
BERNARD ONSONGO; EDWIN
NYANGAU ONSONGO; GEORGE
ONSONGO; VENIS ONSONGO; EUNICE
ONSONGO; PENINAH ONSONGO;
GLADYS ONSONGO; IRENE KUNG'U;
OSBORN OLWCH AWALLA, individually
and as personal representative for the
ESTATES OF JOSIA OWUOR and EDWINA
OWUOR; WARREN AWALA; VINCENT
OWUOR; MARTHA ACHIENG ONYANGO,
individually and as personal representative for
the ESTATE OF ERIC ONYANGO;
JULIANA ATIENO ONYANGO; MARITA
ONYANGO; IRENA KUNG'U; MILLY
MIKALI AMDUSO; JOYCE AUMA
OMBESE ABUR, individually and as personal
representative for the ESTATE OF ERIC
ABUR ONYANGO and on behalf of her child
TILDA ABUR; JOYCE ONYANGO; JAMES
ANDAYI MUKABI; HAMSA SAFULA
ASDI, individually and as personal
representative for the ESTATE OF ABALIAH
MUSYDKYA MWILU and on behalf of her
children HAMIDA MWILU, VONZAIDRISS
MWILU, and ASHA MWILU; GERALD
BOCHART; YVONNE BOCHART; JOMO
MATIKO BOKE; SELINA BOKE;
MONICAH KEBAYI MATIKO; VELMA
AKOSA BONYO, individually and as personal
representative for the ESTATE OF
CHRISPINE BONYO; DOREEN BONYO;
ELIJAH BONYO; ANGELA BONYO;
WINNIE BONYO; BENSON OKUKU
BWAKU; BEATRICE MUGEMI BWAKU;
BELINDA CHAKA; MURABU CHAKA;
LUCY WAIRIMU; CATHERINE LUCY
NYAMBURA MWANGI; ANASTASIA

GIANOPULOS, as executrix of THE ESTATE
OF PHAEDRA VERONTAMITIS and on
behalf of the children LEON
VERONTAMITIS, PAUL VERONTAMITIS,
and ALEXANDER VERONTAMITIS;
GRACE NJERI GICHO, in her own right and
as executrix of THE ESTATE OF PETER
KABAU MACHARIA, and on behalf of the
child DIANA NJOKI; LUCY MUTHONI
GITAU, in her own right, as executrix of the
ESTATE OF LAWRENCE AMBROSE
GITAU, and on behalf of the children
MARGARET WAMBUI GITAU, SUSAN
NJERI GITAU, CATHERINE WAITHERA
GITAU, FELISTER WANJIRU GITAU, and
ERNEST GIGHIRI GITAU; JAPETH
MUNJAL GODIA; MERAB A. GODIA;
JOTHAM ODIANGO GODIA; GRACE
AKANYA; OMARI IDI, in her own right and
as executrix of the ESTATE OF HINDU
OMARI IDI, and on behalf of the children
MAHAMUD IDI, RASHID IDI, and
HAMIDA IDI; CAROLINE NGUHI
KAMAU; KIMANI KAMAU; HANNAH
NGENDA KAMAU, in her own right and as
Executrix of the ESTATE OF VINCENT
KAMAU KYOIKE, and on behalf of the
children STANLEY NYOIKE, SIMON
NGUGI, MERCY WANJIRU, JENNIFER
NJERI, and ANTHONY NJOROGE; JANE
KAMAU, in her own right and as Executrix of
the ESTATE OF JOSEPH NDUTA KAMAU,
and on behalf of the children MONICAH
WAIRIMO KAMAU, and JOAN WANJIKO
KAMAU; JOSINDA KATUMBA KAMAU,
in her own right and as Executrix of the
ESTATE OF VINCENT KAMAU KYOIKE,
and on behalf of the children FAITH WANZA
KAMAU, CHRISTINE M. KAMAU,
CAROLYNE W. KAMAU, DUNCAN
NYOIKE, and RUTH NDUTA; JANE
KAVINDU KATHUKA in her own right and
as Executrix of the ESTATE OF GEOFFREY
MULU KALIO; DAWN NTHAMBI MULU;
IKONYE MICHAEL KIARIE; JANE
MWERU KIARIE; HUMPHREY KIBIRU;

JENNIFER WAMBUI; MICHAEL KIBUE
KAMAU; DAVID KIBURU; HUMPHREY
KIBURU; JUDY WALTHERA; FAITH
WAMBUI KIHATO, in her own right and as
Executrix of the ESTATE OF TONY
KIHATO IRUNGU, and on behalf of the
children JACQUELINE IRUNGU, and
STEVE INRUGU; HARRISON KARIUKI
KIMANI; GRACE WANJIKU KIMANI;
GRACE NJERI KIMATA, in her own right
and as Executrix of the ESTATE OF
FRANCIS WATORO MANAI, and on behalf
of the children VICTOR MANAI and
RACHEAL WAMBUI; ALICE MUZHOMI
KIONGO, in her own right and as Executrix of
the ESTATE OF JOSEPH KAMAU KIONGO,
and on behalf of the children NEWTON
KAMAU, PETER IKONYA, TERESIA
WAITIMER, PAULINE WANKIA KAMAU,
and the ESTATE OF TERESIA WAIRIMU
KAMAU; LUCY KAMAU KIONGO, as
Executrix of the ESTATE OF TERESIA
WAIRIMU KAMAU; ELIZABETH
VICTORIA KITAO; RAPHAEL N.
KIVINDYO; MARGARET MWIKALI
NZOMO; LUKA MWALIE LITWAJ; MARY
VUTAGWA MWALIE; DENNIS KINYUA;
MOSES KINYUA; NANCY N. MACHARI;
ELIZABETH VUTAGE MALOBA, in her
own right and as Executrix of the ESTATE OF
FREDERICK MALOBA YAFES, and on
behalf of the children MARLON OKILE
MALOBA, LEWIS MAFWAVO MALOBA,
and SHARON ADHIAMBO MALOBA;
MARGARET ONYACHI MALOBA, in her
own right and as Executrix of the ESTATE OF
FREDERICK MALOBA YAFES, and on
behalf of the children KENNETH MALOBA,
FAITH ACHEING, DERRICK
MAOAKITWE, STEVEN ODHIAMBO, and
BELINDA ADHIAMBO; SARA MWENDIA
MBOGO, in her own right and as Executrix of
the ESTATE OF FRANCIS MBOGO
NJUNGE, and on behalf of the children
MESHARK IRERI, ISACK KARIUKI,
REUBEN NYAGA, NANCY WANJERU,

EPHANUS NJAGI, STEPHE NJUKI, and
ANNE MUCHOGO; STELLA WAMBUI
MBUGUA; SOLOMON MBUGUA MBUUN;
SAMUEL MBUGUA NDUNGU; GEORGE
MAGAK MIMBA; NANCY MAGAK;
EMILY KANAIZA MINAY; HUDSON
CHORE MAKIDIAH; BARBARA E. MULI;
STEPHEN MULI; CHARLES MWAKA
MULWA; CATHERIN NDUKI MWAKA;
RAPHAEL PETER MUNGUTI; MARY
MBENEKA MUNGUTI; BENSON
NDEGWA MURUTHI; PHOEBA
NYAGUTHI NDEGWA; ANGELA
MWONGELI; SAMMY NG'ANG'A
MWANGI; LUCY N. NG'ANG'A; SARA
TIKOLO NANIAI, in her own right and as
Executrix of the ESTATE OF MOSES
NAMAI, and on behalf of the children
NIGEEL ANDIIKA NAMAI; JAMES
NDEDA; VALENTINE NDEDA; MAUREEN
NDEDA; ROSELYNE KASORANI;
CHARLES MWANGI NDIBUI; MARGRET
MWANGI NDIBUI; FRANCIS MAINA
NDIBUI; WINFRED MAINA; AARON
MAKAU NDIVO; LYDIAH MDILA
MAKAU; MARY MUTHONI, in her own
right and as Executrix of the ESTATE OF
FRANCIS NDUNGU MBUGUA, and on
behalf of the children EDITH NJERI,
SAMUEL MBUGWA, ANGES WANJIKU,
JAMLECK GITAU, JOHN MWIRY, and
ANASTASIAH LUCY MUGURE;
OMUCHIRWA CHARLES OCHOLA; RAEL
OCHOLA; MARY MAKAU OFISI; JOHN
MAKAU OFISI; JULIUS GWARDO
OGORO; ELIZABETH KERUBO GWARO;
PRISCILLA NDULA OKATCH, in her own
right and as Executrix of the ESTATE OF
MAURICE OKATUH OGOLLA, and on
behalf of the children JACKLINE ACHIENG,
ROSEMARY ANYANGO, SAMSON
OGOLLA, and DENNIS OKOTH;
CAROLINE OCHI OKECH; JOHNATHAN
GILBERT OKECH; PATRICK OUMA
OKECH; PHELISTER OKECH; MISCHECK
MBOGO; PHAEDRA VRONTAMITIS;

LEONIDAS VRONTAMITIS; ALEXANDER
VRONTAMITIS; ISAAC KARIUKI
MBOGO; REUBEN NYAGA MBOGO;
NANCY MBOGO; EPHANTUS MBOGO;
STEPHEN MBOGO; ANN MBOGO;
NEPHAT MBOGO; JOASH OTAO
OKINDO; LYDIA NYABOKA OTAO;
ROSEMARY A. OLEWE, in her own right
and as Executrix of the ESTATE OF
FRANCIS OLEWE OCHILO, and on behalf
of the children CHARLES OLEWE, JULIET
OLEWE, and WENDY OLEWE; DANIEL
OWITI OLOO; MAGDALINE ANYANGO
OWITI; MARY AKOTSI MUDECHE;
FLORENCE PAMELA OMORI, in her own
right and as Executrix of the ESTATE OF
EDWIN OPIYO OMORI, and on behalf of the
children BRYAN BOAZ OMORI, and JERRY
ORETA OMORI; DOREEN ATIENO
OPORT; PHILEMON OPORT; OPORT
OPORT; SAMUEL ODHIAMOB ORIARO;
BETTY OBUNGA; RACHEL OYANDA;
MARGARET KANINI OTOLO, in her own
right and as Executrix of the ESTATE OF
ROGER TOKA OTOLO, and on behalf of the
children VICTOR OTOLO, ABRAHAM
OTOLO, and RICHARD OTOLO; TRUSHA
PATEL; PANKAY PATEL; HILARIO
AMBROSE FERNANDES; ROSELYNE
NDEDA; ANNAH WANGECHI; MICHAEL
WARE; HANNAH WAMBUI; and JACINTA
W. WAHOME,

                    Plaintiffs,

        v.

TURKIYE HALK BANKASI A.S., a/k/a
"HALKBANK,"

                    Defendant.

## INTRODUCTION

1.      The Islamic Republic of Iran—working arm-in-arm with Halkbank and others—has engaged in a highly calculated campaign to evade detection of its capital and asset flows into and out of the U.S. financial markets.  Iran's evasion of U.S. sanctions was orchestrated through the transfer of billions of dollars' worth of funds to Halkbank in bad faith, with the expectation that Halkbank would then disguise Iranian oil proceeds by transferring them to other participants in Iran's fraudulent scheme in the hope of evading U.S. sanctions.  The transfers at issue were made while Plaintiffs—the victims of acts of terrorism sponsored by Iran—were litigating their claims against Iran.  Plaintiffs' judgments, totaling more than $10 billion, have never been satisfied by Iran.

2.      Iran made the transfers with knowledge of Plaintiffs' lawsuits and with the intent of circumventing judgments in those cases and U.S. laws designed to capture Iranian funds, after which those funds are subject to attachment and seizure by Plaintiffs and other victims of Iranian-sponsored terrorism.

3.      Iran is the world's leading sponsor of terrorism and an unrepentant judgment debtor.  It owes more than $10 billion to the Plaintiffs, all of whom are victims of terrorism and their families, whose lives were forever altered by the 1998 al Qaeda bombings on the U.S. embassies in Tanzania and Kenya (the "Embassy Bombings"), the 1983 Hezbollah bombing of U.S. Marine barracks in Beirut, Lebanon (the "Beirut Bombing"), the 2001 Hamas bombing of a restaurant in Jerusalem, Israel (the "Jerusalem Bombing"), the 2002 Hamas attack on a school in Atzmona (the "Atzmona Attack"), the 2003 Hamas bombing of a public passenger bus in Jerusalem (the "2003 Bus Bombing"), and the 2006 and 2007 kidnapping and murders of four U.S. service members on deployment in Iraq (the "Iraq Abductions and Murders").  The men, women

and children killed and injured during these terrorist attacks included American heroes—men and women stationed abroad in the U.S. military and Foreign Service, or local employees working at U.S. embassies—and a 15-year-old U.S. citizen.  When the bombs were detonated and murders carried out in Tanzania, Kenya, Beirut, Atzmona, Jerusalem, and Iraq, their bodies and futures were shattered, resulting in indelible physical, emotional and psychological devastation.

4.      The U.S. District Court for the District of Columbia (the "D.C. District Court") has determined on multiple occasions that Iran is liable to these victims for their suffering.

5.      After prolonged litigation, the D.C. District Court determined in 2011 that al Qaeda could not have carried out the Embassy Bombings without Iran's support and sponsorship, and that the "[s]upport from Iran and Hezbollah" in particular "was critical to al Qaeda's execution of the 1998 embassy bombings."  As a result of Iran's sponsorship of al Qaeda's terrorism, the court held Iran liable to Plaintiffs for a total of $9.64 billion in 2014.  But in the six years since the court issued these judgments against Iran, despite dogged pursuit by its judgment creditors, Iran has not paid one dime towards the judgments.

6.      In 2014, the D.C. District Court similarly determined that Hezbollah received massive support from Iran in carrying out the Beirut Bombing and that the "formation and emergence of Hezbollah as a major terrorist organization" in the first place was "due to the government of Iran."  The Court determined that Iran should "be punished to the fullest extent legally possible for the bombing in Beirut" and awarded Plaintiffs judgments totaling $713,693,592.44.  Iran has yet to pay a penny of these judgments.

7.      One year later, in 2015, the D.C. District Court determined that Iran was liable to the family and estate for the death of a 15-year-old U.S. citizen who was one of the many victims of the Jerusalem Bombing.  The Court specifically found that the attack was a "clear" consequence

of Iran's provision of "material support of Hamas' terrorist activities." The D.C. District Court entered judgment against Iran in the total amount of $131,191,019, but Iran has yet to pay any amount towards satisfying it.

8.    That same year, the families and estates of the U.S. service members who were abducted and murdered by the Asa'ib Ahl al-Haq ("AAH") terrorist organization while serving in Iraq initiated a lawsuit against Iran to hold it accountable for those deaths. The D.C. District Court once again found that Iran provided the terrorist organization with material support—support that constituted a "necessary ingredient" "in the chain of events that culminated in the injuries and deaths of" the four U.S. soldiers. Accordingly, the Court found Iran liable to the Plaintiffs for damages and awarded a judgment of $248,948,689. But, Iran has not even attempted to satisfy its debt to these Plaintiffs.

9.    In 2016, the D.C. District Court found Iran liable for providing material support to a Hamas agent who detonated a grenade in a school during the Atzmona Attack. A 19-year-old victim of the Atzmona Attack and his family won $34,750,000 in damages against Iran, but Iran has not satisfied any of this debt.

10.    In 2017, the D.C. District Court awarded judgment in favor of a group of plaintiffs who were injured in the 2003 Bus Bombing in Jerusalem, in which a Hamas operative boarded the bus and detonated a bomb. Iran was held responsible for its sponsorship of Hamas, which carried out the attack, and ordered to pay $208,950,000. Iran has not paid any of this judgment to these victims.

11.    Iran remains one of the world's biggest economies, with its gross domestic product amounting to over $1 trillion, billions of which pass through the international financial markets, including the U.S. financial markets, each year. If detected in the U.S. financial system, however,

Iran's assets would have been frozen in the United States and could be used to satisfy Plaintiffs more than $10 billion judgments.  Having litigated against U.S. judgment creditors—who have sought for decades to enforce their judgments for Iran's support of terrorism resulting in their injuries—Iran was well-aware of the danger that its funds would be seized by judgment creditors such as Plaintiffs unless elaborate subterfuge was successfully employed.

12.     To evade detection and its debts to terror victims like the Plaintiffs Halkbank and Iran developed a fraudulent conveyance scheme involving highly complex, fraudulent transactions that masked the flow of Iranian capital (and oil proceeds in particular) into and out of the U.S. financial markets, and the New York banking system.  Through these fraudulent transactions, Iran transferred or caused to be transferred over $20 billion worth of its funds to Halkbank with the understanding that Halkbank would then willingly and knowingly execute subsequent transfers for the benefit of both Halkbank and Iran within Halkbank, including transfers reclassifying the assets as belonging to private individuals or shell companies.  Once the assets had been disguised by Halkbank, the bank directed the assets in response to "instructions" from Iran that Halkbank itself designed in order to implement Iran's money laundering goals, allowing it to transfer Iranian assets into and out of the U.S. financial system and around the globe without detection.  None of these transfers were made in good faith.

13.     This ornate and carefully calculated deception allowed $20 billion worth of Iranian assets to be fraudulently conveyed to Halkbank and then transferred onwards into the United States and elsewhere without risk of execution by Plaintiffs.  Between 2012 and 2016, at least $1 billion in Iranian assets is estimated to have been fraudulently funneled by Halkbank through the United States pursuant to this scheme.  Not only did this allow Iran to evade its debts to Plaintiffs, it also allowed Iran to circumvent entirely the U.S. Iranian sanctions regime, which was designed and

implemented specifically to exclude Iran from the U.S. financial system and capital markets. Indeed, in order to successfully execute this fraud, Halkbank intentionally deceived the United States government, federal agency officials, and victim banks in New York on behalf of Iran.

14.     Each transfer to Halkbank was a fraudulent conveyance designed to allow Iran to evade its judgment creditors.  These transactions resulted in asset and capital transfers that were not exchanged for equivalent value.  In addition, each transaction was effectuated without fair consideration, as they were not made on a good faith basis since each transaction was specifically intended to evade or circumvent Iran's obligations under U.S. law.

15.     Iran's fraudulent conveyances cannot stand under New York law.  Iran was a defendant in multiple lawsuits that ultimately resulted in judgments totaling more than $10 billion in favor of Plaintiffs when Iran schemed to funnel assets in partnership with Halkbank into the United States without detection by Plaintiffs.  The fraudulent transfers and conveyances must be undone, and the assets must be turned over to Plaintiffs, to compensate these long-suffering victims of terrorism in compliance with New York law.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs seek relief under federal law, namely the Terrorism Risk Insurance Act ("TRIA").  Plaintiffs' lawsuit necessarily raises issues of federal law, including Plaintiffs' entitlement to relief under TRIA.  In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(11) because this action is a mass action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), involving monetary relief claims of over 100 plaintiffs that are proposed to be tried jointly on the ground that the claims involve common questions of law and fact.

17.     This Court has personal jurisdiction over Halkbank pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which permits this Court to exercise personal jurisdiction to the extent allowed by New York statutes.  New York's C.P.L.R. § 302 provides jurisdiction over Halkbank because it transacted business in New York by maintaining correspondent accounts at U.S. financial institutions located in New York.  Further, Halkbank knowingly initiated transactions to be completed in U.S. dollars routed through New York-based correspondent accounts of its agents and fellow participants to complete its fraudulent scheme, as directed by Iran.  This Court also has personal jurisdiction over Halkbank under C.P.L.R. § 302(a)(1) because Halkbank executed its scheme through its agents, Suleyman Aslan, Mehmet Hakan Atilla, and Reza Zarrab, each of whom purposefully directed their actions to the U.S. financial system, including financial institutions in New York.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York.

## THE PARTIES

19.     Plaintiffs are 876 individuals who are direct victims and surviving family members of the Embassy Bombings, Beirut Bombing, Jerusalem Bombing, Atzmona Attack, 2003 Bus Bombing, and two related attacks on U.S. service members serving in Iraq—all attacks carried out with the critical material support of the Iranian government.

20.     Plaintiffs include U.S. foreign service officers and Kenyan and Tanzanian nationals who were employed by the U.S. embassies and on duty during the Embassy Bombings; U.S. service members deployed in Iraq and Beirut; a family on a bus in Jerusalem, including five children under the age of 10 years old; a 19-year-old student; and the family members of a 15 year-old U.S. citizen killed by a terrorist attack while out eating in Jerusalem.  These individuals, and their family members, have suffered severe physical and psychological injuries, including loss of life, loss of limbs, permanent disabilities, physiological trauma, and devastating and debilitating emotional distress.

21.     Defendant Halkbank is a foreign financial institution organized under the laws of, and headquartered in, Turkey.  The Turkey Wealth Fund, which serves as Turkey's sovereign fund, owns 75% of Halkbank.[1]  Halkbank utilizes correspondent bank accounts all over the world, including the United States through accounts in New York, so that its customers "can make payments to any country in the world."[2]  Halkbank acquired its Iranian accounts in 2004, when it merged with Pamuk Bank, a Turkish bank that had long-standing ties with Iran, including an office in Tehran.

---

[1]  *See   Corporate   Information*,   Halkbank,   https://www.halkbank.com.tr/en/investor-relations/50/ownership-structure.

[2]  *See FAQ*, Halkbank Belgrade, http://www.halkbank.rs/faq-en.nspx.

22.     At the end of 2018, Halkbank reported assets of more than $64 billion, including legal reserves in excess of $316 million and extraordinary reserves exceeding $3.1 billion. Halkbank's net operating income for 2018 was more than $461 million, averaging over $1.26 million per day.

23.     Halkbank is currently under indictment in this judicial district for activities relating to Plaintiffs' allegations, namely for its role in a multi-year scheme with Iran to directly and indirectly use front companies in Iran, Turkey, the United Arab Emirates, and elsewhere to violate and evade U.S. prohibitions against Iran's access to the U.S. financial system, restrictions on the use of proceeds of Iranian oil and gas sales, and restrictions on the supply of gold to the government of Iran and Iranian entities.[3]

## **FACTUAL ALLEGATIONS**

### I.     **Iran Owes More Than $10 Billion To Plaintiffs**

#### *A.     The Embassy Bombings*

24.     In 1998, al Qaeda carried out the Embassy Bombings, which were simultaneous suicide bombings on the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya.

25.     Iran and the Republic of Sudan, which is not a party to this action, deliberately provided material support to al Qaeda's planning, recruitment, and training activities to help it carry out the Embassy Bombings.

26.     During the Embassy Bombings, 224 people were killed and more than 5,000 were wounded, including the 456 Plaintiffs in this action.[4]

---

[3]  *See generally United States v. Halkbank*, No. 15-867 (S.D.N.Y. Oct. 15, 2019).

[4]  *See   1998   Embassy   Bombings   Fast   Facts*,   CNN   (Aug.   13,   2019), https://www.cnn.com/2013/10/06/world/africa/africa-embassy-bombings-fast-facts/index.html.

B.    *The Embassy Bombings D.C. District Court Actions*

27.    On October 26, 2001, James Owens brought suit against Iran pursuant to 28 U.S.C. § 1605 of the Foreign Sovereign Immunities Act ("FSIA") for its role in the Embassy Bombings.[5] The *Owens* Suit added additional plaintiffs over time, ultimately including sixty-three (63) plaintiffs seeking justice from Iran and the Republic of Sudan.  On March 5, 2003, the *Owens* plaintiffs successfully completed service of process on Iran.[6]  Iran was thus on notice in 2003 of the *Owens* plaintiffs' action against it.  Iran failed to respond and defaulted later that year.[7]

28.    Six suits against Iran and Sudan followed.  On August 5, 2008, Winifred Wairimu Wamai, individually and as a representative of the Estate of Adam Titus Wamai, who was murdered in the Embassy Bombings, filed suit with a total of one hundred and ninety-six (196) plaintiffs;[8] also on August 5, 2008, Milly Mikali Amduso, who was injured in the Embassy Bombings, brought suit with one hundred and thirteen (113) total plaintiffs;[9] on August 7, 2008, the Estate of Judith Abasi Mwila, who was murdered in the Embassy Bombings, filed suit along with over fifty (50) plaintiffs;[10] also on August 7, 2008, Mary Onsongo brought suit individually and on behalf of the Estate of Evans Onsongo, who was murdered in the Embassy Bombings, with a total of fourteen (14) plaintiffs;[11] on March 5, 2010, Rizwan Khaliq filed suit along with eight

---

[5]   *See generally Owens v. Republic of Sudan*, No. 01-2244 (D.D.C.) ("*Owens* Suit").

[6]   *Owens* Suit Dkt. 10.

[7]   *Owens* Suit Dkt. 11.

[8]   *See generally Wamai v. Republic of Sudan*, No. 08-1349 (D.D.C.) ("*Wamai* Suit").

[9]   *See generally Amduso v. Republic of Sudan*, No. 08-1361 (D.D.C.) ("*Amduso* Suit").

[10]   *See Mwila v. The Islamic Republic of Iran*, No. 08-1377 (D.D.C.) ("*Mwila* Suit"), Dkt. 88.

[11]   *See generally Onsongo v. Republic of Sudan*, No. 08-1380 (D.D.C.) ("*Onsongo* Suit").

(8) other individuals;[12] and on July 24, 2012, Monicah Okoba Opati, filed suit along with over two hundred and eighty-three (283) plaintiffs.[13]

29.    Iran knew that the *Mwila*, *Khaliq*, and *Opati* plaintiffs had initiated lawsuits against it because the *Mwila*, *Khaliq*, and *Opati* plaintiffs served process on Iran on September 8, 2009, October 11, 2010, and March 19, 2014, respectively.[14]  Iran was also aware of the *Wamai*, *Amduso*, and *Onsongo* suits. The *Wamai* plaintiffs served process on Iran on November 18, 2009;[15] the *Amduso* plaintiffs served process on Iran on June 26, 2009;[16] and the *Onsongo* plaintiffs served process on Iran on November 18, 2009.[17]  Iran failed to respond to all of these actions, and a default judgment was entered against it on October 6, 2009 in the *Amduso* action,[18] on February 18, 2010 in the *Mwila* action, on June 2, 2010 in the *Onsongo* action,[19] on June 4, 2010 in the *Wamai* action,[20] on December 22, 2010 in the *Khaliq* action,[21] and on June 18, 2014 in the *Opati* action.[22] All of the Plaintiffs named in the *Owens*, *Mwila*, *Khaliq*, *Opati*, *Onsongo*, *Wamai*, and *Amduso* (collectively, the "Embassy Bombing Plaintiffs") cases are Plaintiffs in this Action.

---

[12]   *See generally Khaliq v. Republic of Sudan*, No. 10-356 (D.D.C.) ("*Khaliq* Suit"), Dkt. 40.

[13]   *See generally Opati v. Republic of Sudan*, No. 12-1224 (D.D.C.) ("*Opati* Suit"), Dkt. 24.

[14]   *Mwila* Suit Dkt. 16; *Khaliq* Suit Dkt. 20; *Opati* Suit Dkt. 38.

[15]   *Wamai* Suit Dkt. 29.

[16]   *Amduso* Suit Dkt. 33; Dkt. 63 at 4.

[17]   *Onsongo* Suit Dkt. 17

[18]   *Amduso* Suit Dkt. 40.

[19]   *Onsongo* Suit Dkt. 23.

[20]   *Wamai* Suit Dkt. 36.

[21]   *Mwila* Suit Dkt. 20; *Khaliq* Suit Dkt. 21.

[22]   *See Opati* Suit Dkt. 42.

30.     In accordance with the FSIA, the D.C. District Court held a consolidated "three-day hearing on liability and damages," during which the Embassy Bombing Plaintiffs independently "established their claims 'by evidence satisfactory to the court.'"[23]  Based on the record before it, the D.C. District Court found Iran "liable for damages suffered by the plaintiffs" because the country "provided material aid and support to al Qaeda [operatives]."[24]  *See Owens*, 826 F. Supp. 2d at 135.  Specifically, "[t]he Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al Qaeda and rendered direct assistance to al Qaeda operatives."  *Id.*  That "[s]upport from Iran and Hezbollah," the D.C. District Court concluded, "was critical to al Qaeda's execution of the 1998 embassy bombings."  *Id.* at 139.

31.     The court then referred the cases to special masters to calculate damages.  Based on their calculations, the court awarded $487,687,665.78 to the *Owens* plaintiffs; $49,761,544.86 to the *Khaliq* plaintiffs; and $419,752,640.49 to the *Mwila* plaintiffs.[25]  The court also awarded $1,755,878,431.22 to the *Amduso* plaintiffs; $3,566,104,489.58 to the *Wamai* plaintiffs; and $199,106,578.19 to the *Onsongo* plaintiffs.[26]  In *Opati*, the court, having taken judicial notice of the three-day liability hearing in the *Owens* Suit, also referred the claims to special masters and granted judgment to the plaintiffs in the amount of $3.1 billion.[27]

32.     Iran knew about the *Khaliq* and *Mwila* judgments because notice of the judgments was served on Iran, in accordance with the FSIA, on August 19, 2014.  Iran also knew about the

---

[23]  *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 134-35 (D.D.C. 2011) (quoting 28 U.S.C. § 1608(e)).

[24]  *Id.* at 139.

[25]  *See Owens* Suit Dkt. 303; *Khaliq* Suit Dkt. 42; *Mwila* Suit Dkt. 91.

[26]  *See Amduso* Suit Dkt. 254; *Wamai* Suit Dkt. 245; *Onsongo* Suit Dkt. 231.

[27]  *See Opati* Suit Dkt. 45.

*Owens* judgment because notice was served on Iran, in accordance with the FSIA, on June 9, 2015. And Iran knew about the *Opati*, *Amduso*, *Wamai*, and *Onsongo* judgments because notice was served on Iran, in accordance with the FSIA, on January 31, 2016.[28]

33.     Iran is jointly and severally liable for the entire amount of the judgments, but has not paid one cent to satisfy them.  The judgments presently remain wholly unsatisfied.

34.     On July 29, 2014, the *Amduso*, *Wamai*, and *Onsongo* plaintiffs registered their judgments in the United States District Court for the Southern District of New York.[29]

35.     On July 29, 2014, the *Opati* plaintiffs registered their judgment in the United States District Court for the Southern District of New York.  *See Opati v. Sudan*, No. 14-231 (S.D.N.Y. July 29, 2014).

36.     On June 12, 2019, the *Owens* plaintiffs, *Mwila* plaintiffs, and *Khaliq* plaintiffs registered their judgments in the United States District Court for the Southern District of New York.[30]

### C.     The Beirut Bombing

37.     In 1983, Hezbollah bombed the U.S. Marine barracks in Beirut, Lebanon.

38.     Iran was determined to have provided "massive material and technical support" to Hezbollah.

---

[28]    *See Opati* Suit Dkt. 77, *Amduso* Suit Dkt. 303, *Wamai* Suit Dkt. 277, and *Onsongo* Suit Dkt. 265

[29]    *See Amduso v. Republic of Sudan*, No. 14-mc-00233 (S.D.N.Y. July 29, 2014); *Wamai v. Republic of Sudan*, No. 14-mc-00232 (S.D.N.Y. July 29, 2014); *Onsongo v. Republic of Sudan*, No. 14-mc-00230 (S.D.N.Y. July 29, 2014).

[30]    *See Owens v. Sudan*, No. 19-288 (S.D.N.Y. June 12, 2019); *Mwila v. Iran*, No. 19-290 (S.D.N.Y. June 12, 2019); *Khaliq v. Sudan*, No. 19-289 (S.D.N.Y. June 12, 2019).

39.     The Beirut Bombing killed 241 U.S. servicemen and wounded many others, including Plaintiffs and their family members in this action.[31]

**D.      The Beirut Bombing D.C. District Court Actions**

40.     On January 10, 2012, lead-plaintiff Kenneth S. Spencer, Jr., individually and as the representative of the Estate of Kenneth S. Spencer, Sr., and over sixty (60) other plaintiffs brought a suit against Iran pursuant to 28 U.S.C. § 1605A of the FSIA, seeking justice from Iran for its role in the Beirut Bombing.[32]  Within that same year, on November 7, 2012, the *Spencer* plaintiffs served process on Iran.[33]  Iran failed to respond, and therefore defaulted in January 2013, and default judgment was entered against it on June 27, 2013.[34]

41.     The case was referred to a special master for determination of plaintiffs' damages under 28 U.S.C. § 1605A(c).[35]  The D.C. District Court adopted the special master's report and recommendation regarding damages and found that Iran was "responsible for plaintiffs' injuries and thus liable under the FSIA's state-sponsored terrorism exception" and "must be punished to the fullest extent legally possible for the bombing in Beirut on October 23, 1983."  *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014).  The Court also "applaud[ed] plaintiffs' persistent efforts to hold Iran accountable for its cowardly support of terrorism."  *Id.*

---

[31]   *See Beirut Marine Barracks Bombing Fast Facts*, CNN (Nov. 13, 2019), https://www.cnn.com/2013/06/13/world/meast/beirut-marine-barracks-bombing-fast-facts/index.html.

[32]   *See generally Spencer v. Islamic Republic of Iran*, No. 12-42 (D.D.C.) ("*Spencer* Suit").

[33]   *Spencer* Suit Dkt. 23.

[34]   *Spencer* Suit Dkts. 24, 31, 34.

[35]   *Spencer* Suit Dkt. 34.

42.     The Court awarded a judgment against Iran and for all of the *Spencer* plaintiffs, aside from Willard Howell, totaling $453,596,509.44.  *Id.*  Iran knew about the *Spencer* judgment because notice of the judgment was served on Iran, in accordance with FSIA, on December 22, 2015.[36]

43.     On February 5, 2020, the *Spencer* plaintiffs registered their judgment in the United States District Court for the Southern District of New York.  *See Spencer v. Iran*, No. 20-69 (S.D.N.Y. Feb. 5, 2020).

44.     On December 28, 2012, a similar suit was filed by lead-plaintiff Nancy Worley, on behalf of herself and as the representative of the Estate of David Edward Worley, and thirty-one (31) other plaintiffs—all victims of the 1983 bombing in Beirut and their families.[37]  Iran knew that the *Worley* plaintiffs had initiated an action against it because the *Worley* plaintiffs served process on Iran on July 31, 2013.[38]  Iran also failed to respond to this action, and default judgment was entered against it on December 8, 2014 on behalf of a majority of the plaintiffs in the *Worley* action.[39]

45.     In the *Worley* Suit, the D.C. District Court found that "'Hezbollah and its agents received massive material and technical support from the Iranian government' in carrying out the Beirut attack and that the 'formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran.'"  *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 321 (D.D.C. 2014).  After the D.C. District Court entered judgment in favor of plaintiffs and against

---

[36]  *Spencer* Suit Dkt. 59.

[37]  *See generally Worley v. Islamic Republic of Iran*, Case No. 12-02069 (D.D.C) ("*Worley* Suit").

[38]  *Worley* Suit Dkt. 17.

[39]  *Worley* Suit Dkt. 32.

Iran with respect to liability, it referred the action to a special master for consideration of plaintiffs' claims for damages under 28 U.S.C. § 1605A(c).[40]

46.     The D.C. District Court adopted the special master's report and recommendation regarding damages and awarded a judgment of $260,097,083 to the *Worley* plaintiffs on April 18, 2016.[41]  After copies of the judgment were mailed to the U.S. Department of State, Director of Overseas Citizens Services, pursuant to FSIA, on December 6, 2019, the D.C. District Court granted the *Worley* plaintiffs' request to proceed with service of the judgment on Iran through diplomatic channels.[42]

47.     Plaintiffs in this action include all of the plaintiffs named in the *Spencer* and *Worley* cases, except for Willard Howell (*Spencer* Suit), Jeff Dadich, Ollie James Edwards, Patricia Ulakovich, Karen Contrillo, the Estate of Richard Morrow, and the Estate of Jane Chipura (*Worley* Suit).

48.     Iran is jointly and severally liable for the entire amount of the *Spencer* and *Worley* judgments, but has not paid one cent to satisfy them.  The judgments presently remain wholly unsatisfied.

### E.     *The Jerusalem Bombing*

49.     In August 2001, a bomb was detonated at a Sbarro restaurant in Jerusalem, Israel on behalf of the militant Islamic group, Hamas.[43]

---

[40]  *Worley* Suit Dkts. 32, 33.

[41]  *Worley* Suit Dkt. 74.

[42]  *Worley* Suit Dkts. 84, 86, 87.

[43]  *Suicide bombing at the Sbarro pizzeria in Jerusalem*, Israel Ministry of Foreign Affairs, https://mfa.gov.il/MFA/MFA-Archive/2000/Pages/Suicide%20bombing%20at%20the%20Sbarro%20pizzeria%20in%20Jerusale.aspx; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015).

50.     Iran and Syria, not a party to this action, provided Hamas with support and encouragement to carry out the Jerusalem attack.

51.      The attack killed 15 people, including 15-year-old U.S. citizen Malka Roth, and injured approximately 130 more.[44]

### F.      The Jerusalem Bombing D.C. District Court Action

52.     On July 28, 2011, nine (9) members of the Roth family, including representatives of their estate, filed a suit against Iran pursuant to 28 U.S.C. § 1605 of the FSIA, seeking damages for the injuries and death of Malka Roth.[45]  Several months later, on September 16, 2012, the *Roth* plaintiffs served process on Iran.[46]  Iran was therefore on notice in 2012 of the *Roth* plaintiffs' claims against it.  Iran failed to respond, and as a result, the clerk of the D.C. District Court entered default judgment against it on April 21, 2014.[47]

53.     On January 27, 2015, the D.C. District Court granted the *Roth* plaintiffs' (except for Elisheva Roth) motion for default judgment on their claim for damages.[48]  The Court found that Malka Roth's death and the pain and suffering her family experienced as a result were "consequences [that] were 'reasonably certain' to occur as a result of [Iran's] material support of Hamas' terrorist activities."  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 404 (D.D.C. 2015).

---

[44]   *Id.*

[45]   *See generally Roth v. Islamic Republic of Iran*, Case No. 11-1377 (D.D.C.) ("*Roth* Suit").

[46]   *Roth* Suit Dkt. 19.

[47]   *Roth* Suit Dkt. 24.

[48]   *Roth* Suit Dkt. 43.

54. On January 27, 2015, the D.C. District Court entered judgment against Iran in the total amount of $131,191,019.[49] On information and belief, Iran knew about the *Roth* judgment because delivery of the notice of judgment was attempted on October 20, 2015, but the Iranian Ministry of Foreign Affairs refused its acceptance.[50]

55. Iran is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it. The judgment presently remains wholly unsatisfied.

56. Plaintiffs in this action include all of the plaintiffs named in the *Roth* case except for Arnold Roth and Elisheva Roth.

### G.    The Atzmona Attack

57. On March 7, 2002, a gunman attacked a religious boarding school in the Jewish settlement of Atzmona, killing five and injuring many others, including plaintiff Nethaniel Chaim Bluth.[51]

58. Nethaniel, who was 19 years old at the time, was hit by a bullet or shrapnel and subsequently endured multiple surgeries in connection with his injuries. His hearing was also permanently affected by a grenade that detonated near him during the attack.

59. A Hamas representative claimed responsibility for the Atzmona attack.

### H.    The Atzmona Attack D.C. District Court Action

---

[49] *Roth* Suit Dkt. 43.

[50] *Roth* Suit Dkt. 48.

[51] *See MIDEAST TURMOIL: THE SCENE; Arab Child of Uprising Grew Up Into Gunman*, N.Y. Times (Mar. 9, 2002), https://www.nytimes.com/2002/03/09/world/mideast-turmoil-the-scene-arab-child-of-uprising-grew-up-into-gunman.html.

60.     On February 13, 2012, Nethaniel Bluth and his family members brought suit against Iran under 28 U.S.C. § 1605 for its role in the Atzmona Attack.[52]  Iran was served with the suit on May 7, 2014 but failed to respond.[53]  Default judgment was entered against Iran on February 24, 2015.[54]

61.     The Court held an evidentiary hearing on January 4, 2016 and found that Iran had provided material support to Hamas, who was responsible for the Atzmona Bombing.[55]  The Court therefore awarded the plaintiffs a judgment against Iran totaling $34,750,000.

### I.     The 2003 Bus Bombing

62.     On August 19, 2003, a Hamas suicide bomber boarded a bus travelling through Jerusalem and detonated a bomb.[56]  Passengers Ora Cohen, her husband, and their five children were all injured by the blast.

### J.     The 2003 Bus Bombing D.C. District Court Action

63.     On September 10, 2012, the Cohen family brought suit against Iran under 28 U.S.C. § 1605 for its role in the 2003 Bus Bombing.[57]  Iran was served with notice of the suit June 13, 2014, but Iran did not respond.[58]

---

[52]  *See generally Bluth v. Islamic Republic of Iran*, Case No. 12-00250 (D.D.C.) ("*Bluth* Suit").

[53]  *Bluth* Suit Dkt. 25-1.

[54]  *Bluth* Suit Dkt. 28.

[55]  *Bluth* Suit Dkt. 62 at 36.

[56]  *See Bombing Kills 18 and Hurts Scores More on Jerusalem Bus*, N.Y. Times (Aug. 19, 2003), https://www.nytimes.com/2003/08/19/international/middleeast/bombing-kills-18-and-hurts-scores-more-on-jerusalem.html.

[57]  *See generally Cohen v. Iran*, Case No. 12-01496 (D.D.C.) ("*Cohen* Suit").

[58]  *Cohen* Suit Dkt. 21.

64.     The Court entered default judgment against Iran on March 1, 2017,[59] then referred the case to a Special Master for factual findings and a calculation of damages.[60]  Once issued, the Court adopted the Special Master's findings and found Iran liable for $208,950,000.[61]

### K.     The Iraq Abductions And Murders

65.     In October 2006 and January 2007, four U.S. soldiers were abducted and murdered while serving in Iraq.[62]  Those soldiers were U.S. service members Ahmed Al-Taie, who was abducted in Baghdad, Iraq, and Jacob Fritz, Johnathan Chism, and Shawn Falter, who were all abducted from Karbala, Iraq.

66.     The two incidents of murder and kidnapping were carried out by the AAH terrorist organization, which is a network of Iraqi Shia militias that relied on training, funding, and support from Iran.[63]

### L.     The Iraq Abductions And Murders D.C. District Court Action

67.     On March 30, 2015, a group of twenty-six (26) plaintiffs comprised of the estates and family members of the four kidnapping and murder victims brought a suit against Iran under 28 U.S.C. § 1605 of the FSIA for its role in those crimes.[64]  The *Fritz* plaintiffs served process on Iran on January 31, 2017.[65]  Iran failed to respond.

---

[59]   *Cohen* Suit Dkt. 41.

[60]   *Cohen* Suit Dkt. 43.

[61]   *Cohen* Suit Dkt. 48.

[62]   *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 55 (D.D.C. 2018).

[63]   *Id.*

[64]   *See generally Fritz v. Islamic Republic of Iran*, Case No. 15-456 (D.D.C.) ("*Fritz* Suit").

[65]   *Fritz* Suit Dkt. 19.

68.     The D.C. District Court ordered default judgment against Iran on August 2, 2018 and appointed a special master to hear the damages claims of the plaintiffs.  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 92 (D.D.C. 2018).[66]  The court found that "Iran provided AAH with material support" for the kidnappings and murders, including training, intelligence, and "essential" financial support, and "[t]he support that Iran provided to AAH was not only a 'substantial factor' in the chain of events that culminated in the injuries and deaths of Fritz, Chism, Falter, and Al-Taie, it was a necessary ingredient."  *Id.* at 84-86; *see also Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 58 (D.D.C. 2018).

69.     The D.C. District Court adopted the special master's damages recommendations and entered partial final judgment against Iran in the total amount of $248,948,689.[67]  Iran knew about the *Fritz* judgment because notice of the judgment was served on Iran, in accordance with the FSIA, on December 6, 2018.[68]

70.     Iran is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it.  The judgment presently remains wholly unsatisfied.

71.     Plaintiffs in this action include all of the plaintiffs named in the *Fritz* case except Bashar Al-Taie.

72.     Plaintiffs have sought for years to compel Iran to satisfy their respective judgments, but Iran has successfully evaded pursuit from Plaintiffs and the many other victims of terrorism to whom it is liable under U.S. law.  Indeed, Iran has nothing but disdain for U.S. courts, denouncing

---

[66]  *See also Fritz* Suit Dkt. 90.

[67]  *Fritz* Suit Dkt. 94.

[68]  *Fritz* Suit Dkt. 106.

U.S. court rulings against the country as "theft."[69]  Its success in evading its judgment creditors would not have been possible without its complex schemes with Halkbank.

## II.     To Avoid Paying Its Debts, Iran Has Disguised Its Involvement In The U.S. Financial Markets

73.     Plaintiffs are entitled to execute on Iranian assets in the United States under both federal and New York law in order to satisfy their judgments.  Their ability to do so, however, turns on their ability to locate Iranian assets within the United States, which have been intentionally obfuscated by Iran and Halkbank in order to avoid detection.

### A.     Plaintiffs Are Entitled To Execute On Iranian Assets Located In The United States

74.     Federal Rule 69(a) of the Federal Rules of Civil Procedure allows Plaintiffs to employ New York's judgment enforcement procedures except to the extent federal law applies.

75.     New York law permits a judgment creditor to seek a turnover order requiring (1) a "person in possession or custody of money . . . in which the judgment debtor has an interest," or (2) a "person who is a transferee of money . . . from the judgment debtor" to pay that money to the judgment creditor, "or so much of it as is sufficient to satisfy the judgment."  C.P.L.R. § 5225.

76.     The FSIA also enables Plaintiffs to execute on Iranian assets in the United States where the assets are "used for a commercial activity in the United States."  28 U.S.C. § 1610(a). In fact, because Plaintiffs are the victims of terrorist acts, the FSIA allows Plaintiffs to execute on not only Iran's property, but also property owned by any of its agencies or instrumentalities.  *See* 28 U.S.C. § 1610(g).

---

[69]  *See, e.g.*, *Iran denounces U.S. ruling awarding Iran money to bomb victims: TV*, Reuters (Apr. 21, 2016), https://www.reuters.com/article/us-usa-court-iran-reaction-idUSKCN0XI214?feedType=RSS&feedName=worldNews.

77.     In addition, TRIA enables plaintiffs who have "obtained a judgment against a terrorist party on a claim based on an act of terrorism" to execute or attach in the aid of execution "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) . . . in order to satisfy such judgment." TRIA § 201(a), Pub. L. 107-297, 116 Stat. 2322, 2340 (Nov. 26, 2002).

78.     Plaintiffs are entitled to execute against Iran's assets under each of these provisions, including those assets held by or controlled by Halkbank.  The assets that Iran and Halkbank funneled into and out of the U.S. financial system all belong to Iran or its agencies, instrumentalities, and alter egos, including the National Iranian Oil Company ("NIOC"), the National Iranian Gas Company ("NIGC"), and the Central Bank of Iran—each of which is liable for Iran's terrorism judgments as a matter of federal law.  Once the Iranian assets were secreted into New York, they were used for commercial purposes, including effectuating U.S. dollar-denominated transactions.  And had they been detected as assets of Iran or its agents and instrumentalities—as they would have, absent Halkbank's efforts to obscure Iran's role in initiating the transfers and the larger fraudulent scheme—they could have been executed upon by Plaintiffs because they would have been blocked in U.S. bank accounts in accordance with the sanctions regime under federal law.

**B.      To Evade Plaintiffs, Iran And Halkbank Also Had To Circumvent The U.S. Sanctions Regime**

79.     In 2012, the U.S. government escalated sanctions on Iran for its refusal to comply with international obligations regarding its nuclear program.  These measures had their intended effect—by the end of 2012, Iran's economy was in a free fall with its currency falling to 40% of

its value,[70] and Iran's oil wealth was tied up in accounts that it could barely use.  It is estimated that over $120 billion in Iran's wealth was effectively frozen around the world, including at least $20 billion at Halkbank.[71]

80.     Among the U.S. sanctions imposed during this time were sanctions that focused on financial transactions involving Iranian oil proceeds (the "Oil Sanctions") and targeted precious metals (the "Gold Sanctions").  Such sanctions are effective because oil transactions in particular are typically priced and conducted in U.S. dollars—because of the dollar's role as the global reserve currency.

81.     In particular, in December 2011, the U.S. government imposed restrictions on government-owned foreign financial institutions that facilitated or conducted transactions for the sale or purchase of petroleum or petroleum products to or from Iran, unless the foreign country significantly reduced its volume of petroleum and petroleum products purchased from Iran.  *See* National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, §§ 1245(d)(1)-(4), 125 Stat. 1298, 1647-48 (Dec. 31, 2011).  These early sanctions were extended in July 2012 to impose sanctions on foreign financial institutions that knowingly conducted or facilitated any significant financial transaction with NIOC or the Central Bank of Iran—entities that transferred funds manipulated by Halkbank.  *See* Exec. Order No. 13622, 77 Fed. Reg. 45,897, 45,899 (Aug. 2, 2012).  The Oil Sanctions were further tightened in February 2013 to require that Iranian oil

---

[70]  *Sanctions   push   Iran   into   recession:   IFF*,   Reuters   (Dec.   10,   2012), https://www.reuters.com/article/us-iran-sanctions-economy/sanctions-push-iran-into-recession-iif-idUSBRE8B90OF20121210; T. Erdbrink, *Iran's President Ties Recent Drop in Currency   to   U.S.-Led   Sanctions*,   N.Y.   Times   (Oct.   2,   2012), https://www.nytimes.com/2012/10/03/world/middleeast/iran-president-mahmoud-ahmadinejad-ties-currency-drop-to-sanctions.html.

[71]  Kenneth   Katzman,   Cong.   Research   Serv.,   RS20871,   *Iran   Sanctions*   (2020), https://fas.org/sgp/crs/mideast/RS20871.pdf.

proceeds held in Turkey be used only for bilateral trade—that is, to buy Turkish commodities for export to Iran.  22 U.S.C. § 8513a(d)(4)(D)(ii).

82.     The Gold Sanctions prohibited materially assisting the purchase or acquisition of precious metals by the government of Iran, including banks and businesses owned by the government.  *See* 77 Fed. Reg. at 45,899.  Effective July 1, 2013, any person determined to have participated in the sale, supply, or transfer of gold or other precious metals to or from Iran— whether or not determined to be the government of Iran—would also have property and interests in property in the United States blocked.  *See* 22 U.S.C. § 8804(a)(1)(A).

83.     If a foreign financial institution violated these restrictions, the United States could prohibit that entity's ability to open or maintain correspondent accounts in the United States, effectively shutting the bank out of the U.S. financial system.  *See* 22 U.S.C. § 8804(c); 77 Fed. Reg. at 45,897.

84.     In addition, if funds were transferred to or from Iran or its agencies or instrumentalities, those funds would be blocked by U.S. banks in compliance with the U.S. sanctions regime, which could again subject them to seizure by Plaintiffs to satisfy their judgments.

85.     In response to these sanctions as well as additional restrictions imposed by the U.S. government over time, Iran reacted with defiance and devoted substantial efforts to circumvent these measures.  For example, Iran's Supreme Leader Ayatollah Khamenei declared the year 2011 to be the year of "economic jihad," as the country aimed to revive the Iranian economy and reverse the impact of Iran's increasing isolation from the global economy.[72]  In 2014, the Iranian President stated, "[o]f course, we bypass sanctions.  We are proud that we bypass sanctions because the

---

[72] Richard Javad Heydarian, *Dissecting Iran's Economic Jihad*, Foreign Policy In Focus (July 28, 2011), https://fpif.org/dissecting_irans_economic_jihad/.

sanctions are illegal."[73]   And, Iran has proclaimed that it has "Ph.D in sanctions busting,"[74] that "all possible options have been planned in government to counter sanctions,"[75] and that it has "perfected . . . the art of evading sanctions."[76]

### C.   Halkbank Designed Iran's Fraud On Plaintiffs And The U.S. Financial System

86.   As a result, Iran knew that its oil proceeds would be restricted the moment they were received and subject to seizure and execution if they were to flow into the United States.  As a result, Iran sought a foreign financial institution that would disguise its asset flows into and out of the United States to help the country engage in prohibited financial transactions, and partnered with Halkbank.  Halkbank willfully and knowingly joined forces with Iran to carefully design, participate in, and benefit from two fraudulent schemes, whereby Iran would transfer assets to Halkbank, Halkbank would then make and receive repeated transfers aimed at disguising Iran as the source of the funds, and then use the laundered funds to evade Plaintiffs' lawsuits, and subsequent judgments, through extensive and calculated fraud on U.S. financial institutions.

87.   Iran and Halkbank implemented both schemes by having Iran transfer billions of dollars of oil sale proceeds to Halkbank for the purpose of laundering the funds in order to enable Iran to extract those oil revenues held at Halkbank in violation of U.S. sanctions.  The transfers were made to Halkbank as part of the scheme to enable the government of Iran and Iranian entities

---

[73]  *Iran President Rouhani hits out at US sanctions*, BBC News (Aug. 20, 2014), https://www.bbc.com/news/world-middle-east-28997452.

[74]  Dan De Luce, *Trump pressure will fail because Iran has a 'Ph.D in sanctions busting,' says Iran's Zarif*, NBC News (Apr. 25, 2019),   https://www.nbcnews.com/news/world/trump-pressure-will-fail-because-iran-has-ph-d-sanctions-n998711.

[75]  *Iran pledges to counter "malicious" oil embargo*, Reuters (July 1, 2020), https://in.reuters.com/article/iran-sanctions/iran-pledges-to-counter-malicious-oil-embargo-idINL6E8I106C20120701.

[76]  Tom Gara, *Iran's Foreign Minister Says It's Impossible For Iran To Repress Its Own People*, BuzzFeed News (Dec. 15, 2018), https://www.buzzfeednews.com/article/tomgara/javad-zarif-iran-dodge-us-sanctions-doha-forum.

to make international payments throughout the world, including through the U.S. financial system, without risk of execution, or even detection, by Plaintiffs.  Halkbank's participation was especially important as few major international banks would willingly volunteer to receive transfers and design schemes that would break U.S. sanctions law.  Halkbank earned substantial commissions in fees and revenues for its knowing participation in the scheme to receive transfers from Iran and then transfer those assets on in disguised form.  As Judge Berman found, Halkbank was "a significant beneficiary in terms of the fees earned and the ability to serve as one of Iran's principal Turkish bankers."

### 1.    The Gold Export Scheme

88.    By or around early 2012, NIOC, the Central Bank of Iran, and other Iranian entities had transferred billions of dollars' worth of Iranian oil proceeds into accounts at Halkbank.

89.    During the summer of 2012, Halkbank, acting through senior management, designed the "Gold Export Scheme" in order to use the Iranian oil proceeds transferred to Halkbank in foreign transactions.  The scheme was premised on a loophole in the Gold Export Sanctions, which prohibited gold transactions with the Iranian government, but not with private Iranian entities.  Accordingly, the bank's senior management devised a scheme whereby its agents would use funds transferred to Halkbank from Iran to purchase gold in Turkey, carry that gold to Dubai, sell it for cash, and use that cash in all kinds of foreign payments for Iran, all while stripping any information relating to the government of Iran and layering the transactions to make them appear as if they involved private entities.

90.    In the fall of 2012, an intermediary acting for Halkbank named Reza Zarrab arranged meetings between Iranian government officials, Iranian bank executives, and Halkbank senior management at Halkbank's offices in Istanbul, Turkey to discuss the scheme.  In particular, in October 2012, Halkbank senior management, Zarrab, and a representative of an Iranian private

bank met with Mahmoud Nikousokhan, the then-finance director of NIOC and other Iranian oil officials.[77]  The participants discussed, among other things, ways to boost the amount of Iranian oil proceeds held at Halkbank and to bring other Iranian oil money currently held at other banks in other countries into Halkbank.

91.     While welcoming increased transfers of new oil proceeds, Halkbank advised against the latter request to move in old oil proceeds, explaining that evading sanctions required Halkbank to execute the scheme the way Halkbank designed it—by internally transferring the Iranian oil proceeds to other accounts at Halkbank in the name of private Iranian banks, and then internally transferring the funds once again to yet more accounts at Halkbank in the name of shell companies controlled by intermediaries like Zarrab.[78]  To outsiders, Halkbank would effectively remove Iran from the equation by virtue of this scheme, which allowed Halkbank to take control over the funds by placing them in the hands of Halkbank intermediaries like Zarrab to be used and transferred pursuant to instructions designed by Halkbank.  As a result, Iranian oil proceeds originated as "Government of Iran oil" money, for example, transformed into "private Iranian bank" money, and ended up as "Reza Zarrab" money (or as money of other Halkbank intermediaries).

92.     Once in the hands of Halkbank's intermediaries, the front companies would buy gold to export from Turkey.  Zarrab and his carriers would physically transport the gold to Dubai,

---

[77]  Under Executive Order 13382 and the Weapons of Mass Destruction Non-Proliferation Sanctions Regulations, 31 C.F.R. § 544, Mahmoud Nikousokhan, the then-NIOC finance director and a director of Petro Suisse Intertrade Company SA, had been designated a Specially Designated National, or "SDN."  *See* U.S. Department of the Treasury Press Center, *Treasury Announces New Sanctions Against Iran*, (May 23, 2013), https://www.treasury.gov/press-center/press-releases/Pages/jl1955.aspx.

[78]  Halkbank ultimately agreed to accept foreign payments for Iranian oil, but only on the condition that the arrangement not be leaked to the public because of concerns about questions from U.S. regulators.

but all of the customs documents, which were created with Halkbank's assistance, would show the final destination as Iran, transiting through Dubai so that it would appear to be permitted bilateral trade between Iran and Turkey instead of a means of generating funds that Iran could use to make international payments in violation of U.S. sanctions.  Halkbank specifically instructed its intermediaries to place Iran as the intended location on custom forms, maintaining control over the funds once they were in the intermediary's hands.

93.     But after being exported from Turkey, the gold never went to Iran.  Rather, pursuant to the scheme agreed to between Halkbank and Iran, the gold would be converted into cash or currency and used to conduct international financial transactions around the world, including in the U.S. financial system.  The transactions were executed according to money orders from the government of Iran and Iranian entities, such as NIOC and the Central Bank of Iran.  The money orders would indicate the intended beneficiary of the transaction, the amount necessary to complete the transaction, and the currency needed for the transaction.

94.     In sum, the Gold Export Scheme operated as follows:

a.     NIOC sold oil to Turkish companies, and at Iran's direction the Turkish companies made payments of the money owed to NIOC into accounts at Halkbank maintained for the benefit of Iran.

b.     Consistent with Halkbank's design of the fraudulent scheme, NIOC would then send a money order for an intra-Halkbank transfer to accounts at Halkbank held by private Iranian banks, such as Sarmayeh Bank.  This transfer served to begin the process of freeing the oil proceeds from sanctions.

c.     The money order from NIOC, drafted pursuant to instructions from personnel at Halkbank, would contain payment instructions to the private Iranian banks,

detailing the ultimate recipient of the money, the final destination bank, the currency, and the account information.

d.      The private Iranian bank, having received NIOC's "instructions" in the form dictated by Halkbank, would send a wire instruction that an equivalent amount be transferred from the private Iranian bank's account at Halkbank to a purportedly non-Iranian intermediary account held by shell companies, also at Halkbank.  This transaction was documented in the instructions as a transaction for gold.

e.      An intermediary, often Zarrab, would then use the monies transferred to the shell companies' Halkbank accounts to transfer the funds to another Turkish bank, where the monies were then used to purchase gold in Turkey.

f.      The intermediary would then export the gold to Dubai, where it was sold for cash.

g.      The cash received was then deposited into another intermediary account in a bank in Dubai.  Those funds would then be transferred to Dubai-based exchange houses for purposes of conducting international transactions, including in U.S. dollar-denominated transactions funneled through U.S. correspondent accounts.

h.      Iran directed the intermediary in Dubai, through a prior money order sent to the private Iranian bank, to make payments from the Dubai-based exchanges according to whatever payments it desired to make, and in what currency denomination.

95.      Between approximately December 2012 and October 2013 alone, the government of Iran and the Iranian entities that held accounts at Halkbank directed more than $900 million in such transactions to be conducted by U.S. financial institutions through correspondent accounts maintained in the United States.

##      2.      The Fake Food Scheme

96.      In February 2013, the United States imposed sanctions that further restricted the

gold sales to *any* Iranian entity, upsetting the Gold Export Scheme.  Thus, Iran and Halkbank sought to take advantage of one of the last remaining loopholes in U.S. sanctions: the humanitarian exemption for purchases of food.  Due to the "bilateral trade" restriction on Iranian oil proceeds, however, the scheme had to ensure that proceeds of Iranian oil sales made to Turkey be deposited into accounts in Turkey and be used only for trade between Turkey and Iran.

97.     Between April 9 and 10, 2013, Halkbank senior management—namely Aslan, Halkbank's General Manager, and Atilla, Halkbank's Deputy General Manager—and Iranian government banking and oil officials, including Nikousokhan, NIOC's then-finance director, discussed the design of a new scheme through which Iran would continue to transfer, or cause to be transferred, funds to Halkbank and Halkbank would continue to execute multiple transfers of Iranian oil proceeds, yet falsely represent that the purpose of those transfers was to sell food to Iran.  This scheme closely followed the Gold Export Scheme—the Fake Food Scheme entailed numerous transfers within Halkbank of the Iranian oil proceeds transferred to it before Halkbank transferred the funds to intermediary shell companies controlled by intermediaries, including Zarrab.  The primary difference came in the documentation.  Halkbank manipulated these transactions to falsely represent that they involved a sale of food from Turkey directly to Iran when in fact no food was actually sold at all.  While nominally submitted by Halkbank intermediaries, it was Halkbank officials who controlled the content of the transfer documents.

98.     Once these payments were in the hands of Zarrab-controlled accounts, or accounts controlled by other Halkbank intermediaries, the funds would then be used to make international payments for the benefit of Iran, including through the U.S. financial system.  These international transactions were carried out in the same way as the Gold Export Scheme detailed above.

99.     As explained by Judge Berman, who presided over the trial of Atilla and presides over the ongoing criminal proceedings against Halkbank, "the end result of a series of intra, that is to say within-Halkbank transfers[,] was that the funds in furtherance of the schemes or conspiracies became unblocked and were then used to fund international payment obligations on behalf of Iran, thus avoiding the sanctions upon trade in Iranian products that was applicable."

100.    Altogether, Halkbank received and exported billions in assets for Iran, including at least approximately $1 billion through U.S. financial institutions in violation of U.S. sanctions laws as a result of these fraudulent schemes.

### 3.     Iran's Accounts At Halkbank Were Held In The Names Of The Iranian Government's Agencies, Instrumentalities, Or Alter Egos

101.    The proceeds of Iran's sale of oil and gas transferred to Halkbank were initially transferred into accounts in the names of NIOC, the Central Bank of Iran, and NIGC.  Because, as a matter of fact and law, NIOC, the Central Bank of Iran, and the NIGC are arms of the Iranian government, any assets held by or traced to these entities are also subject to execution in the United States to satisfy Plaintiffs' judgments.

102.    NIOC is an Iranian oil company entirely owned by the government of Iran, through the Ministry of Petroleum, and is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.[79]  Despite its corporate existence, NIOC expressly identifies itself as a "government agency," rather than a separate and independent entity.[80]

103.    The U.S. government agrees, classifying NIOC as part of the government of Iran.

---

[79]  Letter from A. Szubin, Director of U.S. Department of Treasury Office of Foreign Assets Control, to Congress, at 1 (Sept. 24, 2012), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/report_to_congress_09242012.pdf.

[80]  *National Iranian Oil Company*, LinkedIn, https://www.linkedin.com/company/national-iranian-oil-company/about/ (last visited Mar. 8, 2020).

On February 5, 2012, the President signed Executive Order 13,599 to implement the 2012 NDAA to block all property and interests in the property of the government of Iran.  77 Fed. Reg. 6,659. Pursuant to that Executive Order, OFAC officially identified NIOC as the government of Iran.[81]

104.    In addition, on September 24, 2012, OFAC submitted a letter to Congress explaining that OFAC had concluded NIOC to be an agent or affiliate of Iran's Islamic Revolutionary Guard Corps ("IRGC"), itself a part of the Iranian military and thus the Iranian government.[82]  OFAC noted that "IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.  Recently, the IRGC has been coordinating a new campaign to sell Iranian oil, in order to evade international sanctions."[83]  OFAC explained that the "IRGC's influence has grown within NIOC," pointing to how Iran's parliament had appointed Rostam Qasemia, a Brigadier General in the IRGC, as Minister of Petroleum, who had publicly stated his allegiance to the IRGC in his new role as the Minister of Petroleum.[84]

105.    Thus, NIOC is an arm of the government of Iran and should be considered the state itself.  At a minimum, it serves as an agency or instrumentality of Iran.  NIOC is not a citizen of a state of the United States, and it was created under the laws of Iran.

106.    Alternatively, NIOC is an alter ego of Iran's government.  It is a corporate entity that is wholly owned by Iran.  Iran formed NIOC "after [the] nationalization of the Iranian oil

---

[81]  *OFAC FAQs: Iran Sanctions*, Resource Center, United States Department of the Treasury https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_iran.aspx#eo13599   (last visited Mar. 7, 2020).

[82]  Letter from the A. Szubin to Congress, at 1.

[83]  *Id.*

[84]  *Id.*

industry" in the 1950s.[85]  It operates as the flagship of the four main "national companies" that constitute Iran's Ministry of Petroleum, which "implement[s] the major polices of the Islamic Republic in the oil and gas sectors including producing, developing, planning, and supervising all operations in both [the] upstream and downstream oil industry."[86]  The Ministry of Petroleum, officially "intended to monitor NIOC, has actually developed a symbiotic relationship in which the two are intertwined and nearly indistinguishable."[87]  For example, the Minister of Petroleum appoints the CEO of NIOC, who then serves the government of Iran as a Deputy Minister of Petroleum.[88]  These cross-appointments create a feedback loop, breaking down any meaningful distinction between the Ministry and NIOC.  The government of Iran strictly controls the Ministry of Petroleum and NIOC:  Iran's Supreme Leader sets the Ministry's agenda, and the Ministry of Petroleum is a member of the Supreme Energy Council, which is chaired by the President of Iran.[89] As a result of this control, the Ministry of Petroleum acts as a mouthpiece for NIOC, tweeting

---

[85]  *National Iranian Oil Company*, The Islamic Republic of Iran, https://en.mop.ir/portal/home/?generaltext/4012/4187/165282/National-Iranian-Oil-Company-(NIOC) (last visited Mar. 8, 2020).

[86]  *Ministry of Petroleum of Iran*, LinkedIn, https://www.linkedin.com/company/ministry-of-petroleum-of-iran/about/ (last visited Mar. 8, 2020).

[87]  Daniel Brumberg and Ariel Ahram, *The Natl. Iranian Oil Co. In Iranian Politics*, Baker Inst. for Pub. Policy, at 26 (Mar. 2017), https://www.bakerinstitute.org/media/files/page/99dcb050/noc_nioc_brumberg_ahram.pdf.

[88]  *Organizational Chart of the Ministry of Petroleum*, The Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165294/Organizational-Chart-of-the-Ministry-of-Petroleum (last visited Mar. 8, 2020).

[89]  *See Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background; *see also General Policies Instructed by Supreme Leader Ayatollah Ali Khamenei for Oil & Gas Sector*, the Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165568/General-Policies-Instructed-by-Supreme-Leader-Ayatollah-Ali-Khamenei-for-Oil--Gas-Sector (last visited Mar. 8, 2020).

press releases when important developments occur, and NIOC acts as a mouthpiece for the Ministry of Petroleum, discussing general news related to the Ministry negotiations, OPEC meetings, and development projects in Iran. What is more, Iran underwrites NIOC's debts and it is the government that allocates NIOC's budget through legislation.[90]

107.    Furthermore, Iran uses NIOC to achieve Iran's energy, social and political objectives. Sharing the same priorities as the Ministry of Petroleum, NIOC's agenda includes "national and regional policies."[91] For example, the Ministry's "Vision" was announced in its "6th Development Plan and Ministry of Petroleum Policies to Realize Objectives of Vision Plan, Resilient Economy, etc." and that development plan contained detailed directives covering the minutiae of the oil industry, including many changes that would impact NIOC and noting explicitly that a key goal is to "[i]ncrease NIOC's share of revenue from joint oil and gas fields' output."[92] This is because Iran relies on NIOC's profits—"NIOC must sell in the international market to generate revenue for the Iranian national treasury. The state can then use these funds as it sees fit."[93] Indeed, almost 70% of Iran's national budget is funded by NIOC and its sister companies, including NIGC. NIOC, moreover, has also directly administered a significant program subsidizing domestic consumption of fuel for the entire country.[94]

---

[90]  Daniel Brumberg and Ariel Ahram, *The Natl. Iranian Oil Co. In Iranian Politics*, at 2.

[91]  *National Iranian Oil Company*, The Islamic Republic of Iran Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165282/National-Iranian-Oil-Company-(NIOC) (last visited Mar. 8, 2020).

[92]  *Vision*, The Islamic Republic of Iran Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165639/Vision (last visited Mar. 24, 2020).

[93]  Daniel Brumberg and Ariel Ahram, at 4.

[94]  *Id.* at 22-23.

108.    Outside of the energy sector, NIOC has remitted funds to the national treasury for government spending on social programs, such as education and food subsidies,[95] and to the defense and state police, awarding contracts to a construction and development wing of the IRGC.[96]  For another example, during the Iran-Iraq war, "NIOC offices were used as fronts to circumvent the Western arms embargo, essentially bartering oil for weapons."[97]

109.    Iran, moreover, uses NIOC to protect "the country's oil wealth from foreign interference"[98] by controlling the type of contracts that NIOC may enter into with foreign companies.[99]

110.    The Central Bank of Iran was also a nominal owner of the Iranian oil proceeds held at Halkbank.  The Central Bank of Iran is also wholly owned by the government of Iran.  It describes itself as "banker to the government."[100]  Moreover, the Central Bank of Iran is "mandated to keep government accounts, grant loans and credits to state enterprises and agencies."[101]

111.    The U.S. government has also identified the Central Bank of Iran as part of the government of Iran.  On February 5, 2012, President Obama signed Executive Order 13,599 to implement the 2012 NDAA to "block[]" "all property and interests in property of the Government

---

[95]  *Id.* at 24.; *see also* D. Victor, D. Hults, & M. Thurber, *Oil, monarch, revolution, and theocracy: a study on the National Iranian Oil Company* in *Oil and Governance State-Owned Enterprises and the World Energy Supply*, at 248, Cambridge University Press (Dec. 31, 2011).

[96]  D. Victor, D. Hults, & M. Thurber, *Oil, monarch, revolution, and theocracy*, at 256.

[97]  Daniel Brumberg and Ariel Ahram, at 18-19.

[98]  *Id.* at 257.

[99]  *See Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background.

[100]  *General Information*, Central Bank of the Islamic Republic of Iran, https://www.cbi.ir/page/GeneralInformation.aspx (last visited Mar. 12, 2020).

[101]  *Id.*

of Iran, *including the Central Bank of Iran*." Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 8, 2012) (emphasis added). Thus, unlike most central banks around the world, the Central Bank of Iran is deemed to be part and parcel with the Iranian government under U.S. law.

112.    The Central Bank is thus an arm of the government of Iran and should be considered the state itself. At a minimum, the Central Bank of Iran is an agency or instrumentality of Iran. The Central Bank of Iran is not a citizen of a state of the United States, and it was created under the laws of Iran. Indeed, the U.S. government has identified the Central Bank of Iran as "an agency, instrumentality and controlled entity of the government of Iran for all purposes." 31 C.F.R. § 535.433.

113.    Alternatively, the Central Bank of Iran is an alter ego of the government. It is a corporate entity that is wholly owned by Iran. The government of Iran established the Central Bank of Iran in 1960 with Iran's first Monetary and Banking Act "to issue currency and serve as the government's banker."[102] Indeed, the government of Iran exercises day-to-day control over the Central Bank. The General Assembly of the Central Bank, which oversees the bank's operations, is composed of the President of Iran, the Minister of Economic Affairs, Head of the State Management and Planning Organization, Minister of Industry, Mine and Trade, and one more minister to be selected by the Council of Ministers.[103] The Governor and Deputy Governor of the Central Bank of Iran are nominated by the President, confirmed by the General Assembly,

---

[102]   R. Zahedi and P. Azadi, *Central Banking in Iran*, Stanford Iran 2040 Project, at 6 (June 2018), https://iranian-studies.stanford.edu/sites/g/files/sbiybj6191/f/publications/central_banking_in_iran.pdf.

[103]   *Organization*, Central Bank of the Islamic Republic of Iran, https://www.cbi.ir/organization/16147.aspx (last visited Mar. 12, 2020).

and appointed by the President.[104]  In short, "the appointment and removal of [the Central Bank of Iran's] governors have been based solely on the discretion of the government."[105]

114.    Iran uses the Central Bank of Iran to achieve Iran's own economic and political goals.  Unlike a typical central bank, the Central Bank of Iran "can neither independently set monetary policy goals nor conduct monetary policy."[106]  Instead, the Central Bank of Iran "chronically serve[s] as a quasi-fiscal arm to finance the unsustainable policies of different [Iranian] governments while simply overlooking its primary task of ensuring price stability."[107]

115.    Further, the General Assembly considers and approves the balance sheet of the Central Bank of Iran and the recommended appropriation of the net profit.[108]

116.    In exercising that control, the government of Iran has used the Central Bank of Iran to further its military, rather than just Iran's economy, by moving "millions of dollars through banks to support the Quds Force and Hizballah."[109]  The Quds Force, "IRGC's extra-territorial branch responsible for supporting proxies in the region," "engage[s] in large-scale illicit financing schemes to fund its malign activities."[110]  These schemes are "facilitated at the highest levels of Iran's government, including through the Central Bank of Iran."[111]  For example, in May 2018,

---

[104]  *Id.*

[105]  R. Zahedi and P. Azadi, *Central Banking in Iran*, at 14.

[106]  *Id.*

[107]  *Id.*

[108]  *Organization*, Central Bank of the Islamic Republic of Iran.

[109]  Iran Action Group, U.S. Department of State, *Outlaw Regime: A Chronicle of Iran's Destructive Activities*, at 5 (2018), https://www.state.gov/wp-content/uploads/2018/12/Iran-Report.pdf.

[110]  *Id.* at 23.

[111]  *Id.*

the U.S. Treasury revealed that the Central Bank of Iran's Governor and the Assistant Director of the Central Bank's international department conspired with the Quds Force "to conceal the movement of illicit funds to its terrorist proxy, Hizballah."[112]

117.    NIGC, an Iranian gas company, is also wholly owned by the government of Iran, through the Ministry of Petroleum.  As one of the "key state-owned enterprises," NIGC supplies "more than 70 percent of total energy in the country" and "controls natural gas downstream activities" to "process, deliver, and distribute natural gas for domestic use."[113]

118.    Thus, NIGC is an arm of the government of Iran and should be considered the state itself.  At a minimum, it serves as an agency or instrumentality of Iran.  And, NIGC is not a citizen of a state of the United States, and it was created under the laws of Iran.

119.    Alternatively, NIGC is an alter ego of Iran's government.  It is a corporate entity that is wholly owned by Iran.  Iran created NIGC in 1965 as one of the four principal companies under the purview of the Ministry of Petroleum.[114]  Since then, NIGC has "moved in line with the country's economic and social development goals."[115]  Indeed, one of NIGC's core strategies is

---

[112] *Id.*

[113] *Organization    Chart*,    National    Iranian    Gas    Company, http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=394 (last visited Mar. 13, 2020); *Natural Gas*, National Iranian Gas Company, (Oct. 14, 2018), http://www.iraniangas.ir/index.aspx?fkeyid=&siteid=3&pageid=393&newsview=1236 (last visited Mar. 13, 2020). *See Background Reference: Iran*, U.S. Energy Information Administration    (Jan.    7,    2019), https://www.eia.gov/international/analysis/country/IRN/background.

[114] *National Iranian Gas Company (NIGC)*, The Islamic Republic of Iran Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165290/National-Iranian-Gas-Company-(NIGC) (last visited Mar. 13, 2020).

[115] *Id.*

"to enhance Iran's current share in the total global gas trade."[116]  As it does for NIOC, Iran's Ministry of Petroleum, which is controlled by Iran's Supreme Leader and the president of Iran, controls NIGC.[117]  The Minister of Petroleum appoints the CEO of NIGC,[118] who then serves the government of Iran as a Deputy Minister of Petroleum.[119]  As a result of this control, the Ministry speaks on behalf of NIGC, announcing nationwide "projects" that are "on the agenda" of NIGC, and NIGC speaks on behalf of Iran, explaining its efforts to further Iran's international goal of "achieving 30% share of natural gas in the world."[120]  Furthermore, and also like NIOC, Iran has not only been held responsible for NIGC's debts, but has paid full compensation to NIGC's

---

[116]  H. Omidvar, *Iran, the Key Player of Transition*, Int'l J. of Petrochemistry & Research, at 259 (Feb. 26, 2019), *available at* https://madridge.org/international-journal-of-petrochemistry/ijpr-1000144.pdf.

[117]  *Ministry of Petroleum of Iran*, LinkedIn, https://www.linkedin.com/company/ministry-of-petroleum-of-iran/about/ (last visited Mar. 8, 2020); *see also Background Reference: Iran*, U.S. Energy Information Administration (Jan. 7, 2019), https://www.eia.gov/international/analysis/country/IRN/background; *see also General Polices Instructed by Supreme Leader Ayatollah Ali Khamenei for Oil & Gas Sector*, the Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165568/General-Policies-Instructed-by-Supreme-Leader-Ayatollah-Ali-Khamenei-for-Oil--Gas-Sector (last visited Mar. 8, 2020).

[118]  *New NIGC CEO Appointed*, National Iranian Gas Company, (Apr. 12, 2018), http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=276&newsview=1999.

[119]  *Organizational Chart of the Ministry of Petroleum*, The Islamic Republic of Iran, Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165294/Organizational-Chart-of-the-Ministry-of-Petroleum (last visited Mar. 8, 2020).

[120]  *Iran starts building MEs largest gas storage tank*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=276&newsview=7317 (last visited Mar. 25, 2020); *Iran proposes achieving 30% share of natural gas by 2040*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?siteid=3&fkeyid=&siteid=3&pageid=276&newsview=6272 (last visited Mar. 25, 2020).

creditors.[121]

120.   The Ministry, moreover, imposes its will on the operations of NIGC.  For example, the Ministry directed NIGC to reorganize its structure to create "two integrated departments—one focusing on gas imports, exports, transit, gas swaps and upstream ventures, and the other on [liquefied natural gas] projects" so as to "strengthen NIGC as a potential future national gas champion."[122]

121.   Iran additionally uses NIGC to achieve Iran's social, economic, and political objectives.  For example, NIGC deploys "31 provincial gas companies throughout the country which are responsible for gas delivery to the cities, villages, power plants, industries and commercial consumers."[123]  Moreover, NIGC, on behalf of Iran, exports natural gas throughout the world, and Iran uses NIGC to attract foreign investment and hard currency.[124]  Outside of the energy sector, Iran directs NIGC to assist with social programs.  For example, Iran requires NIGC to pay 20 percent of its earned income each year to the Ministry of Education for renewal of heating

---

[121] *See, e.g.*, *Turkmenistan suspends gas supplies to Iran*, Economist, http://country.eiu.com/article.aspx?articleid=1954995179&Country=Turkmenistan&topic=Economy&subto_1 (last visited Mar. 25, 2020); A. Agency, *Iran pays $1.9B arbitration debt to Turkey, settles debt for gas exports*, Daily Sabah, (Feb 6, 2018), https://www.dailysabah.com/energy/2018/02/06/iran-pays-19b-arbitration-debt-to-turkey-settles-debt-for-gas-exports.

[122] *Iran reorganises gas companies to spur development*, Oil&Gas (May 19, 2010), https://www.oilandgasmiddleeast.com/article-7368-iran-reorganises-gas-companies-to-spur-development.

[123] *A Glance At The NIGC Administration And Organization Staff*, National Iranian Gas Company, http://www.iraniangas.ir/index.aspx?fkeyid=&siteid=3&pageid=393&newsview=1235   (last visited Mar. 13, 2020).

[124] *See* Annual Review 2017/2018, Central Bank of The Islamic Republic of Iran at 55, *available at* https://www.cbi.ir/simplelist/AnnualReview_en.aspx.; *see also Iran attracts $2b in foreign capital through BOT contracts: NIGC*, Iran Daily (June 18, 2018), http://www.iran-daily.com/News/216885.html.

systems and equipment of Iranian secondary schools.[125]

122.    In light of the foregoing, the property of NIOC, the Central Bank of Iran, and NIGC are all subject to attachment in aid of execution, and subject to execution upon the judgment against Iran because each entity operates as an alter ego of the government based on the level of economic control Iran has over their property and their day-to-day operations.

123.    Furthermore, given the nature of Plaintiffs' judgments, the property of NIOC, the Central Bank of Iran, and NIGC are all subject to attachment in aid of execution, and subject to execution upon the judgment against Iran even if they were not alter egos of Iran.  Rather, because they are themselves the Iranian government state, agencies or instrumentalities of Iran, their assets (including those held or manipulated by Halkbank) are subject to execution regardless of the level of economic control Iran has over their property by the government of the foreign state; whether the profits of the property go to Iran; the degree to which Iranian government officials manage the property or otherwise control its daily affairs; whether Iran is the sole beneficiary in interest of the property; or whether establishing the property as a separate entity would entitle Iran to benefits in the United States courts while avoiding its obligations.

## III.    Halkbank Exercised Control And Dominion Over The Iranian Accounts To Execute Iran's Fraudulent Conveyances

### A.    Halkbank's Senior Management And Agents Worked Closely Together To Execute And Conceal The Fraudulent Conveyance Schemes

124.    Halkbank carefully designed, participated in, and meaningfully benefitted from the Gold Export Scheme and the Fake Food Scheme that allowed Iran access to the $20 billion worth of oil revenues that Iran transferred to Halkbank, which ultimately disguised them and forwarded

---

[125] *See, e.g.*, *NIGC fulfills 95% of commitments to Iran's Ministry of Education*, Trend News Agency (Dec. 25, 2018), https://en.trend.az/iran/2998350.html.

them on to its agents for the express purpose of violating U.S. sanctions.  To do this, Halkbank's senior management and agents worked closely together to control Iran's funds, ushering them through numerous internal transfers and intermediary shell companies before they traveled to their intended beneficiary.

125.    Among other senior Halkbank executives, Aslan, Halkbank's General Manager, agreed to the schemes, met with Iranian banking and oil officials to ensure the schemes' smooth operation without detection, knew the details of each scheme, and oversaw their operation.  For example, Levant Balkan, Halkbank's Deputy Manager of International Banking, who the U.S. government also indicted, emailed Aslan in June 2012 confirming the schemes, and explaining that "[a]s of February 2012, gold bullion [sic] transactions have been started intensively," that "the actual import of gold into Iran has not been clearly identified and documented," that "a substantial portion of the gold physically remains in Dubai" where it "can be used in all kinds of foreign payments of Iran, either in gold or in foreign currency," and that the "gold transaction volume has reached remarkable dimensions in terms of international Iran sanctions. . . . [i]nquiry is likely to be the cause."  Balkan recommends that Aslan "provid[e] bonus[es]"—or bribes—to those "who have already been taking care of Iran transactions" to manage the Gold Export Scheme "more effectively."  Further, on or about March 26, 2013, it was Aslan who advised Zarrab that Halkbank would stop processing fraudulent gold transactions over the next several months and would begin to channel the Iranian oil revenues out of Turkey by pretending that these transfers were in connection with selling food to Iran, which would qualify as an exception to U.S. sanctions.  An April 2013 email shows that Aslan knew precisely how to execute the Fake Food Scheme, as he was provided with "information" on the "required documents and the steps of the transaction" related to certain food exports.  Aslan also advised Zarrab at that time that Halkbank would provide

42

the requisite documentation for these transactions, even if that involved submitting fraudulent documents.

126.    Furthermore, during the execution of the schemes, Aslan maintained control of the Iranian funds, extensively communicating with Zarrab and Halkbank's other intermediaries to ensure that the funds would reach their intended beneficiary without detection.  For example, in a February 2013 WhatsApp exchange, Aslan informed Zarrab that "I transferred the incoming export payments that came today even if it was too late in the day . . . [t]he balances are too low.  There will be oil and gas payments next week.  This will improve the situation a little."  And in another instance, on or about May 6, 2013, Aslan told Zarrab that Atilla had reported that NIOC had directly transferred 70 million Turkish lira to an account controlled by Zarrab at Halkbank.  This transfer contradicted the agreement among Halkbank, NIOC, and Zarrab—*i.e.*, that NIOC's oil proceeds would be transferred to a private Iranian bank before being transferred to Zarrab.  At Zarrab's request, Aslan agreed to void the transaction and told Zarrab that Halkbank would not report the sanctions violation.  But for Aslan's control, that transaction would have alerted U.S. regulators to the schemes.  Finally, before starting the Fake Food Scheme, Zarrab sought Aslan's permission to begin the transactions, to which Aslan replied, "[f]ine then start.  But then again don't start too fast, you will accelerate later."

127.    Atilla, Halkbank's Deputy General Manager, also met frequently with Iranian banking and oil officials to explain Halkbank's careful design of the fraudulent schemes, and Halkbank's specific participation in each scheme.  Atilla also took orders directly from Aslan and extensively communicated with Zarrab and Halkbank's other intermediaries to ensure that the intended transactions were completed in a way that concealed Iran's nexus to the funds.  For

example, he instructed Zarrab to alter the customs paperwork submitted to Halkbank documenting the gold transactions by changing the purported destination of the gold from Dubai to Iran.

128.   Moreover, during Halkbank's execution of the Fake Food Scheme, Atilla constantly communicated with Zarrab, advising him to be careful with the documents that he submitted on behalf of Halkbank because errors could expose the scheme.  For instance, on or about July 2, 2013, Atilla cautioned Zarrab when the quantities of the purported food reflected in the documents were unrealistic in light of the vessels that Zarrab purported to use to transport the food.  Similarly, on or about July 9, 2013, Zarrab and Atilla discussed more errors in the falsified documents noting that the documents either (a) claim to load quantities of goods on the vessels larger than the purported capacities of the ships, or (b) purport to use vessels that were large enough to be able to provide the bills of lading that Zarrab could not, in fact, provide.  Atilla instructed Zarrab to ensure that the "load . . . match" the size of the vessels.  But for Halkbank's constant monitoring and intervention through bank personnel such as Atilla, the Fake Food Scheme would have been susceptible to detection.

129.   Zarrab and other Halkbank intermediaries worked closely with Aslan and Atilla and other Halkbank executives to execute Iran and Halkbank's fraudulent schemes.  Zarrab in particular arranged multiple meetings with Halkbank's senior management and Iranian banking and oil officials; he controlled many of the intermediary shell companies that purchased gold to export to Dubai and arranged couriers to physically carry that gold to Dubai; he controlled many of the intermediary shell companies that facilitated transfers through exchange houses that, in turn, transferred Iranian oil proceeds through U.S. correspondent accounts; and he regularly falsified documents both for the Gold Export Scheme and Fake Food Scheme according to Halkbank's instructions and under the bank's constant watch.  The fraudulent schemes, however, involved

44

many other intermediaries in addition to Zarrab, and Halkbank continued to receive transfers of funds from Iran and continued to pass them on for routing through New York correspondent accounts for at least two years after Zarrab was arrested in Turkey for his fraud.

130.    Halkbank senior management also met with OFAC regularly, at least twice a year, during the operation of these fraudulent schemes.  At these meetings, some of which were held in Washington, D.C., Halkbank's senior management lied to OFAC, assuring U.S. regulators that the bank was not executing transactions on behalf of Iran.  Halkbank did this in order to conceal its role in receiving the fraudulent transfers from Iran and forwarding them on for routing through the United States.  For example, in March 2012, the then-U.S. Undersecretary of the Treasury for Terrorism and Financial Intelligence, David Cohen, discussed with Halkbank the U.S. requirement to reduce Iranian oil imports and the accompanying penalty of cutting off banks from the U.S. financial market if imports were not significantly reduced.  During this meeting, Halkbank senior management informed OFAC that Halkbank was not allowing Iran to acquire gold using its Iranian oil proceeds that had been transferred to Halkbank and that they knew and understood that Iran would seek to use deceptive practices to evade U.S. sanctions.  Later that year, Halkbank again affirmatively lied to U.S. regulators when it emailed the then-Director of OFAC and claimed that Halkbank stopped allowing Iranian gold transactions as of June 10, 2013.

### B.    *Halkbank Benefitted From Its Execution Of The Schemes*

131.    Halkbank was a full and willing participant in the Gold Export and Fake Food Schemes, pocketing over $100 million of the transferred oil proceeds for itself.  Halkbank charged commissions—typically of about 1%—on the transfers it received and then laundered for Iran. Indeed, Judge Berman found that Halkbank was a "significant beneficiary in terms of fees earned and the ability to serve as one of Iran's principal Turkish bankers."

132.     The Gold Export and Fake Food Schemes, moreover, hinged on transfers of Iranian funds to Halkbank for subsequent transfer to accounts subject, directly and indirectly, to Halkbank's dominion and control.   The transfers were undertaken for the express purpose of allowing Halkbank to exercise dominion and control over the accounts, so as to render the funds contained therein available for Halkbank's and, eventually, Iran's use (less numerous commissions, bribes and other amounts received by Halkbank, its banking personnel and its agents).   Thus, the relations between Iran and Halkbank differed vastly from an ordinary depository relationship.

133.     Indeed, as U.S. sanctions became more expansive in limiting how Halkbank could treat the funds Iranian entities such as NIOC had transferred to it, those deposits became far less profitable for Halkbank.   The Gold Export Scheme and Fake Food Scheme served to free up oil proceeds for Halkbank's control.   But for these schemes, those funds would not have been available for Halkbank's use.

134.     Lastly, Halkbank deliberately designed the illicit transactions so that it could maintain its own access to the American financial system.   Specifically, stripping Iran's nexus from these transactions enabled Halkbank to continue using correspondent banking accounts in the United States, including in New York, while achieving the goal of converting Iranian oil proceeds to dollars by routing transactions through accounts in New York.   Without these accounts, Halkbank would not be able to conduct U.S. dollar transactions for itself and its customers.

C.     ***Halkbank Faces Criminal Liability For Its Execution Of Iran's Fraudulent Conveyances***

135.     In 2016, Zarrab was arrested upon arriving in Florida from Istanbul.   The United States Attorney's Office for the Southern District of New York charged him with, among other

46

things, conspiracy to defraud the United States and to impede the lawful functions of OFAC; conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"); bank fraud; conspiracy to commit bank fraud; money laundering; and conspiracy to commit money laundering. Facing 130 years of imprisonment, Zarrab pled guilty to the aforementioned charges in October 2017. He is currently serving his prison sentence.

136.     Atilla was also arrested in March 2017, and charged with a host of federal crimes, including conspiracy to defraud the United States; conspiracy to violate IEEPA; bank fraud; conspiracy to commit bank fraud; money laundering; and conspiracy to commit money laundering. Atilla's trial on these charges began in November 2017, and included testimony from Zarrab who testified regarding the design, development, and execution of the fraudulent schemes—including both the Gold Export Scheme and the Fake Food Scheme. Following that trial, Atilla was convicted of conspiracy to defraud the United States, conspiracy to violate the IEEPA, bank fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering, and sentenced to 32 months in prison. Although he ultimately elected not to impose a guidelines-based sentence, Judge Berman noted that under the sentencing guidelines Atilla's sentence was subject to significant enhancements because the case involved "sophisticated money laundering" and "obstruction of justice."

137.     Aslan and another bank official, Levent Balkan, were also indicted alongside Zarrab and Atilla, but they have not yet been apprehended by the United States.

138.     Soon thereafter, the U.S. government indicted Halkbank itself for its role in the fraudulent schemes alleged herein. This criminal proceeding is currently pending in the Southern District before Judge Berman, and Halkbank's arraignment is scheduled for March 31, 2020. As a result of Iran and Halkbank's fraudulent scheme, the full extent of Iran's transfers to Halkbank

as well as Halkbank's role in receiving fraudulently conveyed Iranian oil proceeds, and intentionally and knowingly controlling the Iranian funds to disguise them and hide them from regulators and then transferring those funds on was not known to Plaintiffs until the government filed its indictment in 2019.

## IV.     Halkbank's Dominion And Control Of The Schemes Enabled The Execution Of International Payments Using The Funds Otherwise Due To Plaintiffs

139.   Without Halkbank's close coordination with Iranian officials, senior-level management, and agents, consistent monitoring of every step of the schemes, and deliberate lies to OFAC and other financial institutions, these fraudulent transactions would not have evaded detection in the U.S. financial system. Halkbank knowingly and intentionally caused at least $1 billion of the Iranian oil proceeds to pass through U.S. correspondent accounts located in New York.

140.   For instance, as part of the scheme, on October 21, 2014, Centrica General Trading, one of Zarrab's companies that has an account with Halkbank in Turkey funded using transfers from Iran to Halkbank, made a payment of $92,723 to Shanghai Hisheng Plastic Products Company Limited, a company in China that holds an account at the Bank of China, so that Iran could use the funds for its own benefit. Halkbank caused the funds to be transferred through New York correspondent accounts by executing or causing to be executed several transfers of these funds: first the funds were transferred to Centrica's account, then the funds traveled from Centrica's accounts to a currency exchange house, then to a correspondent account at a bank in New York, and finally to Bank of China. In a similar example, on October 21, 2014, Halkbank executed a transfer of the fraudulently conveyed funds, causing Centrica General Trading to make a payment of $45,639 to P.T. South Pacific Viscose, a company in Indonesia that holds an account at the Bank Negara Indonesia for Iran's ultimate benefit. Again, after Halkbank executed several

internal transfers of these funds, the funds were sent out of Halkbank to Centrica's account, then on through a currency exchange house, then to a correspondent bank account in New York, and finally to Bank Negara Indonesia.

141.    At least $1 billion of the funds that were fraudulently conveyed by Iran to Halkbank were intentionally routed through U.S. dollar correspondent accounts in New York by Halkbank and Iran.

142.    Upon information and belief, Iranian oil proceeds remain in accounts held by Halkbank and Halkbank continues to actively transact business in the United States.

## CLAIMS FOR RELIEF

### FIRST COUNT

**(Against Halkbank for Rescission and Turnover of Fraudulent
Conveyances in Violation of New York Debtor and Creditor Law § 273-a)**

143.    Plaintiffs incorporate herein by reference paragraphs 1 through 124, *supra*, as if fully set forth herein.

144.    Iran fraudulently conveyed billions of dollars' worth of oil proceeds to Halkbank in bad faith with the express intention of laundering these funds in order to conduct international financial transactions in violation of U.S. sanctions.  Halkbank willingly and knowingly received fraudulent transfers from Iran and designed, participated in, and benefited from the fraudulent schemes to fraudulently divert Iranian assets owed to Plaintiffs to intermediary shell companies that enabled the government of Iran and its agencies, instrumentalities, and alter egos to engage in illicit financial transactions that violated U.S. sanctions and exploited the U.S. financial system.

145.    Halkbank knowingly accepted the fraudulent transfers and benefitted by receiving substantial commission for its role in the schemes, earning fees and revenues that would have been unavailable to it absent the transfers at issue.  Further, Halkbank benefited from its development

49

and execution of the Gold Export Scheme and Fake Food Scheme by freeing otherwise blocked Iranian funds for its own use while nominally on deposit in the name of Iran's alter ego and Halkbank's agents.  Halkbank also benefitted from its development and execution of the Gold Export Scheme and Fake Food Scheme by knowingly and deliberately concealing the schemes from U.S. regulators so that it could maintain its access to the U.S. financial system and its U.S. correspondent banking accounts while profiting from its relationship with Iran.

146.    The conveyances of Iranian oil revenues to Halkbank and from Halkbank into intermediary shell companies at Halkbank were made without fair consideration because they were designed to be fraudulent and not conducted in good faith.  In addition, fraudulent conveyances of Iranian oil revenues that Halkbank further directed to third-party beneficiaries through U.S. correspondent accounts were also made without fair consideration because they were designed to be fraudulent and not conducted in good faith.

147.    Iran engaged in multiple transfers of Iranian oil proceeds to accounts at Halkbank in bad faith with the express intent that the origin of those proceeds be concealed before they were transferred on by Halkbank.  Once at Halkbank, the funds were transferred further to accounts nominally held in the name of a private bank and intermediary shell companies for no equivalent value.  The funds Iran fraudulently transferred to Halkbank, which then controlled and subsequently transferred the funds into the hands of its agents, would then be used to execute international financial transactions for Iran, including at least $1 billion in transfers that Halkbank deliberately routed through correspondent accounts in New York.

148.    Iran failed to deal honestly, fairly and openly when it participated in two fraudulent schemes that utilized trade-based money laundering, falsified documents, front companies, and payment intermediaries.  In efforts to evade detection by Plaintiffs and others, Iran worked with

Halkbank and its top-level executives to design and conduct multiple transfers to conceal information that would reveal a nexus to the government of Iran.  By removing this information, the funds—once transferred out of Turkey via intermediary shell companies—could travel through the U.S. financial system.  Together, Iran and Halkbank's schemes defrauded U.S. financial institutions by inducing them to provide financial services for the government of Iran and NIOC, among other Iranian entities, in violation of sanctions laws.  By evading detection, Iran intentionally evaded Plaintiffs' legitimate claims, which could have been at least partially satisfied if Iran's funds had been frozen as required by U.S. law.

149.   To execute these schemes while evading sanctions and maintaining its U.S. correspondent accounts, Halkbank explicitly and repeatedly lied to OFAC multiple times, including at meetings in which Halkbank senior management traveled to Washington, D.C., to meet with U.S. regulators.  Specifically, Halkbank falsely informed OFAC that it ceased facilitating gold sales to Iran in June 2013 when it had not; failed to report violations; and gave false assurances that Halkbank was not allowing Iran to direct a scheme that enabled it to acquire gold using oil revenues when it was allowing Iran to do exactly that.

150.   Halkbank's lies and deception hindered and delayed U.S. Treasury's ability to discover that Iran was, in fact, laundering nearly $1 billion through the U.S. financial system at institutions in New York.  Halkbank's deception further prevented sanctions against Halkbank that would have cut it off from the U.S. financial system.  Further, Halkbank's conduct shielded billions of dollars of Iranian assets from seizure and execution by Plaintiffs in the United States.

151.   At the time of the fraudulent conveyances that occurred from 2012 until March 28, 2014, Iran was a defendant in the actions initiated by the Embassy Bombing Plaintiffs, the *Spencer*

plaintiffs, the *Worley* plaintiffs, the *Roth* plaintiffs, the *Bluth* plaintiffs and the *Cohen* plaintiffs in the D.C. District Court.

152.    At the time of the fraudulent conveyances that occurred from March 28, 2014 until 2016, Iran was indebted to the Plaintiffs, by virtue of the judgments entered against it in the amount of $487,687,665.78 for the *Owens* plaintiffs, in the amount of $419,752,640.49 for the *Mwila* plaintiffs, in the amount of $49,761,544.86 for the *Khaliq* plaintiffs, in the amount of $3,163,433,873.00 for the *Opati* plaintiffs, in the amount of $1,755,878,431.22 to the *Amduso* plaintiffs, in the amount of $3,566,104,489.58 to the *Wamai* plaintiffs, in the amount of $199,106,578.19 to the *Onsongo* plaintiffs, in the amount of $453,596,509.44 for the *Spencer* plaintiffs, in the amount of $260,097,083 for the *Worley* plaintiffs, in the amount of $131,191,019 for the *Roth* plaintiffs, and in the amount of $34,750,000 for the *Bluth* plaintiffs.  At this time, Iran was also a defendant in the *Fritz* and *Cohen* Suits, in which it was ultimately ordered to pay a $248,948,689 judgment to the *Fritz* plaintiffs and a $208,950,000 to the *Cohen* plaintiffs.

153.    The judgments are final judgments rendered against Iran.

154.    Iran has failed to satisfy the judgments.

155.    The transfers made by Iran to Halkbank with knowledge of Plaintiffs' claims and during the pendency of Plaintiffs' lawsuits were not made in good faith and because Iran has failed to satisfy Plaintiffs' judgments, New York Debtor and Creditor Law Section 273-a dictates that Iran's conveyances were fraudulent as to Plaintiffs.

156.    As a result of the fraudulent nature of the Gold Export Scheme and Fake Food Scheme, Plaintiffs are entitled to an order setting aside the conveyances and causing Halkbank to turn over the transferred property to Plaintiffs.

157.    Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in Halkbank's possession, Plaintiffs are entitled to an order requiring Halkbank to pay money damages to Plaintiffs in the amount of the judgments.

158.    Furthermore, as a result of Halkbank's gross and wanton conduct, namely fabricating evidence and directly lying to U.S. regulators, Plaintiffs are entitled to an order requiring Halkbank to pay punitive damages in the amount of the judgments.

## SECOND COUNT

### (Against Halkbank for Rescission and Turnover of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law Section 276)

159.    Plaintiffs incorporate herein by reference paragraphs 1 through 140, *supra*, as if fully set forth herein.

160.    Iran fraudulently conveyed its oil proceeds to Halkbank, so that it could use these funds to conduct international financial transactions.  Halkbank designed, participated in, and benefited from these fraudulent schemes to fraudulently divert Iranian assets owed to Plaintiffs to intermediary shell companies that enabled the government of Iran and Iranian entities to deliberately and knowingly engage in illicit financial transactions that violated U.S. sanctions and exploited the U.S. financial system.  Both separately and collectively, these transactions bear a number of badges of fraud, including, but not limited to, a close relationship between Iran and Halkbank, multiple secret transactions not in the ordinary course of business, inadequacy of consideration, the use of multiple shell companies, Iran's use of the funds after the chain of fraudulent transfers was complete, and Iran's knowledge of Plaintiffs' claims and the judgments at the time the transfers occurred.

161.    To accomplish the Gold Export Scheme and Fake Food Scheme, Iranian officials, Halkbank, and others involved in the scheme worked closely together.  Iranian banking and oil

53

officials met frequently with Halkbank and its intermediaries, including Zarrab, to ensure that the schemes would be designed and carried out carefully to avoid detection.  In addition, senior Halkbank executives including Aslan and Atilla constantly communicated with intermediaries like Zarrab who used shell companies to purchase gold to export out of Turkey to then be used to make financial payments in accordance with instructions received from Iran and NIOC.  At times, for example, Aslan and Atilla directed Zarrab to correct errors on documents submitted to Halkbank that falsified the Gold Export Scheme and Fake Food Scheme, and cautioned Zarrab when he engaged in transactions outside the scope of the schemes' design.

162.    Iran and Halkbank conducted these transfers outside the ordinary course of business.  For example, at Iran's request Halkbank transferred money at Halkbank to Iranian private bank accounts at Halkbank to conceal that the funds were associated with the government of Iran or NIOC.  Those funds were then further transferred at Halkbank's direction to accounts in the name of shell companies, also at Halkbank.  To carry out these schemes for the government of Iran and NIOC, Halkbank intentionally accepted falsified documents to substantiate both the Gold Export and Fake Food Scheme; and directly lied to U.S. regulators and other financial institutions about its participation in and execution of these schemes to purposefully evade detection and circumvent U.S. sanctions.

163.    Iran and Halkbank effectuated the fraudulent schemes with the intention of evading its debt to Plaintiffs, as well as hindering and delaying U.S. Treasury's ability to administer sanctions as compliance with such sanctions would have led to the funds transferred through New York being frozen and available to satisfy, at least in part, Plaintiffs' judgments.  Iran defrauded U.S. regulators through transfers to Halkbank with the intent that Halkbank would develop and

execute layered transactions that concealed information relating to the government of Iran and NIOC to give Iran access to the U.S. financial system.

164.    At the time of the fraudulent conveyances that occurred from 2012 until March 28, 2014, Iran was a defendant in the actions initiated by the Embassy Bombings Plaintiffs, the *Spencer* plaintiffs, the *Worley* plaintiffs, the *Roth* plaintiffs, the *Bluth* plaintiffs, and the *Cohen* plaintiffs in the D.C. District Court.

165.    At the time of the fraudulent conveyances that occurred from March 28, 2014 until 2016, Iran was indebted to the Plaintiffs, by virtue of the judgments entered against it in the amount of $487,687,665.78 for the *Owens* plaintiffs, in the amount of $419,752,640.49 for the *Mwila* plaintiffs, in the amount of $49,761,544.86 for the *Khaliq* plaintiffs, in the amount of $3,163,433,873.00 for the *Opati* plaintiffs, in the amount of $1,755,878,431.22 to the *Amduso* plaintiffs, in the amount of $3,566,104,489.58 to the *Wamai* plaintiffs, in the amount of $199,106,578.19 to the *Onsongo* plaintiffs, in the amount of $453,596,509.44 for the *Spencer* plaintiffs, in the amount of $260,097,083 for the *Worley* plaintiffs, in the amount of $131,191,019 for the *Roth* plaintiffs, and in the amount of $34,750,000 for the *Bluth* plaintiffs.  At this time, Iran was also a defendant in the *Fritz* and *Cohen* Suits, in which it was ultimately ordered to pay a $248,948,689 judgment to the *Fritz* plaintiffs and a $208,950,000 to the *Cohen* plaintiffs.

166.    The judgments are final judgments rendered against Iran.

167.    Iran has failed to satisfy the judgments.

168.    As a result of the fraudulent nature of the Gold Export and Fake Food schemes, Plaintiffs are entitled to an order from the Court setting aside the conveyances and causing Halkbank to turn over the transferred property to Plaintiffs.

169.    Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in Halkbank's possession, Plaintiffs are entitled to an order requiring Halkbank to pay money damages to Plaintiffs in the amount of the judgments.

170.    Furthermore, as a result of Halkbank's gross and wanton conduct, namely fabricating evidence and directly lying to U.S. regulators, Plaintiffs are entitled to an order requiring Halkbank to pay punitive damages in the amount of the judgments.

## THIRD COUNT

### (Against Halkbank for Turnover Pursuant to C.P.L.R. § 5225)

171.    Plaintiffs incorporate herein by reference paragraphs 1 through 152, *supra*, as if fully set forth herein.

172.    Section 5225(b) of the C.P.L.R. states, in relevant part, that a court "shall require a . . . person in possession or custody of money . . . in which the judgment debtor has an interest or . . . a person who is a transferee of money . . . from the judgment debtor . . . to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor."

173.    Pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and C.P.L.R. § 5225, Plaintiffs respectfully request that the Court enforce Plaintiffs' judgments against Iran by issuing an order conveying, assigning, and directing the payment to Plaintiffs of all rights, title, and interest of Iran in any Iranian assets that remain in the possession of Halkbank.

## FOURTH COUNT

### (Against Halkbank for Turnover Pursuant to the Terrorism Risk Insurance Act)

174.    Plaintiffs incorporate herein by reference paragraphs 1 through 155, *supra*, as if fully set forth herein.

175.    TRIA provides that "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of

terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).

176.    Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA, § 201(a).

177.    In Executive Order 13,599, the President invoked his IEEPA authority and "blocked" "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch." 77 Fed. Reg. 6,659.

178.    Plaintiffs hold judgments for compensatory damages against Iran based on an act of terrorism under 28 U.S.C. § 1605A.

179.    The Central Bank of Iran, NIOC, and the NIGC satisfy the definition of Iran because they are owned or controlled by, or acting on behalf of, the government of Iran.

180.    Alternatively, the Central Bank of Iran, NIOC, and the NIGC satisfy the definition of Iran because they are agencies or instrumentalities or alter egos of the government of Iran.

181.    Had Halkbank not concealed the Iranian assets that traveled through the U.S. financial system, those assets would have been blocked pursuant to Executive Order 13,599, and thus subject to execution by the Plaintiffs.

182.     Under TRIA, Plaintiffs are thus entitled to an order directing Halkbank to turn over any remaining Iranian funds in partial satisfaction of the compensatory damages awarded in the judgments.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.     Enter an order rescinding, or setting aside, the fraudulent conveyances made by Iran to Halkbank through intermediaries on behalf of the government of Iran, NIOC, the Central Bank of Iran, and NIGC, and requiring Halkbank to turn over the fraudulently transferred assets to Plaintiffs in the amount of Plaintiffs' judgments, including pre- and post-judgment interest;

2.     Enter an order requiring Halkbank to pay Plaintiffs monetary damages in the amount of Plaintiffs' judgments, including pre- and post-judgment interest, to the extent that the fraudulently transferred assets no longer exist or are no longer in Halkbank's possession;

3.     Enter an order directing Halkbank to turn over any asset of Iran currently within its possession;

4.     Enter an order requiring Halkbank to pay Plaintiffs punitive damages;

5.     Enter an order enjoining Halkbank from taking any action to transfer, dispose of, encumber, or otherwise reduce or jeopardize Plaintiffs' interest in Iranian assets;

6.     Order payment of Plaintiffs' attorneys' fees and expenses; and

7.     Award Plaintiffs other and further relief the Court deems just and proper.

Dated:  August 14, 2020                   Respectfully submitted,


                                          /s/ Robert Weigel
                                          Robert L. Weigel
                                          Jason W. Myatt
                                          GIBSON, DUNN & CRUTCHER LLP
                                          200 Park Avenue
                                          New York, NY  10166
                                          Telephone:  (212) 351-4000
                                          Facsimile:  (212) 351-4035
                                          rweigel@gibsondunn.com
                                          jmyatt@gibsondunn.com

                                          Chantale Fiebig
                                          Matthew D. McGill
                                          Noah P. Sullivan (*pro hac vice* application
                                          forthcoming)
                                          Suria M. Bahadue (*pro hac vice* application
                                          forthcoming)
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, D.C.  20036
                                          Telephone:  (202) 955-8500
                                          Facsimile:  (202) 530-9522
                                          mmcgill@gibsondunn.com
                                          cfiebig@gibsondunn.com
                                          nsullivan@gibsondunn.com
                                          sbahadue@gibsondunn.com


                                          *Attorneys for Plaintiffs*